## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

168th and DODGE, L.P., a Nebraska,           )
Limited Partnership f/k/a BROWN              )
INVESTMENT PARTNERSHIP, LTD., and )
RED DEVELOPMENT OF WEST DODGE, )
LLC, a Missouri Limited Liability Company, )
                                             )
            Plaintiffs,           )
                                             )          INDEX OF EVIDENCE
    vs.                                    )
                                             )
RAVE REVIEWS CINEMAS, LLC,                   )
a Texas Limited Liability Corporation,       )
                                             )
            Defendant.            )

COMES NOW the Plaintiffs, and submit the following evidence in support of their

Motion to Compel:

| Exhibit 1 | Affidavit of Timothy J. Thalken, |
|---|---|
| Exhibit 2 | Rule 45 Subpoena, |
| Exhibit 3 | July 28, 2004, Letter from Boston Ventures' legal counsel to Plaintiff's counsel, |
| Exhibit 4 | August 3, 2004, Letter from Boston Ventures to Plaintiff's counsel, |
| Exhibit 5 | August 11, 2004, Letter from Plaintiff's counsel to Boston Ventures' counsel, |
| Exhibit 6 | August 18, 2004, Letter from Boston Ventures' counsel to Plaintiff's counsel, |
| Exhibit 7 | May 31, 2005 Subpoena Duces Tecum, |
| Exhibit 8 | June 10, 2005 Letter, |
| Exhibit 9 | June 29, 2005 Letter, and |

Exhibit 10    Deposition Transcript of Elizabeth Granville-Smith (Boston Ventures 30(b)(6) deponent).

Exhibit 11    Portions of Deposition Transcript of Scott Rehorn

168th and DODGE, L.P., a Nebraska Limited Partnership f/k/a BROWN INVESTMENT PARTNERSHIP, LTD, and RED DEVELOPMENT OF WEST DODGE, LLC, a Missouri Limited Liability Company, Plaintiffs

BY:

Michael F. Coyle, #18299
FRASER, STRYKER, MEUSEY, OLSON, BOYER & BLOCH, P.C.
500 Energy Plaza
409 South 17th Street
Omaha, Nebraska 68102
(402) 341-6000
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2005, I served the foregoing on the following individuals via regular United States Mail:

Edward G. Warin
McGrath, North, Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE 68102

Lynn S. McCreary
Jennifer A. Donnelli
Bryan Cave, LLP
1200 Main Street, Suite 3500
Kansas City, MO 64105-2100

Kathleen Burdette Shields
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2804
Attorneys for Boston Ventures Management, Inc.

389006.01

-2-

AO 88 (Rev. 11/91) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

168TH AND DODGE, LP, a Nebraska Limited Partnership, f/k/a BROWN INVESTMENT PARTNERSHIP, LTD., and RED DEVELOPMENT OF WEST DODGE, LLC, a Missouri Limited Liability Company,

v.

RAVE REVIEW CINEMAS, LLC, a Texas Limited Liability Corporation.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: 8:03CV171

Filed in United States District Court for the District of Nebraska

TO:    **Boston Ventures Management, Inc.**
       **One Federal Street, 23rd Floor**
       **Boston, Massachusetts 02110-2003**

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

X YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**See attached Subpoena Rider**

| PLACE | DATE AND TIME |
|---|---|
| **Attn: Jennifer Goguen**<br>**Apex Reporting**<br>**327 Summer Street, First Floor**<br>**Boston, MA 02210** | **Wednesday, August 4, 2004 at**<br>**9:00 a.m. EST** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiff | July 12, 2004 |

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |
|---|---|
| Michael F. Coyle | Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C.<br>500 Energy Plaza, 409 S. 17th Street<br>Omaha, NE 68102-2613; (402) 341-6000 |

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

**EXHIBIT**

2

| PROOF OF SERVICE | | | |
|---|---|---|---|
| | DATE | PLACE | |
| SERVED | | | |
| SERVED ON (PRINT NAME) | | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | | TITLE |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information con- tained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)   PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue bur-den or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a rea-sonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of pro-duction or inspection unless commanded to appear for deposition, hear-ing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or at-torney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a part or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in per-son, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 10 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)   DUTIES IN RESPONDING TO SUBPOENA

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SUBPOENA RIDER

1.  Produce all correspondence, whether in electronic format or otherwise, between Rave Reviews Cinemas, L.L.C., including its agents and employees, and Boston Ventures Management, Inc., including its parents, subsidiaries, agents and employees, regarding the Village Pointe Shopping Center project in Omaha, Nebraska.

2.  Produce all documents, whether in electronic format or otherwise, between Rave Reviews Cinemas, L.L.C., including its agents and employees, and Boston Ventures Management, Inc., including its parents, subsidiaries, agents and employees, regarding building and/or operating a movie theater in Omaha, Nebraska.

3.  Produce all market studies, reports, memoranda or other documents that refer to building or operating  movie theaters in Omaha, Nebraska or the greater Omaha area.

4.  Produce all documents relating to Boston Ventures Management, Inc.'s financing of or investment in, Rave Reviews Cinemas, L.L.C.

5.  Produce all documents, including correspondence, between Rave Reviews Cinemas, L.L.C., its agents or employees, and Boston Ventures Management, Inc., its agents or employees, regarding the lawsuit entitled: "168th and DODGE, LP, a Nebraska Limited Partnership f/k/a BROWN INVESTMENT PARTNERSHIP, LTD., and RED DEVELOPMENT OF WEST DODGE, LLC, a Missouri Limited Liability Company v. Rave Reviews Cinemas, L.L.C." in the United States District Court for the District of Nebraska, Case No. 8:03CV171

355752

# CHOATE, HALL & STEWART

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

JENNIFER A. BRENNAN
DIRECT DIAL: (617) 248-5005
EMAIL: JBRENNAN@CHOATE.COM

**EXCHANGE PLACE**

**53 STATE STREET**

BOSTON, MASSACHUSETTS 02109-2804

TELEPHONE (617) 248-5000 · FAX (617) 248-4000

WWW.CHOATE.COM

AUG 2 - 2004

July 28, 2004

**VIA FACSIMILE AND REGULAR MAIL**

Michael F. Coyle
Fraser, Stryker, Meussey, Olson, Boyer & Bloch, P.C.
500 Energy Plaza
409 S. 17th Street
Omaha, NE 68102-2613

> RE:    168th and Dodge, LP v. Rave Review Cinemas, LLC
> United States District Court (D. Neb.) Case No.: 8:03CV171

Dear Mr. Coyle:

This firm represents Boston Ventures Management, Inc. ("Boston Ventures"), the recipient of a third-party subpoena (the "Subpoena") issued by your office in the above-captioned litigation. Boston Ventures hereby objects, pursuant to Fed. R. Civ. P. 45(c)(2)(B), to the inspection or copying of the materials designated in the Subpoena as follows:

1.    Boston Ventures objects to the Subpoena insofar as it assumes the existence of the documents requested. Boston Ventures' objections to any of the requests shall not constitute a representation that any such documents exist.

2.    Boston Ventures objects to the Subpoena to the extent that it seeks materials protected by the attorney-client privilege and/or the attorney work-product doctrine. Boston Ventures further objects to the Subpoena to the extent that it calls for the production of materials that are confidential, proprietary or contain or constitute trade secrets.

3.    Boston Ventures objects to each specific request for the production of documents contained in the Subpoena to the extent that they are overly broad, unduly burdensome, and so vague and indefinite as to fail to identify those documents being sought with sufficient specificity to enable Boston Ventures to ascertain which documents are responsive to the request.

4.    Boston Ventures objects to the Subpoena insofar as it seeks documents that are neither relevant to the subject matter of the Litigation nor reasonably calculated to lead to the discovery of admissible evidence.

3728564v1

**EXHIBIT**

**3**

Michael F. Coyle
July 28, 2004
Page 2

5. Boston Ventures objects to the Subpoena to the extent it is not narrowly tailored so as to avoid imposing undue burden or expense on Boston Ventures as required by Fed. R. Civ. P. 45(c)(1).

6. Boston Ventures objects to the Subpoena on the ground that it fails to provide Boston Ventures with sufficient time to investigate, gather, review and, if appropriate, produce the materials reasonably called for in the Subpoena.

Subject to and without waiving its objections, Boston Ventures will produce all non-privileged documents in its possession, custody, or control which are reasonably responsive to request numbers one, two, three and five. For the reasons stated above, Boston Ventures objects to the Subpoena and declines to produce any documents in response to request number four.

For your convenience, Boston Ventures will make its production directly to you at your Omaha, Nebraska address on or before August 4, 2004.

Please do not hesitate to call me if you have any questions or would like to discuss this matter.

Sincerely,

Jennifer A. Brenna

Jennifer A. Brennan

cc:    Mark D. Cahill, Esq.

# CHOATE, HALL & STEWART

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

JENNIFER A. BRENNAN
DIRECT DIAL: (617) 248-5005
EMAIL: JBRENNAN@CHOATE.COM

EXCHANGE PLACE

53 STATE STREET

BOSTON, MASSACHUSETTS 02109-2804

TELEPHONE (617) 248-5000 · FAX (617) 248-4000

WWW.CHOATE.COM

AUG - 4 2004

August 3, 2004

**VIA OVERNIGHT MAIL**

Michael F. Coyle
Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C.
500 Energy Plaza
409 S. 17th Street
Omaha, NE 68102-2613

>    RE:    168th and Dodge, LP v. Rave Review Cinemas, LLC
>    United States District Court (D. Neb.) Case No.: 8:03CV171

Dear Mr. Coyle:

As you are aware, this firm represents Boston Ventures Management, Inc. ("Boston Ventures"), the recipient of a third-party subpoena (the "Subpoena") issued by your office in the above-captioned litigation. Subject to and without waiving the objections set forth in my letter dated July 28, 2004, Boston Ventures hereby produces documents labeled BV 001-002, in response to the Subpoena. Boston Ventures has reviewed its files and determined that it possesses no additional documents reasonably responsive to the Subpoena.

I believe that this fulfills Boston Ventures obligations with respect to the Subpoena. Please call me if you disagree with this position.

Sincerely,

Jennifer A. Brennan

cc:    Mark D. Cahill, Esq. (w/encl.)

**EXHIBIT**

**4**

3730256v1

╫R╫    RAVE REVIEWS CINEMAS, LLC
BOARD OF MANAGERS MEETING
AGENDA
SEPTEMBER 11, 2002

Est. Time

1.  Financial Update (July final and August flash)               45 min  *1 – 1:30*
    o   Theater results vs budget
        -   Attendance
        -   Market share and growth
        -   Operating results (TCF)
        -   Film costs
    o   Consolidated results vs budget

2.  Theater Operations Review                                    45 min  *1:30 – 2:00*
    o   Box office and concession per caps
    o   Marketing

3.  Real Estate Review                                           45 min  *2:00 – 3:00*
    o   Status of existing markets
        -   Surrounding mass
        -   New developments
    o   Comparison of existing markets to future builds
    o   New market opportunities and pipeline
    o   Timetables - 2003
        -   Chattanooga (?), Baton Rouge, Cincinnati, Melbourne, Destin, Syracuse and
            Patton Creek (?)
    o   Overview – 2004
        -   Austin, Omaha and Patton Creek (?)

4.  Operating Outlook for the Balance of 2002                    30 min

5.  Construction Update                                          15 min
    o   Daphne, Vestavia Hills and Little Rock
    o   Design changes to the 18-screen prototype

6.  Film                                                         15 min
    o   Outlook for the balance of 2002

7.  Financing Update                                             45 min  *3:00*
    o   Senior credit agreement
    o   EPT and WP Carey
    o   Capital needs
        -   Committed projects
        -   Proposed projects
    o   Forward commitments

                                                    Total    4.0 hrs

| 1-6 | | | Open & operating theaters | 90 | | Misc. | | | | 90 |

## Theater Pipeline    As Of:    9/10/2002

| # | Opening Year | Opening Month | Theater | Scrns | | Market | State | Construction Start | | Cummulative Screen Count |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | 2002 | November | Vestavia Hills | 10 | | Birmingham | AL | March | 2002 | |
| 8 | 2002 | December | Colonel Glenn | 18 | | Little Rock | AR | May | 2002 | 118 |
| 9 | 2003 | April | West Chester Village | 18 | | Cincinnati | OH | Sept. | 2002 | |
| 10 | 2003 | June | Hatteras Village | 16 | (L) | Baton Rouge | LA | Sept. | 2002 | *w l carey → Fsha |
| 11 | 2003 | Fall | Destin Commons | 14 | (L) | Destin | FL | Jan. | 2003 | |
| 12 | 2003 | Fall | Patton Creek | 16 | (L) | Birmingham | AL | Feb. | 2003 | No Parent-hariat |
| 13 | 2003 | Fall (Late) | Erie Blvd | 18 | | Syracuse | NY | March | 2003 | 200 |
| 14 | 2004 | Spring | TBA | 18 | | Chattanooga | TN | Fall | 2003 | |
| 15 | 2004 | Spring | Viera Promenade | 16 | (L) | Melbourne | FL | July | 2003 | No Parent Guarantee |
| 16 | 2004 | Spring | Dodge Road | 18 | | Omaha | NE | Qtr 3 | 2003 | |
| 17 | 2004 | Spring | Dogwood Festival | 18 | | Jackson | MS | Qtr 3 | 2004 | |
| 18 | 2004 | Fall | 6th & Lamar | 12 | (L) | Austin | TX | Qtr 1 | 2004 | 282 |

A16 Baker - No parent company guarantee .

FRASER STRYKER MEUSEY OLSON BOYER & BLOCH, PC
LAWYERS

TIMOTHY J. THALKEN
DIRECT DIAL: 402.978.5285
TTHALKEN@FRASERSTRYKER.COM

500 ENERGY PLAZA
409 SOUTH 17TH STREET
OMAHA, NEBRASKA 68102-2663
TELEPHONE 402.341.6000
TELEFAX 402.341.8290
WWW.FRASERSTRYKER.COM

OMAHA
DENVER

August 11, 2004

Jennifer A. Brennan
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, MA 02109-2804

RE:    168th and Dodge, LP v. Rave Reviews Cinemas, LLC
U.S. District Court (D. Neb.) Case No. 8:03CV171

Dear Ms. Brennan:

We are in receipt of the two documents that Boston Ventures produced pursuant to RED's Rule 45 Subpoena as well as a letter dated July 28, 2004, setting forth a number of seemingly standard objections to RED's Subpoena. We request that you provide some clarification regarding your document production and objections.

In your July 28, 2004 letter you state a number of objections, including objections based on the attorney-client and work-product privileges. In your August 3, 2004 cover letter you state that Boston Ventures "possesses no additional documents reasonably responsive to the Subpoena" but that your production is being made pursuant to the objections outlined in your July 28, 2004 letter. We would like you to clarify whether the two documents you have produced are the only documents in your possession, or whether you have additional documents over which you are (1) claiming a privilege or (2) objecting on other grounds.

To the extent that you have additional documents that you consider to be confidential and proprietary and which may constitute trade secrets we are willing to enter into an appropriate Protective Order to ensure that these confidential and proprietary documents are used only for purposes of this litigation. With respect to your objection that you have had insufficient time in which to respond to the subpoena, RED is more than willing to work with you to provide a reasonable time in which you can more fully respond to our subpoena.

EXHIBIT

5

Jennifer A. Brennan
August 11, 2004
Page 2

We are aware that Boston Ventures is a significant investor in Rave Reviews Cinemas. We note that according to document BV002 which you produced, Rave Reviews Cinemas provided you with a schedule showing that they would open a new theater in the Spring of 2004 located on Dodge Road in Omaha, Nebraska with construction to begin in the third quarter of 2003. Rave's agreement to build that theater in Omaha is at the heart of the lawsuit filed by RED. Given that the proposed theater in Omaha was a topic of discussion during your September 11, 2002, Board of Managers Meeting, we believe that you may have additional documents relating to Rave's plans to build a theater in Omaha, Nebraska that have not yet been produced.

Please contact me at your earliest convenience to discuss this clarification.

Very truly yours,

Timothy J. Thalken
FOR THE FIRM

TJT/dmw
cc:   Michael F. Coyle
360382.01

# CHOATE, HALL & STEWART

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

JENNIFER A. BRENNAN
DIRECT DIAL: (617) 248-5005
EMAIL: JBRENNAN@CHOATE.COM

## EXCHANGE PLACE

### 53 STATE STREET

BOSTON, MASSACHUSETTS 02109-2804

TELEPHONE (617) 248-5000 · FAX (617) 248-4000

WWW.CHOATE.COM

August 18, 2004

Timothy J. Thalken
Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C.
500 Energy Plaza
409 S. 17th Street
Omaha, NE 68102-2613

>    RE:    168th and Dodge, LP v. Rave Review Cinemas, LLC
>    United States District Court (D. Neb.) Case No.: 8:03CV171

Dear Mr. Coyle:

I am in receipt of your August 11, 2004 letter concerning Boston Ventures' response to your client's subpoena. In response to your inquiries, Boston Ventures has completed its review for responsive materials and has no additional materials to produce. Boston Ventures is not withholding any documents responsive to Request Nos. 1, 2, 3, or 5 from production based on a claim of privilege or other objection.

As noted in my July 28, 2004 letter, Boston Ventures continues to withhold documents responsive to request number four, which seeks production of materials relating to Boston Ventures' financing of, or investment in Rave Reviews Cinemas. Documents concerning these topics are not germane to the issues in dispute - - the alleged opening and construction of a theatre (as described in your letter) - - and constitute confidential and propriety business information and/or trade secrets. Given these concerns, at this time, we decline your offer to produce these materials pursuant to a protective order.

3735901_1.DOC

**EXHIBIT**

6

Timothy J. Thalken
August 18, 2004
Page 2


Please do not hesitate to call me if you need any additional information or clarification.
Boston Ventures reserves all rights in connection with this matter.


Sincerely,

Jennifer A. Brennan

cc:     Mark D. Cahill, Esq.

AO 88 (Rev. 11/91) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT

_____ FOR THE DISTRICT OF MASSACHUSETTS _____

168TH AND DODGE, LP, a Nebraska Limited Partnership, f/k/a BROWN INVESTMENT PARTNERSHIP, LTD., and RED DEVELOPMENT OF WEST DODGE, LLC, a Missouri Limited Liability Company,

v.

RAVE REVIEW CINEMAS, LLC, a Texas Limited Liability Corporation.

### SUBPOENA IN A CIVIL CASE

CASE NUMBER: 8:03CV171

Filed in United States District Court for the District of Nebraska

TO:   **Boston Ventures Management, Inc.**
      **One Federal Street, 23rd Floor**
      **Boston, Massachusetts 02110-2003**

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

X  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Choate, Hall & Stewart, LLP<br>Excahnge Place, 53 State St.<br>Boston, MA 02109<br>**See attached Subpoena Rider** | Thursday, June 30, 2005, at 9:00 a.m. EST |

X YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified above (list documents or objects):

**See attached Subpoena Rider**

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _signature_  Attorney for Plaintiff | May 31, 2005 |

| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |
|---|---|
| Timothy J. Thalken | Fraser, Stryker, Meusey, Olson, Boyer & Bloch,<br>500 Energy Plaza, 409 S. 17th Street<br>Omaha, NE  68102-2613; (402) 341-6000 |

**EXHIBIT**

7

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (Rev. 11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information con- tained in the Proof of Service is true and correct.

Executed on _____
                     DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue bur-den or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a rea-sonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of pro-duction or inspection unless commanded to appear for deposition, hear-ing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or at-torney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a part or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in per-son, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 10 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SUBPOENA RIDER

1.  Produce all correspondence, whether in electronic format or otherwise, between Rave Reviews Cinemas, L.L.C., including its agents and employees, and Boston Ventures Management, Inc., including its parents, subsidiaries, agents and employees, regarding the Village Pointe Shopping Center project in Omaha, Nebraska.

2.  Produce all documents, whether in electronic format or otherwise, between Rave Reviews Cinemas, L.L.C., including its agents and employees, and Boston Ventures Management, Inc., including its parents, subsidiaries, agents and employees, regarding building and/or operating a movie theater in Omaha, Nebraska.

3.  Produce all market studies, reports, memoranda or other documents that refer to building or operating  movie theaters in Omaha, Nebraska or the greater Omaha area.

4.  Produce all documents relating or referring to Rave Reviews Cinemas, L.L.C.'s decision not to build and or operate a theater in Omaha, Nebraska or the greater Omaha area.

5.  Produce all documents relating to Boston Ventures Management, Inc.'s financing of or investment in, Rave Reviews Cinemas, L.L.C.

6.  Produce all documents, including correspondence, between Rave Reviews Cinemas, L.L.C., its agents or employees, and Boston Ventures Management, Inc., its agents or employees, regarding the lawsuit entitled: "168th and DODGE, LP, a Nebraska Limited Partnership f/k/a BROWN INVESTMENT PARTNERSHIP, LTD., and RED DEVELOPMENT OF WEST DODGE, LLC, a Missouri Limited Liability Company v. Rave Reviews Cinemas, L.L.C." in the United States District Court for the District of Nebraska, Case No. 8:03CV171    .

7.  Produce a witness who has the most knowledge regarding Boston Ventures Management, Inc.'s April 2002 site visit to Omaha, Nebraska to discuss Rave Reviews Cinemas, L.L.C., building and/or operating a theater in the Omaha area.

8.  Produce a witness who has the most knowledge regarding the issues identified in items 1-7 above.

9.  Produce a witness who has the most knowledge regarding communications made by Rave Reviews Cinemas, L.L.C., regarding its plans or intent to build and/or operate a theater in Omaha, Nebraska.

10. Produce a witness who has the most knowledge regarding communications made by Rave Reviews Cinemas, L.L.C., regarding its decision not to build and/or operate a theater in Omaha, Nebraska.

355752.01

# CHOATE, HALL & STEWART LLP

EXCHANGE PLACE
53 STATE STREET
BOSTON, MASSACHUSETTS 02109-2804

T (617) 248-5000    F (617) 248-4000
www.choate.com

June 10, 2005

## VIA FACSIMILE AND REGULAR MAIL

Timothy J. Thalken
Michael F. Coyle
Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C.
500 Energy Plaza
409 South 17th St.
Omaha, NE 68102

      RE:    *168th & Dodge, L.P., et al. v. Rave Reviews Cinemas, LLC,*
              Case No. 8:03CV171 (D. Neb.)

Dear Mr. Thalken:

I am in receipt of your e-mail message of May 31, 2005 stating that you would "shortly" be issuing a third party subpoena (the "Subpoena") to Boston Ventures Management, Inc. ("Boston Ventures"), and your deposition notice dated June 3, 2005 for the deposition of Boston Ventures. While I have not yet been served with a formal deposition subpoena, I am writing to place you on notice that Boston Ventures objects, pursuant to Fed. R. Civ. P. 45(c)(2)(B), to the inspection or copying of materials designated in the Subpoena as follows:

1.     Boston Ventures objects to the Subpoena insofar as it assumes the existence of the documents requested. Boston Ventures' objections to any of the requests shall not constitute a representation that any such documents exist.

2.     Boston Ventures objects to the Subpoena to the extent that it seeks materials protected by the attorney-client privilege and/or the attorney work-product doctrine. Boston Ventures further objects to the Subpoena to the extent that it calls for the production of materials that are confidential, proprietary or contain or constitute trade secrets.

3.     Boston Ventures objects to each specific request for the production of documents contained in the Subpoena to the extent that they are overly broad, unduly burdensome, and so vague and indefinite as to fail to identify those documents being sought with sufficient specificity to enable Boston Ventures to ascertain which documents are responsive to the request.



**EXHIBIT**

8

Timothy J. Thalken
June 10, 2005
Page 2

4. Boston Ventures objects to the Subpoena insofar as it seeks documents that are neither relevant to the subject matter of the litigation between Red and Rave Reviews, nor reasonably calculated to lead to the discovery of admissible evidence.

5. Boston Ventures objects to the Subpoena to the extent it is not narrowly tailored so as to avoid imposing undue burden or expense on Boston Ventures as required by Fed. R. Civ. P. 45(c)(1).

6. Boston Ventures objects to the Subpoena on the ground that it is largely duplicative of the Subpoena you served on Boston Ventures on July 12, 2004.

7. Boston Ventures objects to the Subpoena to the extent that it calls for the testimony of the "witness who has the most knowledge" on various topics. Such requests exceed Boston Ventures' obligations under Fed. R. Civ. P. 30(b)(6). In compliance with Rule 30(b)(6), Boston Ventures will designate an individual to testify on its behalf as to matters known to, or reasonably available to, the company.

8. Boston Ventures objects to producing documents responsive to topic number five in the Subpoena Rider, which requests "documents relating to Boston Ventures' financing of, or investment in, Rave Reviews Cinemas, LLC." Documents concerning this topic are not relevant to any of the issues in dispute, nor are they reasonably likely to lead to the discovery of admissible evidence. These documents further constitute confidential and proprietary business information and/or trade secrets of Boston Ventures. Because of the highly sensitive nature of the information requested in topic five, Boston Ventures is not designating a witness to testify to that particular subject matter.

Subject to and without waiving its objections, Boston Ventures will search for non-privileged documents in its possession, custody, or control, in addition to those it produced in August 2004, which are reasonably responsive to the topics numbered one, two, three, four and six. Boston Ventures will also designate a witness to testify in response to the topics numbered seven eight, nine and ten, with the exception that with respect to topic eight, it will not designate a witness to testify as to topic number five.

For your convenience, Boston Ventures will produce any additional documents it locates directly to you at your Omaha, Nebraska address on or before June 27, 2004..

Timothy J. Thalken
June 10, 2005
Page 3


Please do not hesitate to call me if you have any questions or would like to discuss this matter.

Very truly yours,

Kathleen Burdette Shields

Kathleen Burdette Shields

cc: Mark D. Cahill, Esq.

FRASER STRYKER MEUSEY OLSON BOYER & BLOCH, PC
LAWYERS

500 ENERGY PLAZA
409 SOUTH 17TH STREET
OMAHA, NEBRASKA 68102-2663
MICHAEL F. COYLE                         TELEPHONE 402.341.6000
DIRECT DIAL: 402.978.5260                 TELEFAX 402.341.8290
MCOYLE@FRASERSTRYKER.COM                  WWW.FRASERSTRYKER.COM

June 29, 2005

***VIA FACSIMILE: (617) 248-4000***
***AND FIRST CLASS MAIL***

Kathleen Burdette Shields
Chaote Hall & Stewart, LLP
Exchange Place
53 State Street
Boston, MA 02109-2804

> RE:   *168th and Dodge, LP v. Rave Reviews Cinemas, LLC*
> Case No. 8:03CV171

Dear Kathleen:

This letter follows up our conversation yesterday. It is our understanding that Boston Ventures has documents outlining its relationship with Rave Reviews Cinemas, LLC ("Rave"), but that you have not produced those documents because you do not believe that they are relevant. We believe that our request for documents and information relating to Boston Ventures' involvement in Rave Reviews Cinemas is reasonably calculated to lead to the discovery of admissible evidence. Therefore, we once again request that you produce documents relating to Boston Ventures' relationship with Rave.

More specifically, we are entitled to learn whether Boston Ventures exercises any control over, or has the right to approve or disapprove of, particular theater projects that are proposed by Rave, and whether there are specific protocols or procedures that must be followed in this approval process. Previously, you produced to us documents showing that various theater projects, including the Omaha project, were discussed at a Manager's meeting, but you have not provided any meeting minutes or any notes from the participants in that meeting. Please provide these documents at tomorrow's deposition.

As you know, we will are expending significant resources to travel to Boston for this deposition. Should another trip be required due to your decision to withhold discoverable documents, we reserve the right to take the matter up with the Court and seek our costs related to taking a second deposition of Boston Ventures.



EXHIBIT

9

Ms. Kathleen Shields
June 29, 2005
Page 2

I look forward to meeting you in person tomorrow.

Very truly yours,

Michael F. Coyle
FOR THE FIRM

386058.02

Page 1

VOLUME:         I
PAGES:        205
EXHIBITS:    1 - 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

168th and DODGE, L.P., a Nebraska          )
Limited Partnership f/k/a BROWN            )
INVESTMENT PARTNERSHIP, LTD., and          )
RED DEVELOPMENT OF WEST DODGE, LLC         )
a Missouri Limited Liability Company,      )
                                           )
                        Plaintiffs,        )
                                           )
vs.                                        )
                                           )
RAVE REVIEWS CINEMAS, LLC, a Texas         )
Limited Liability Corporation,             )
                                           )
                        Defendant.         )

VIDEO DEPOSITION OF ELIZABETH
GRANVILLE-SMITH, a witness called on behalf of the
Plaintiffs before Dawn Mack-Boaden, Court Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, held at the Law Offices of Choate,
Hall & Stewart, 53 State Street, Boston,
Massachusetts, on Thursday, June 30, 2005,
commencing at 9:15 a.m.

EYAL COURT REPORTING, INC.
4 FANEUIL HALL MARKETPLACE
BOSTON, MASSACHUSETTS   02109
(617) 723-9432          (800) 322-3925

**EXHIBIT**

10

1   APPEARANCES
2
Michael F. Coyle, Esquire
3   FRASER STRYKER MEUSEY OLSON BOYER & BLOCH, P.C.
    500 Energy Plaza
4   409 South 17th Street
    Omaha, Nebraska 68102-2663
5   (402) 341-6000
    Counsel on behalf of the Plaintiffs
6
7   Kathleen Burdette Shields, Esquire
    CHOATE HALL & STEWART
8   Exchange Place
    53 State Street
9   Boston, Massachusetts 02109
    (617) 248-5000
10  Counsel on behalf of Ms. Granville-Smith
11
    Lynn S. McCreary, Esquire
12  Jennifer A. Donnelli
    BRYAN CAVE, LLP
13  One Kansas City Place
    1200 Main Street, Suite 3500
14  Kansas City, Missouri 64105-2100
    (816) 374-3208
15  Counsel on behalf of the Defendant
16
17  ALSO PRESENT:
18  Steven M. Maun, RED
19
20
21
22
23
24
                                                Page 2

1           INDEX
2   Witness      Direct Cross Redirect Recross
3   ELIZABETH GRANVILLE-SMITH
4   (By Mr. Coyle)    4
5
6
          EXHIBITS
7
    No. Description              Page
8
    1  Notice of Deposition         6
9
    2  Three-page Document; Letter, BV 001, BV 002  13
10
    3  Rave Motion Pictures Web Site      120
11
    4  Boston Ventures Web Site          131
12
    5  Eleven-Page Document          137
13
    6  Set-Aside Letter              149
14
15
16  * Exhibits were retained by the court reporter and
          delivered with the transcript.
17
18
19
20
21
22
23
24
                                                Page 3

1           PROCEEDINGS
2
3          (Exhibit Number 1 was marked for
4       identification.)
5
6       ELIZABETH GRANVILLE-SMITH, a witness
7       first having been duly sworn,
8       testified as follows:
9
10          DIRECT EXAMINATION
11
12  BY MR. COYLE:
13      Q.  Would you state your name for the record,
14  please.
15      A.  Elizabeth Granville-Smith.
16      Q.  Ms. Smith, my name is Michael Coyle. I'm
17  an attorney from Omaha, Nebraska; and I represent
18  the 168th and Dodge Partnership and RED Development
19  Company, who are Plaintiffs in a lawsuit that's
20  pending in the United States District Court for the
21  District of Nebraska against a company called Rave
22  Reviews Cinemas, and I introduced myself to you
23  before we got started.
24      A.  Good morning.
                                                Page 4

1       Q.  What I'm going to do here this morning is
2   I'd like to ask you some questions about some
3   knowledge that you may or may not have about some of
4   the matters that are pending in that lawsuit. Do
5   you understand that?
6       A.  Yes, I do.
7       Q.  Do you understand that your testimony here
8   today is under oath?
9       A.  Yes, I do.
10      Q.  And what I will do is, is I'll ask you a
11  question, and if you understand it, please go ahead
12  and answer it. If it's unclear to you and you'd
13  like for me to rephrase it, then please ask me to do
14  so because if you do answer, I'm going to assume
15  that you understood my question. Okay?
16      A.  Yes.
17      Q.  Now, your attorney here today is with you,
18  Ms. Kathleen Shields. If you would like to take a
19  recess and visit with Ms. Shields at any time, just
20  tell me. Okay?
21      A.  Okay.
22      Q.  Now, do you understand I'll be depending
23  on your answers in my preparation for this case?
24      A.  Yes, I do.
                                                Page 5

| | |
|---|---|
| 1   **Q. Now, where are you employed?** | 1   **Q. And, again, I'm not trying to get anything** |
| 2   A.   Boston Ventures Management. | 2  **you talked about with your attorney.** |
| 3   **Q. Okay. And how long have you been so** | 3   **Are you the person who's been designated** |
| 4  **employed?** | 4  **by Boston Ventures to render testimony here today?** |
| 5   A.   Approximately, ten years. | 5   A.   Yes, I am. |
| 6   **Q. Now, this deposition is being shown in the** | 6   **Q. And are you the person who has been** |
| 7  **United States District in Omaha, Nebraska. But** | 7  **designated by Boston Ventures as their** |
| 8  **we're taking this deposition in Boston,** | 8  **representative to testify about the matters that are** |
| 9  **Massachusetts; is that correct?** | 9  **contained on Exhibit Number 1?** |
| 10   A.   Yes. | 10 |
| 11   **Q. Do you actually live in Boston?** | 11      MS. SHIELDS: And at this time, I'll |
| 12   A.   No, I don't. | 12   state for the record that Boston Ventures |
| 13   **Q. Okay. Do you live out -- I take it you** | 13   has objected to Topic Number 5 and is not |
| 14  **live in the area.** | 14   producing Ms. Granville-Smith to testify as |
| 15   A.   No; I live in New York City. | 15   to Topic Number 5; and to the extent that |
| 16   **Q. Okay. And you traveled down here for** | 16   Topic Number 8 requests testimony on Topic |
| 17  **purposes of this deposition today?** | 17   Number 5, that portion of Topic 8. |
| 18   A.   Yes, I did. | 18      MR. COYLE: Okay. You were doing it a |
| 19   **Q. Now, have you received a copy of Exhibit** | 19   little quickly there for me, Counsel. |
| 20  **Number 1, a notice to take your deposition?** | 20      Could you read my question back, |
| 21   A.   Let me take a look at it. | 21   please. |
| 22 | 22 |
| 23      MS. SHIELDS: Please review all the | 23      (The question was read back as |
| 24   pages of the exhibit. | 24   follows: |
|                   Page 6 |                   Page 8 |
| 1      THE WITNESS: I recall receiving the | 1      "And are you the person who has |
| 2   first three pages, but not the subsequent | 2   been designated by Boston Ventures as |
| 3   two. | 3   their representative to testify about |
| 4 | 4   the matters that are contained on |
| 5  BY MR. COYLE: | 5   Exhibit Number 1?") |
| 6   **Q. Okay. And pages 1, 2, and 3, those would** | 6 |
| 7  **be a notice to take a deposition duces tecum of** | 7      MS. SHIELDS: Same objection. |
| 8  **Boston Ventures Management; is that correct?** | 8      THE WITNESS: Subject to the |
| 9   A.   That's what it says, yes. | 9   objection, yes, I am. |
| 10   **Q. And you have seen those documents prior to** | 10      MR. COYLE: Okay. And just let me |
| 11  **this morning?** | 11   see if I can understand what the objection |
| 12   A.   Yes, I have. | 12   is. |
| 13   **Q. The last two pages you haven't seen prior** | 13 |
| 14  **to today?** | 14  BY MR. COYLE: |
| 15   A.   No, I have not. | 15   **Q. Is it you are not prepared to testify here** |
| 16   **Q. Okay. Now, this is a 30(b)(6) deposition.** | 16  **today about anything relating to Item Number 5; is** |
| 17  **Was that explained to you by your attorney?** | 17  **that correct?** |
| 18 | 18 |
| 19      MS. SHIELDS: Objection. That -- that | 19      MS. SHIELDS: For the record, |
| 20   question calls for material that's | 20   Mr. Coyle, Boston Ventures has objected to |
| 21   protected by the attorney/client privilege. | 21   Topic Number 5. It's a vastly overbroad |
| 22      MR. COYLE: Okay. | 22   request that involves confidential and |
| 23 | 23   proprietary business information of Boston |
| 24  BY MR. COYLE: | 24   Ventures. |
|                   Page 7 |                   Page 9 |

3 (Pages 6 to 9)

1    We've objected to this topic, and we
2    have not conducted a search for documents
3    in response to this topic.
4        However, without waiving our
5    objections to this topic, I understand that
6    you are interested in a far narrower
7    subject, which is Boston Ventures' control
8    over or right to control the approval or
9    disapproval of particular theater projects.
10       We've not undertaken a search for
11   documents with respect to that narrower
12   issue, but I'll permit Ms. Granville-Smith
13   to answer questions relating to that much
14   narrower issue.
15       MR. COYLE: Okay. And I understand
16   that you and I have a disagreement among
17   the two of us about whether Boston Ventures
18   has appropriately responded to the subpoena
19   that was issued to you, as well as the
20   deposition notice duces tecum. I
21   understand that, and we can -- we can take
22   that up at a -- at a later date.
23       Why don't I go ahead and examine the
24   witness here today about what we can get
                                        Page 10

1    objections.
2        The first is the topic is so broad
3    that it covers an unreasonable -- an
4    unreasonably broad number of documents.
5    Responding to the subpoena would be unduly
6    burdensome for Boston Ventures.
7        The second is that those documents are
8    not relevant to the present dispute; that
9    being a dispute about a particular project
10   in Omaha.
11       And the third is that these documents,
12   in addition to being voluminous and
13   irrelevant, are highly confidential and
14   proprietary.
15       MR. COYLE: Okay. Let's move on.
16
17   BY MR. COYLE:
18   **Q. Ms. Smith, pursuant to Exhibit Number 1,**
19   **you were asked to bring some documents with you here**
20   **today.**
21   A. I was asked to produce some documents for
22   this request.
23   **Q. Is that correct?**
24   A. Yes.
                                        Page 12

1    accomplished, and then you and I can see
2    where we disagree. Okay?
3        MS. SHIELDS: That's fine. Just so
4    you understand, there may be questions to
5    which Boston Ventures objects and will not
6    permit the witness to answer because
7    they're not properly covered by the
8    permissible topics on your subpoena.
9        MR. COYLE: Okay. And, again, we can
10   take that up when we get to it. Okay.
11       And I just -- I'll need to know the --
12   the basis of your objection to that would
13   be that you don't think it's relevant to
14   the lawsuit that's pending in Nebraska?
15       MS. SHIELDS: The basis of our
16   objection has been explained in numerous
17   pieces of correspondence and conversations
18   with your office.
19       MR. COYLE: Okay. And I understand
20   that. Just, again, I don't know whether I
21   agree or disagree with that. But is it
22   that it's not relevant or it's confidential
23   or both?
24       MS. SHIELDS: There are a number of
                                        Page 11

1    **Q. Okay. Let me hand to you what has been --**
2    **I'm going to ask the court reporter to mark as**
3    **Exhibit Number 2.**
4
5        (Exhibit Number 2 was marked for
6        identification.)
7
8    BY MR. COYLE:
9    **Q. After you've had a chance to take a look**
10   **at that for a moment, I'll ask you some questions**
11   **about it. Okay?**
12   A. Okay.
13   **Q. Have you had an opportunity to look at**
14   **Deposition Exhibit Number 2?**
15   A. Yes, I have.
16   **Q. And can you identify those documents for**
17   **the record, please.**
18   A. Attached to Exhibit Number 2 are two
19   documents.
20       The first is entitled, Board of Managers
21   Meeting Agenda, September 11th, 2002.
22       The second is entitled, Theater Pipeline,
23   as of September 10th, 2002.
24   **Q. Okay. Now, so Exhibit Number 2 consists**
                                        Page 13

4  (Pages 10 to 13)

1  of three pages; is that correct?
2    A.   Yes.
3    Q.   And the two documents that you referred to
4  have Bate stamps numbers at the bottom of them.
5        One of them says BV 001, and the second
6  says BV 002; is that correct?
7    A.   Yes.
8    Q.   Now, is it your testimony that those two
9  documents are the documents that you've produced in
10 response to Exhibit Number 1?
11   A.   These two documents were produced earlier
12 in this process from the first subpoena.
13       We then received a subsequent subpoena,
14 and we went back and reviewed our documentation
15 again; and these two documents were the only ones
16 that were responsive.
17   Q.   Okay. So just so you and I understand
18 each other, documents BV 001 and BV 002 are the only
19 documents that were produced in response to Exhibit
20 Number 1?
21   A.   That's correct.
22   Q.   Okay. Now, let's go back to Exhibit
23 Number 1, and I'll ask that you turn to the third
24 page. Okay? Do you see Exhibit A there?
                                              Page 14

1    A.   Yes.
2    Q.   First of all, it asks you to produce all
3  correspondence, whether in electronic format or
4  otherwise, between Rave Reviews Cinemas, L.L.C.,
5  including its agents and employees, and Boston
6  Ventures Management, Inc., including its parents,
7  subsidiaries, agents and employees, regarding the
8  Village Pointe Shopping Center project in Omaha,
9  Nebraska. Did I read that correctly?
10   A.   Yes.
11   Q.   Now, did you actually engage in this
12 search?
13   A.   Yes, I did.
14   Q.   What steps did you take to -- to look for
15 responsive documents?
16   A.   I reviewed all of my own personal Rave
17 files, as well as all my electronic files. I then
18 reviewed all of the central files that we keep
19 within the firm, where we keep all of our deal
20 memoranda, et. cetera.
21       I then requested that every member of my
22 team do the same and asked for them to respond back
23 to me with the affirmative that either they had
24 found documents or they had not. They were also
                                              Page 15

1  each given a copy of this subpoena.
2    Q.   Okay. Now, Ms. Granville-Smith, is it
3  your testimony that there is no e-mails between
4  Boston Ventures and Rave Reviews Cinemas regarding a
5  potential theater engagement in Omaha, Nebraska?
6    A.   Based upon my review of our files, I did
7  not find any e-mail correspondence.
8    Q.   So -- okay. Again, I'm following up so I
9  can understand you.
10       So it's your testimony for the judge and
11 the ladies and gentlemen of the jury that Boston
12 Ventures doesn't have a single e-mail communication
13 between any employee, agent of Boston Ventures and
14 any representative of the Rave Reviews Cinemas
15 regarding a theater project in Omaha, Nebraska?
16
17       MS. SHIELDS: Objection.
18       MS. MCCREARY: Objection; asked and
19 answered. It's argumentative.
20       MS. SHIELDS: Same objection.
21       THE WITNESS: Shall I answer?
22       MS. SHIELDS: If you can.
23       THE WITNESS: Based upon my review of
24 our files, which I believe was thorough, I
                                              Page 16

1       found no e-mail correspondence.
2
3  BY MR. COYLE:
4    Q.   Now, were you actually -- did you have any
5  involvement in this particular engagement?
6
7        MS. SHIELDS: Objection as vague.
8
9  BY MR. COYLE:
10   Q.   Did you have any involvement in -- in
11 Boston Ventures looking at a potential investment in
12 a Rave -- Rave Reviews Cinema project in Omaha,
13 Nebraska? Did you have any involvement in that?
14   A.   I had no direct involvement.
15   Q.   What does that mean? I mean, did people
16 on your team have involvement in that?
17   A.   No direct involvement.
18   Q.   I guess I -- I don't know what that means.
19
20       MS. MCCREARY: I'm going to object.
21 I'm going to ask the court reporter if you
22 can read back his foundational question,
23 please.
24       COURT REPORTER: The last question?
                                              Page 17

1    MS. MCCREARY: His foundational
2  question.
3    MS. SHIELDS: The not what does that
4  mean. The one where there's actually a
5  substantive question.
6
7    (The question was read back as
8  follows:
9    "I mean, did people on your team
10  have involvement in that?")
11
12    MS. MCCREARY: The one before that.
13
14    (The question was read back as
15  follows:
16    "Did you have any involvement in
17  Boston Ventures looking at a
18  potential investment in a Rave
19  Reviews Cinema project in Nebraska?")
20
21    MS. MCCREARY: Thank you.
22    MR. COYLE: Can you read my last
23  question back, please?
24
Page 18

1  e-mail to them about that or not.
2    Q. Okay. Did -- did you ever have any
3  discussions with anybody at Rave about a potential
4  investment in a theater project in Omaha, Nebraska?
5    A. I had knowledge that they were looking at
6  Omaha. I had no direct involvement in the process.
7    Q. Okay. Now, let's go back to when you say
8  direct involvement -- and we'll talk about that in a
9  second, but my question is really a lot more narrow.
10    What I'm trying to find out is, is were
11  there ever any e-mail communications with
12  representatives of Boston Ventures and
13  representatives of Rave involving this project in
14  Omaha, Nebraska?
15
16    MS. SHIELDS: Objection; asked and
17  answered.
18    MS. MCCREARY: And foundation.
19    THE WITNESS: I don't know if there
20  are any e-mails.
21
22  BY MR. COYLE:
23    Q. Okay. And let me tell you why I'm asking
24  you the question is, is that we sent out this
Page 20

1    (The question was read back as
2  follows:
3    "I mean, did people on your team
4  have involvement in that?")
5
6  BY MR. COYLE:
7    Q. Now, you've answered -- let me follow up.
8  You're telling me no direct involvement.
9  I take it that direct involvement means that you
10  never personally sent an e-mail?
11
12    MS. SHIELDS: Objection; vague. If
13  you can answer the question as posed,
14  please do.
15
16  BY MR. COYLE:
17    Q. I mean, really, this is not meant to be
18  that hard.
19    I'm just trying to find out if there's --
20  is it your testimony, Ms. Granville-Smith, that you
21  never sent an e-mail to anybody at Rave regarding
22  Boston Ventures potentially participating in the
23  development of a theater complex in Omaha, Nebraska?
24    A. I don't know whether or not I sent an
Page 19

1  notice, Exhibit Number 1, and we asked Boston
2  Ventures to produce somebody who could testify about
3  these matters, and we asked you to bring with you
4  all e-mails between Boston Ventures and Rave
5  regarding this potential engagement in Omaha,
6  Nebraska, and none have been produced. Can we agree
7  on that?
8    A. None have been produced.
9    Q. Okay. Now, I understand that you sent out
10  a copy of the subpoena to all of your colleagues and
11  asked them, you know, to look; and, apparently,
12  nobody gave you any e-mails. Is that what you're
13  telling us?
14
15    MS. SHIELDS: Objection. It misstates
16  the witness's prior testimony.
17    THE WITNESS: I sent out the subpoena.
18  I asked people to review their e-mail
19  correspondence, all their electronic files,
20  as well as our print files. And what I
21  received back is what I produced.
22
23  BY MR. COYLE:
24    Q. Do you -- do people at Boston Ventures
Page 21

| | |
|---|---|
| 1  routinely use e-mail? | 1      (The question was read back as |
| 2    A.   Yes. | 2   follows: |
| 3    Q.   And, certainly, Rave Reviews Cinema is | 3      "So just -- and just so I'm |
| 4  somebody that members of your team, so to speak, | 4   certain I understand this, what |
| 5  work with on a daily basis; is that a fair | 5   you're telling us is that nobody at |
| 6  statement? | 6   Boston Ventures ever exchanged an |
| 7 | 7   e-mail with anybody at Rave regarding |
| 8         MS. SHIELDS:  Objection. | 8   Rave potentially developing a theater |
| 9         THE WITNESS:  Not on a daily basis. | 9   in Omaha, Nebraska?") |
| 10 | 10 |
| 11  BY MR. COYLE: | 11      THE WITNESS:  Do you want me to answer |
| 12    Q.   How about on a routine basis? | 12   that again? |
| 13 | 13      MS. SHIELDS:  If you can. |
| 14         MS. SHIELDS:  Objection. | 14      THE WITNESS:  What I've said before is |
| 15         MS. MCCREARY:  Objection. | 15   that I don't know if there are any e-mails |
| 16         THE WITNESS:  On a routine basis, we | 16   regarding Omaha; but there were none |
| 17   discuss things with the management team of | 17   produced because none were found as part of |
| 18   Rave. | 18   the discovery process. |
| 19 | 19 |
| 20  BY MR. COYLE: | 20  BY MR. COYLE: |
| 21    Q.   Okay.  I mean, I'm just trying to figure | 21    Q.   So it's your testimony that you don't know |
| 22  out what your testimony is on this. | 22  if there were e-mails exchanged, but nobody gave you |
| 23      Are you telling us that there are no | 23  any? |
| 24  e-mails? | 24 |
| Page 22 | Page 24 |
| 1         MS. SHIELDS:  Objection; asked and | 1      MS. SHIELDS:  Objection.  That |
| 2    answered. | 2   misstates the witness's prior testimony. |
| 3         MS. MCCREARY:  Same. | 3   We've been through this area a couple of |
| 4         THE WITNESS:  That's what I'm saying. | 4   times. |
| 5    Based upon our review of our documentation, | 5      MR. COYLE:  No, I don't -- this is a |
| 6    there are no e-mails that exist. | 6   completely different answer, Kathleen. |
| 7 | 7      MS. SHIELDS:  If you can answer the |
| 8  BY MR. COYLE: | 8   question. |
| 9    Q.   Okay.  So just -- and just so I'm certain | 9      THE WITNESS:  Could you please read -- |
| 10  I understand this, what you're telling us is that | 10   state the question. |
| 11  nobody at Boston Ventures ever exchanged an e-mail | 11 |
| 12  with anybody at Rave regarding Rave potentially | 12      (The question was read back as |
| 13  developing a theater in Omaha, Nebraska? | 13   follows: |
| 14 | 14      "So it's your testimony that you |
| 15         MS. SHIELDS:  Objection; asked and | 15   don't know if there were e-mails |
| 16   answered.  It's argumentative. | 16   exchanged, but nobody gave you any?") |
| 17         Ms. Granville-Smith has answered this | 17 |
| 18   question several times.  I'll permit her to | 18      THE WITNESS:  That's correct. |
| 19   answer it one more time, and that's it. | 19 |
| 20         MR. COYLE:  Well, then I want the | 20  BY MR. COYLE: |
| 21   court reporter to read back and -- I | 21    Q.   Okay.  Does -- does Boston Ventures have a |
| 22   understand your objection.  I don't know if | 22  protocol where e-mails are purged from its system on |
| 23   I agree with it, but I understand it. | 23  a routine basis? |
| 24   Please read it back. | 24    A.   Yes; we have a protocol for file |
| Page 23 | Page 25 |

1  management.
2    **Q.  Do you know what that is?**
3    A.  I know the protocol, in general. I would
4  have to research the specifics of how it's
5  conducted.
6    **Q.  So what is your understanding of the --**
7    **what's your general understanding of that protocol?**
8    A.  We are each given an amount of space on
9  our server for management of our e-mails. When you
10  get above a certain level of space, you need to
11  clean up your desktop.
12    **Q.  Okay. And then I take it you have**
13    **somebody that works in IT there?**
14    A.  Yes.
15    **Q.  And, presumably, is there some mannerism**
16  **that your company uses to store e-mails?**
17
18        MS. SHIELDS: Objection. I caution
19        the witness not to speculate.
20        THE WITNESS: I don't know the
21        specifics.
22
23  BY MR. COYLE:
24    **Q.  Well, and, again, nobody wants you to**
Page 26

1  **speculate. But I think -- can you -- just give me**
2  **your general understanding.**
3        **I take it that there is a protocol at**
4  **Boston Ventures for storage of e-mail**
5  **communications.**
6
7        MS. SHIELDS: Same objection.
8        THE WITNESS: There is, but I don't
9        know the specifics about it. It's not my
10        area.
11
12  BY MR. COYLE:
13    **Q.  Okay. Now, Ms. Granville-Smith, do you**
14  **personally use e-mail to communicate with people at**
15  **Rave?**
16    A.  Sometimes. I typically use the telephone.
17    **Q.  Okay. Now, did you search your own**
18  **e-mails?**
19    A.  Yes.
20    **Q.  How did you do that?**
21    A.  I reviewed my directories by name and
22  reviewed -- looked for e-mails relevant to the
23  subpoena request.
24    **Q.  Okay. And do you understand the dilemma**
Page 27

1  **that you -- that I'm in is that we've asked for**
2  **these e-mail communications, and I understand that**
3  **you sent out -- you described for me what you did to**
4  **try to find these; but now you've told me that you**
5  **don't know whether there are or there aren't, but**
6  **nobody gave you any to produce here today.**
7
8        MS. SHIELDS: Objection.
9
10  BY MR. COYLE:
11    **Q.  And so my understanding is what is it that**
12  **I would have to do to find out whether such e-mail**
13  **transmissions exist between Boston Ventures and Rave**
14  **regarding the engagement in Omaha, Nebraska?**
15
16        MS. SHIELDS: Objection. It's vague.
17        It's argumentative. The witness has
18        answered the question, and Boston Ventures
19        has produced documents in response to the
20        subpoena.
21        If you can answer the question, go
22        ahead; but I think the question is
23        improper.
24        MR. COYLE: Kathleen, the witness
Page 28

1  doesn't know if there's e-mails or not.
2        MS. SHIELDS: Boston Ventures --
3        MR. COYLE: I'm just trying to find
4  out how we -- I mean, this is the person
5  that you produced. Okay.
6        MS. SHIELDS: And, Mr. Coyle, Boston
7  Ventures has complied with all of its
8  obligations under the Federal Rules of
9  Civil Procedure in response to your
10  subpoena.
11        MR. COYLE: Okay. Let me keep working
12  here.
13        And if you could read back my
14  question, please.
15
16        (The question was read back as
17  follows:
18        "What is it that I would have to
19  do to find out whether such e-mail
20  transmissions exist between Boston
21  Ventures and Rave regarding the
22  engagement in Omaha, Nebraska?")
23
24        THE WITNESS: As I said before, that's
Page 29

1    really outside my scope of knowledge of how
2    we manage our e-mail system.
3
4    BY MR. COYLE:
5    Q.   Okay. Who -- who would know?
6    A.   I suspect our IT manager would know.
7    Q.   Okay. Do you know that person's name?
8    A.   Elizabeth Fisher.
9    Q.   Okay. Did you ever check with Elizabeth
10   Fisher relative to the request set forth in Exhibit
11   Number 1, Paragraph Number 1, about how to locate
12   these e-mails?
13   A.   No, I did not.
14   Q.   And the directors that you sent out these
15   e-mails -- this request to to locate these e-mails,
16   I mean, how many people are we talking about?
17   A.   Three people in addition to myself. I
18   also believe that I copied all of their admin
19   assistants as well.
20   Q.   Okay. Would those be the three directors
21   at Boston Ventures that have any relationship with
22   Rave?
23   A.   For clarity, only two of them are
24   directors. The third is an associate that helps me.
                                                    Page 30

1    But those three people, in addition to
2    myself, are the four people involved with Rave.
3    Q.   Okay. And what are their names?
4    A.   Copey Coppedge.
5    Q.   Could you spell that for us, please.
6    A.   C-O-P-E-Y, the first name; last name,
7    Coppedge, C-O-P-P-E-D-G-E.
8    Q.   Okay. Who else?
9    A.   Barbara Ginader.
10   Q.   Could you spell her last name, please.
11   A.   Yes; G-I-N-A-D-E-R. And then Brian
12   Flemming is my associate.
13   Q.   So Coppedge and Ginader are both
14   directors?
15   A.   They are both on the board of managers of
16   Rave.
17   Q.   And Brian Flemming is -- is an associate
18   that works for Boston Ventures and has some dealings
19   with Rave?
20   A.   Yes.
21   Q.   Okay. And then you, yourself, are also a
22   director?
23   A.   Yes, I am.
24   Q.   So you asked those individuals to come up
                                                    Page 31

1    with responsive e-mails, if they had them, and to
2    give them to you?
3    A.   Yes, I did.
4    Q.   Okay. Do you know what steps these
5    individuals took to try to locate these e-mails?
6    A.   I don't know the specifics of their
7    investigation.
8    Q.   Okay. Do you know whether these
9    individuals have any knowledge about how to search
10   for such e-mails?
11
12        MS. SHIELDS: Objection; calls for
13   speculation. I caution the witness not to
14   speculate.
15        MR. COYLE: Well, it's a foundational
16   question, Counsel. I said: Did you know?
17   If she doesn't know, then you might be
18   right.
19        Could you read my question back,
20   please.
21
22        (The question was read back as
23   follows:
24        "Do you know whether these
                                                    Page 32

1        individuals have any knowledge about
2        how to search for such e-mails?")
3
4        THE WITNESS: Based upon their level
5   of competency, it is reasonable to assume
6   that they are able to search for e-mails.
7
8    BY MR. COYLE:
9    Q.   Okay. What's the basis of that knowledge?
10   A.   I've worked with them for ten years.
11   Q.   And do you know -- do you know what -- but
12   you don't know what specific steps they took?
13
14        MS. SHIELDS: Objection; asked and
15   answered.
16        THE WITNESS: No, I do not know what
17   specific steps they took.
18
19   BY MR. COYLE:
20   Q.   Did you get, like, an e-mail back from
21   them that said I couldn't find anything?
22   A.   I can't recall how they communicated back.
23   It could have been by e-mail. It could have been
24   verbal.
                                                    Page 33

1    Q.   Ms. Granville-Smith, do you believe that
2    it would be unusual that your company doesn't have a
3    single e-mail between representatives of Rave
4    regarding this potential theater project in Omaha,
5    Nebraska?
6
7            MS. SHIELDS: Objection.
8            THE WITNESS: No, I do not believe
9        that it's unusual.
10
11   BY MR. COYLE:
12   Q.   Okay. And why?
13   A.   This was a company matter. It had not yet
14   reached the level of the board of managers.
15
16           MR. COYLE: Could you read that answer
17       back, please,
18
19           (The answer was read back as
20       follows:
21           "This was a company matter. It
22       had not yet reached the level of the
23       board of managers.")
24
                                          Page 34

1    MR. MAUN: It's the Rave board of
2        managers.
3
4    BY MR. COYLE:
5    Q.   Thank you. You say that was not discussed
6    in detail at the Rave board of managers level; is
7    that correct?
8    A.   Yes.
9    Q.   Okay. And there are individuals at Boston
10   Ventures that are on the Rave board of managers?
11   A.   Yes.
12   Q.   Okay. If Boston Ventures is going to
13   invest in a Rave project, is it discussed at the
14   Rave board of managers level?
15
16           MS. SHIELDS: Objection. This goes
17       back to the discussion we had earlier.
18       I'll permit Ms. Granville-Smith to answer
19       these questions; but if you stray much
20       further, we may have to have another
21       discussion.
22           THE WITNESS: Could you please restate
23       the question for me.
24
                                          Page 36

1    BY MR. COYLE:
2    Q.   Okay. Let me follow up on that. What do
3    you mean by company matter?
4    A.   That's a vague question. You'll have to
5    be more specific.
6    Q.   I'm just following up on your -- you said
7    to me -- I asked you if it was unusual; you said no
8    because this was a company matter; it had not
9    reached the level of the board of managers.
10           And I'm just trying to figure out what you
11   meant by company matter. What does that mean?
12   A.   The potential site in Omaha had not yet
13   reached a level of development in which it was
14   discussed in detail at the board of managers level.
15   Q.   Did the board of managers at Boston
16   Ventures discuss specific Rave projects for theater
17   sites?
18
19           MS. SHIELDS: Objection.
20           MS. MCCREARY: Objection.
21           THE WITNESS: Your question is
22       incorrect. You have to restate the
23       question.
24           MR. COYLE: Okay.
                                          Page 35

1           (The question was read back as
2        follows:
3           "If Boston Ventures is going to
4        invest in a Rave project, is it
5        discussed at the Rave board of
6        managers level?")
7
8            THE WITNESS: New theater
9        opportunities are discussed at the board of
10       managers level.
11
12   BY MR. COYLE:
13   Q.   And just -- just so I understand what --
14   maybe we can step back and you can describe for me
15   Boston Ventures. Could you describe what Boston
16   Ventures is, generally, as a company?
17   A.   Yes. We're a private equity company that
18   invests in media entertainment and communications
19   businesses.
20   Q.   Okay. And Rave would be one of the
21   companies that Boston Ventures has had a
22   relationship with?
23   A.   They are in our portfolio, yes.
24   Q.   Now, is there a certain level of equity
                                          Page 37

**that -- that Boston Ventures has committed to Rave?**

2

3      MS. SHIELDS: Objection. This -- this

4  question verges into an area that's

5  improper.

6      It was a subject of the subpoena to

7  which we objected, and Ms. Granville-Smith

8  is not being produced in response to that

9  topic.

10      MR. COYLE: Well, she most certainly

11  is.

12      MS. SHIELDS: She's not being produced

13  in response to Topic 5.

14      MR. COYLE: Well, but not giving me

15  any documents and then saying that the

16  witness is not going to be able to testify

17  to Item 5, we've never discussed that.

18      MS. SHIELDS: It's been in all of the

19  correspondence. In my most recent

20  objection to your amended subpoena, it most

21  certainly was in that objection.

22      MR. COYLE: You'll have to get that --

23  that she's not going to testify?

24      MS. SHIELDS: I informed you that we

Page 38

1  were not producing documents in response to

2  Topic Number 5 and that Ms. Granville-Smith

3  was not designated to testify as to Topic

4  5.

5      I told you that without waiving our

6  objection to that topic, I would permit you

7  to inquire as to the specific procedures or

8  protocols, if any, that Boston Ventures

9  uses in determining whether to approve or

10  disapprove a theater project.

11      Questions about investment in --

12  general questions about investment in Rave

13  are covered by Topic 5, to which we have

14  objected.

15      If you had a problem with Topic 5, you

16  should have pursued that well before the

17  deposition.

18      MR. COYLE: Kathy, you told me on the

19  phone that -- when I called you about it,

20  you told me you were going to produce

21  additional documents on June 27th. I

22  didn't get any.

23      MS. SHIELDS: That's because there

24  were --

Page 39

1      MR. COYLE: I called you --

2      MS. SHIELDS: -- no additional

3  documents.

4      MR. COYLE: I called you on the phone

5  -- no, there are additional documents. You

6  told me that they're proprietary and

7  confidential, and my subpoena's overbroad.

8  That's what you've told me.

9      MS. SHIELDS: I told you that we would

10  produce additional documents to the topics

11  to which we agreed to produce documents.

12      MR. COYLE: Okay. Item Number 8 --

13  directing your attention, Counsel, to Item

14  Number 8.

15      It says: Produce a witness who has

16  the most knowledge regarding the issues

17  identified in Items 1 to 7 above.

18      Now, whether you've produced documents

19  to me or not about Item 5, you have to

20  produce the witness who has the most

21  knowledge about it. She's here. I've

22  flown to Boston. Mr. Maun has come here

23  from Arizona. I'd like to get through this

24  because we've got another deposition. I'd

Page 40

1  like to ask the witness questions about it.

2      MS. SHIELDS: Mr. Coyle, in the letter

3  I wrote to you objecting to your subpoena,

4  I informed you -- and if you'd look at that

5  letter, you'd see that we objected to Topic

6  8 to the extent that it relied on Topic 5.

7      I will permit Ms. Granville-Smith,

8  without waiving our objections to Topic 5,

9  and 8 to the extent that it incorporates 5,

10  to answer questions on the narrow topic

11  that we discussed at the beginning of that

12  deposition.

13      That narrower topic that's a sub part

14  of five is the procedure that Boston

15  Ventures follows in deciding whether to

16  approve or disapprove a particular theater

17  project.

18      Questions about investment which are

19  otherwise covered by Topic 5, are subjects

20  to which we've objected. If you had --

21      MR. COYLE: You didn't --

22      MS. SHIELDS: -- wished to take up

23  those subject matters, you should have done

24  so more than two days before the

Page 41

```
 1   deposition.
 2        MR. COYLE: Well, you told me on June
 3   27th I was going to get more documents.
 4   You didn't send me any. Okay. Now --
 5        MS. SHIELDS: You were told that if
 6   additional documents were located, they'd
 7   be produced.
 8        MR. COYLE: I'm not going to sit here
 9   and argue with you, Counsel. I'm out here
10   for --
11        MS. SHIELDS: I have no interest in
12   arguing with you.
13        MR. COYLE: Well, I'm out here for a
14   deposition. I mean, I'm here in good
15   faith.
16        I just would like to ask
17   Ms. Granville-Smith some questions and then
18   go home; but I don't want to come back out
19   here.
20        MS. SHIELDS: And I don't want you to
21   either.
22        If you'd -- there is a proper
23   procedure for taking up your objections to
24   our response to your subpoena. Those
                                        Page 42
```

```
 1   procedures weren't followed in this case.
 2        MR. COYLE: Well, I disagree with you;
 3   and I can tell you that Judge Patallion in
 4   Omaha is not going to look kindly on the
 5   fact that we're playing games.
 6        So, I mean, if -- you can't pick and
 7   choose and have me make deals about what
 8   I'm going to ask the witness or not ask.
 9        She was sent a subpoena -- a notice to
10   take her deposition -- duces tecum. We
11   gave you all these items that we asked you
12   to produce somebody to testify about.
13        You've brought this lady here today.
14   I'm sure she's extremely confident. I
15   think she's going to do just fine. I'd
16   like to ask these questions and go home.
17        Now, you want to take a recess and
18   think about it?
19        MS. SHIELDS: Mr. Coyle, there's no
20   need for a recess.
21        I object to your characterization of
22   what happened, and I also object to your
23   discussion about what a judge in Omaha may
24   or may not do in this case.
                                        Page 43
```

```
 1        The subpoena was properly served in
 2   the Massachusetts District Court. If
 3   you're interested in addressing these
 4   issues, the courthouse is right over across
 5   the water there. I'd be happy to do that
 6   with you.
 7        MR. COYLE: Okay. That's not -- I
 8   mean, there's a good faith basis of this,
 9   and --
10        MS. SHIELDS: And there's a good -- a
11   very good faith basis to our objections.
12   We can agree to disagree.
13        MR. COYLE: That doesn't surprise me.
14        Why don't you read my question back.
15   We'll see what we can get, and then we'll
16   move on.
17        MS. SHIELDS: Let's do that.
18        MR. COYLE: And I guess the other way
19   we can handle this --
20        COURT REPORTER: I can't read if
21   you're going to keep talking.
22        MR. COYLE: Go ahead.
23
24        (The question was read back as
                                        Page 44
```

```
 1   follows:
 2        "Now, is there a certain level
 3   of equity that Boston Ventures has
 4   committed to Rave?")
 5
 6        MS. SHIELDS: And I'm going to
 7   instruct the witness not to answer that
 8   question.
 9        MR. COYLE: Kathy, I just want to go
10   through the process of how theaters are
11   approved or not approved; and you've told
12   me that -- that you were going to allow the
13   witness to answer that.
14        So I'm assuming that there's a certain
15   amount of money involved, and they can't
16   finance every theater that somebody wants
17   to build, and I want to take her through
18   that.
19        So if there's X-number of dollars
20   involved, that's just a really simple
21   question.
22        MS. SHIELDS: Why don't we take a
23   break.
24        I'll discuss with Ms. Granville-Smith
                                        Page 45
```

1    whether she feels comfortable in answering
2    these questions under the circumstances.
3        MS. COYLE: All right. That's fine.
4
5    (Whereupon, a break was taken in the
6    proceedings.)
7
8    BY MR. COYLE:
9    **Q.   Ms. Granville-Smith, we took a short**
10   **recess. Are you ready to proceed?**
11   A.   Yes, I am.
12   **Q.   I think before we took a short recess a**
13   **question was asked to you as to whether there's a**
14   **certain amount of equity that was committed by**
15   **Boston Ventures to -- to the Rave Cinemas. Do you**
16   **recall that question?**
17   A.   Yes, I do.
18   **Q.   Okay. Is there a certain amount of money?**
19   A.   There is a certain amount of money
20   committed to Rave; but, upon needs, we can commit
21   more, if necessary.
22   **Q.   Okay. Now, was there a specific year**
23   **where that amount of money was -- was committed?**
24   A.   Yes.

Page 46

1    **Q.   And what year was that?**
2    A.   Boston Ventures has made two commitments
3    to Rave. The first, in or around 1999. The second
4    was in 2002.
5
6        MS. SHIELDS: And, for the record, I'm
7        permitting Ms. Granville-Smith to answer
8        certain of these questions without waiving
9        our objections to Topic 5 and 8 in the
10       subpoena.
11
12   BY MR. COYLE:
13   **Q.   Okay. Now, is there a -- maybe I need to**
14   **understand a little better about Boston Ventures.**
15   **When -- your company has people that are**
16   **called directors; is that -- is that correct?**
17   A.   We have a variety of different job
18   classifications at Boston Ventures.
19   **Q.   Okay. Is there a specific team at Boston**
20   **Ventures that works with Rave?**
21   A.   Yes.
22   **Q.   Okay. And are those the names of people**
23   **that you just gave me earlier: Coppedge, Ginader,**
24   **Flemming, and yourself?**

Page 47

1    A.   Yes; that's correct.
2    **Q.   Are there others?**
3    A.   Prior to 2000, there may have been a
4    different associate staffed with me on Rave.
5    **Q.   Okay. All right. Are you the managing**
6    **director?**
7    A.   I am a managing director.
8    **Q.   Are you the managing director for the Rave**
9    **at?**
10   A.   No; we work as a team.
11   **Q.   Okay. Now, is there -- so -- all right.**
12   **Back up.**
13       So Boston Ventures is a company that
14   **provides equity to invest in these different areas**
15   **that you've described.**
16
17       MS. SHIELDS: Objection.
18
19   BY MR. COYLE:
20   **Q.   I mean, generally, that's what they do.**
21   A.   We invest in media, communications,
22   entertainment, and publishing; all areas of media.
23   **Q.   And your first dealings with Rave was in**
24   **1999?**

Page 48

1    A.   We have had business conversations with
2    members of the Rave management team prior to that.
3    **Q.   Okay. But your first equity commitment**
4    **was in 1999?**
5    A.   In or around 1999.
6    **Q.   Okay. Was there a certain amount of money**
7    **that was committed in 1999?**
8    A.   In or around 1999, we committed a first
9    installment, yes.
10   **Q.   And how much was that?**
11   A.   Fifty million dollars.
12   **Q.   Okay. Now, in regard to that $50 million**
13   **commitment, was there a protocol that was generally**
14   **followed by Boston Ventures and Rave about**
15   **individual sites?**
16
17       MS. SHIELDS: Objection; vague and
18       ambiguous.
19
20   BY MR. COYLE:
21   **Q.   Do you understand my question?**
22   A.   Could you restate it, please.
23   **Q.   Well, I take it that you're not going to**
24   **build a theater in every, you know, city in America**

Page 49

13  (Pages 46 to 49)

1 -- I mean Rave.
2    I mean, presumably, they are going to seek
3 markets where they think it would be a favorable
4 location to build a theater. Is that, generally, a
5 fair statement?
6
7    MS. SHIELDS: Objection.
8    MS. MCCREARY: Objection; calls for
9 speculation.
10    THE WITNESS: I'd like you to ask me
11    the question; then I'll answer it in my own
12    words.
13
14 BY MR. COYLE:
15    Q.   Okay. Do you know whether Rave looks for
16 theater opportunities in specific locations?
17    A.   Yes, we look at specific locations.
18    Q.   And are there certain aspects or markets
19 that they -- that they feel are more favorable for
20 building a new theater?
21
22    MS. SHIELDS: Objection; calls for
23    speculation.
24    THE WITNESS: There are certain

Page 50

1    aspects, among many, that cause the
2    management team, and then, subsequently,
3    the board of managers, to view a site as
4    attractive.
5
6 BY MR. COYLE:
7    Q.   Okay. Now, when you say management team,
8 is that the management team at Rave?
9    A.   Yes, it is.
10    Q.   And then the board of directors -- or the
11 board of managers would be people from both Rave and
12 Boston Ventures?
13    A.   Yes.
14    Q.   Okay. Do you know what factors they
15 generally look at when they're thinking about going
16 into a specific market?
17    A.   I can name some of the factors. I
18 certainly can't name all of them.
19    Q.   I understand. What are some of those
20 factors?
21    A.   Competition, market size, market
22 demographics. That's all that I can recall as I sit
23 here today.
24    Q.   Now, when does the management team at Rave

Page 51

1 actually give a list of -- at what point in the
2 process do they get Boston Ventures involved?
3
4    MS. SHIELDS: Objection; vague and
5 ambiguous.
6    THE WITNESS: It depends on a
7 site-by-site basis.
8
9 BY MR. COYLE:
10    Q.   Okay. But -- okay. And could you explain
11 that for me, please.
12    I take it all sites are -- have -- are
13 unique, in some sense?
14    A.   Yes; every site is unique.
15    Q.   Okay. What -- what different factors are
16 involved that have an impact on when Boston Ventures
17 gets involved in the process?
18
19    MS. MCCREARY: Objection. Lacks
20    foundation. Calls for speculation.
21    MS. SHIELDS: Same objection.
22    THE WITNESS: Every site is unique. I
23    can't possibly put a structure around it.
24

Page 52

1 BY MR. COYLE:
2    Q.   Just give me a general procedure.
3
4    MS. MCCREARY: Objection; asked and
5 answered. It's badgering.
6    MS. SHIELDS: Same objection.
7    THE WITNESS: Shall I answer?
8    MS. SHIELDS: If you can answer the
9 question.
10    THE WITNESS: In very general terms,
11    the management team at Rave reviews many
12    sites. At any time, we could have five to
13    ten sites in different levels of analysis
14    and diligence.
15    At some point during the analysis of a
16    site, the Rave management team makes a
17    determination that they want to go forward
18    with the site; and they will bring an
19    approval book to the board of managers.
20
21 BY MR. COYLE:
22    Q.   And that board of managers would be the
23 board of managers at Boston Ventures?
24

Page 53

14  (Pages 50 to 53)

| | |
|---|---|
| 1      MS. SHIELDS: Objection. | 1      speculation. |
| 2          THE WITNESS: It's the board of | 2          MS. MCCREARY: I object. It's outside |
| 3      managers at Rave Motion Pictures. | 3      the scope of the subpoena and as designated |
| 4 | 4      therein. |
| 5  BY MR. COYLE: | 5          THE WITNESS: Should I answer? |
| 6      **Q.   Okay. But there are -- for example,** | 6          MS. SHIELDS: If you can. This is in |
| 7  **you're one of those board of managers?** | 7      that area where we're permitting you to |
| 8      A.   Yes, I am. | 8      answer questions if you're comfortable with |
| 9      **Q.   Okay. And some of your colleagues are on** | 9      them despite -- despite and without waiving |
| 10 **that board of managers as well?** | 10     our objections to Topics 5 and 8. |
| 11     A.   Yes. | 11         THE WITNESS: To the best of my |
| 12     **Q.   Would that be Mr. Coppedge?** | 12     knowledge, up to this point, we've never |
| 13     A.   He is on the board, yes. | 13     had different ownership structures on a |
| 14     **Q.   And is Ms. Ginader?** | 14     site-by-site basis. |
| 15     A.   Ms. Ginader is on the board, yes. | 15 |
| 16     **Q.   Okay. Have there been other people on the** | 16 BY MR. COYLE: |
| 17 **board at any given time from Boston Ventures?** | 17     **Q.   And I'm -- you've never had different** |
| 18     A.   Not from Boston Ventures, no. | 18 **ownership structures on a site-by-site basis. I'm** |
| 19     **Q.   Okay. All right. Let me see if I** | 19 **sorry, I don't know what that means. Could you** |
| 20 **understand this, then.** | 20 **describe that for me.** |
| 21         **Rave Reviews Cinemas is a separate entity,** | 21     A.   To the best of my knowledge, we have -- we |
| 22 **isn't it?** | 22 have not set different ownership structures for each |
| 23 | 23 site. We've never done that, to the best of my |
| 24         MS. SHIELDS: Objection; calls for | 24 knowledge, up to this point. |
| Page 54 | Page 56 |
| 1      legal conclusion. | 1      **Q.   Okay. Are all of the different sites** |
| 2 | 2  **subsidiaries of Rave?** |
| 3  BY MR. COYLE: | 3 |
| 4      **Q.   I mean, to the best of your knowledge,** | 4          MS. SHIELDS: Objection; calls for a |
| 5  **they're their own independent company?** | 5      legal conclusion. |
| 6 | 6          THE WITNESS: To the best of my |
| 7          MS. SHIELDS: Same objection. | 7      knowledge, as I sit here today, I believe |
| 8          THE WITNESS: It's a separate entity | 8      that all of the sites are in subsidiary |
| 9      from Boston Ventures, yes. | 9      entities. |
| 10 | 10 |
| 11 BY MR. COYLE: | 11 BY MR. COYLE: |
| 12     **Q.   Okay. All right. But I take it that** | 12     **Q.   Of Rave?** |
| 13 **Boston Ventures owns some portion of Rave?** | 13     A.   Of Rave, yes. |
| 14 | 14     **Q.   Okay. And then Boston Ventures has an** |
| 15         MS. SHIELDS: Objection. | 15 **ownership interest in Rave, the parent company?** |
| 16         THE WITNESS: Yes, we own a portion of | 16     A.   Yes. |
| 17     Rave. | 17     **Q.   Okay. Do you own all of the common stock?** |
| 18 | 18 |
| 19 BY MR. COYLE: | 19         MS. SHIELDS: Objection. |
| 20     **Q.   Now, when you say you own a portion of** | 20         THE WITNESS: No. |
| 21 **Rave, I take it that how that ownership interest** | 21 |
| 22 **exists would be different depending on the site?** | 22 BY MR. COYLE: |
| 23 | 23     **Q.   Do you have a majority interest?** |
| 24         MS. SHIELDS: Objection; calls for | 24 |
| Page 55 | Page 57 |

1    MS. SHIELDS: Objection.
2        THE WITNESS: We own a majority of the
3    stock in the company.
4
5    BY MR. COYLE:
6    **Q.  Okay. Now, Boston Ventures, then, has**
7    **voting control at Rave?**
8
9        MS. SHIELDS: Objection; calls for a
10   legal conclusion.  You can answer if you
11   can.
12       THE WITNESS: On certain items within
13   the governess of the company, we have
14   voting control.
15
16   BY MR. COYLE:
17   **Q.  Okay. Which items are those?**
18
19       MS. SHIELDS: Objection.
20       THE WITNESS: I can't recall all the
21   items as I sit here today.  Quite a few.
22
23   BY MR. COYLE:
24   **Q.  New sites?**
                                    Page 58

1        I can imagine a situation where the
2    company was building from ground up and
3    didn't sign a lease at all.
4
5    BY MR. COYLE:
6    **Q.  I understand. But, generally, it --**
7    **barring that circumstances that you've just**
8    **described, each new site would involve the execution**
9    **of a lease.**
10
11       MS. SHIELDS: Objection; calls for
12   speculation, asked and answered.
13       MS. MCCREARY: Lacks foundation.
14       THE WITNESS: Shall I answer?
15       MS. SHIELDS: If you can.
16       THE WITNESS: In some of the Rave
17   Cinemas, there is a lease arrangement with
18   the landlord.
19
20   BY MR. COYLE:
21   **Q.  Okay. Do all the existing Rave sites have**
22   **leases?**
23
24       MS. SHIELDS: Objection. It's beyond
                                    Page 60

1        MS. SHIELDS: Objection.
2        THE WITNESS: The signing of leases is
3    one of the items within our control.
4
5    BY MR. COYLE:
6    **Q.  Okay. And I take it that when you talk**
7    **about the signing of leases, how these different --**
8    **all of the Rave theater sites involve leases; isn't**
9    **that a fair statement?**
10
11       MS. SHIELDS: Objection.
12       THE WITNESS: Your question is a bit
13   rambley.  So --
14
15   BY MR. COYLE:
16   **Q.  It's not intended to be. In other words,**
17   **if -- if Rave's going to open a new theater, then --**
18   **then they're going to sign a lease; isn't that**
19   **correct?**
20
21       MS. SHIELDS: Objection; calls for
22   speculation.
23       THE WITNESS: It really depends upon
24   the financing mechanism or the opportunity.
                                    Page 59

1    the scope of the subpoena.  You can answer
2    if you can.
3        MS. MCCREARY: Objection; foundation.
4        THE WITNESS: I don't know.
5
6    BY MR. COYLE:
7    **Q.  Can you -- as you sit here today, can you**
8    **think of any Rave site that does not have a lease?**
9
10       MS. MCCREARY: Objection.
11       MS. SHIELDS: Objection.
12       MS. MCCREARY: Lacks foundation.
13       MS. SHIELDS: Same objection.
14       THE WITNESS: Certain of our sites
15   have sale-leaseback transactions with a
16   third-party financing source.
17
18   BY MR. COYLE:
19   **Q.  Okay. But barring that relationship, all**
20   **the sites have a lease?**
21
22       MS. SHIELDS: Objection.
23       THE WITNESS: I believe that element
24   confuses your question.
                                    Page 61

1  BY MR. COYLE:
2     Q.  Well, I mean, it's -- it's really more
3  simple than that.
4        If -- if Boston Ventures is going to put
5  equity in a Rave -- a new Rave theater site and Rave
6  has to sign a lease, Boston Ventures gets to approve
7  that.
8
9        MS. SHIELDS:  Objection; compound.
10       THE WITNESS:  Your question is also
11   incorrect.
12
13 BY MR. COYLE:
14    Q.  Okay.  Well, let's go back.  Let's go back
15 to -- because I think we're getting down to minutia
16 here, and it's -- I'm not intending it to make it
17 any more complicated than it is.
18       The Rave management team goes out and
19 looks at potential sites, as a general rule;
20 correct?
21    A.  Yes.
22    Q.  And at some point in the process after
23 they've looked at different sites, they will conduct
24 a certain due diligence as to whether that would be

Page 62

1        (The question was read back as
2  follows:
3        "And so to the extent that
4  they've looked at a site that they
5  ultimately conclude on their own they
6  may or may not be interested in, then
7  the board of managers from Boston
8  Ventures might not even know about
9  it.")
10
11       MS. MCCREARY:  Preserve the
12 objections, please.
13       MS. SHIELDS:  Preserve the objections,
14 please.
15       THE WITNESS:  In the development
16 efforts at Rave, there is always a deep
17 pipeline of sites that they are working on
18 which may or may never rise up to the
19 approval process with the board of
20 managers.
21
22 BY MR. COYLE:
23    Q.  Okay.  Let's take a look at Exhibit Number
24 2.  Right here.  Let's go to page BV 002.

Page 64

1  a prudent site to build a new theater.
2
3        MS. MCCREARY:  Objection; calls for
4  speculation, lacks foundation.
5        THE WITNESS:  They conduct an analysis
6  and diligence process to determine whether
7  or not they want to propose a site to the
8  board of managers.
9
10 BY MR. COYLE:
11    Q.  Okay.  And -- and so to the extent that
12 they've looked at a site that they ultimately
13 conclude on their own they may or may not be
14 interested in, then the board of managers from
15 Boston Ventures might not ever even know about it?
16
17       MS. MCCREARY:  Objection.
18       MS. SHIELDS:  Objection.
19       MS. MCCREARY:  Lacks foundation; calls
20 for speculation.
21       MS. SHIELDS:  Same objection.
22       THE WITNESS:  Could you read back the
23 question, please.
24

Page 63

1        First of all, can you identify that
2  document?
3     A.  As I sit here today, I know what this is;
4  but I don't recall receiving it.
5     Q.  Okay.  But this is a document that -- it
6  was in the -- it was, obviously, in the possession
7  of Boston Ventures?
8     A.  That's right.
9     Q.  And it looks to me like that -- that there
10 is another page to this.  It says Theater Pipeline,
11 and it starts with Number 7.  See that there at the
12 top?
13    A.  Yes; I see Number 7 at the top.
14    Q.  So, presumably, there's another page
15 that's got sites 1 through 6 on it?
16
17       MS. SHIELDS:  Objection; calls for
18 speculation.
19       THE WITNESS:  Actually, 1 through 6
20 are the open and operating cinemas.  It
21 says that at the top of the page.
22
23 BY MR. COYLE:
24    Q.  Okay.  And then the theater pipeline is --

Page 65

1    is 7 through 18. These are different theaters that
2    -- well, tell me what these are.
3        A.   These are the names of different theaters
4    that the company was working on at that time as
5    potentials.
6        Q.   Okay. When you say the company, that
7    would be Rave or Boston Ventures?
8        A.   No; always Rave when I'm saying the
9    company.
10       Q.   Okay. So as of the date of this document,
11   September 10, 2002, these are different potential
12   theater sites that -- that Rave is looking at?
13
14            MS. MCCREARY: Objection. Misstates
15       her testimony.
16            MS. SHIELDS: Same objection.
17            THE WITNESS: What I said was that
18       these are cinemas -- potential cinema sites
19       that are in various stages of development
20       and analysis that they were looking at at
21       that time.
22
23   BY MR. COYLE:
24       Q.   Well, now, the date of this document is
                                              Page 66

1    September 10 of 2002. Do you see that?
2        A.   I do see that.
3        Q.   Okay. Let's go back to page BV 001. Can
4    you identify this document?
5        A.   I've already told you what this document
6    is earlier.
7        Q.   Oh, I'm sorry. Is this a board of
8    managers meeting agenda?
9        A.   That's what it says on the top of the
10   page.
11       Q.   Okay. Did you actually go to this
12   meeting?
13       A.   I can't recall whether or not I was at
14   this meeting or not.
15       Q.   Okay. Would it be your normal routine to
16   attend such meetings?
17       A.   Yes.
18       Q.   Okay. And these --
19       A.   In most cases, I am at these meetings.
20       Q.   All right. Do these take place here in
21   Boston or -- or at Rave?
22       A.   They take place at various locations
23   throughout the country.
24       Q.   Okay. Do you know where this meeting took
                                              Page 67

1    place?
2        A.   No; I can't recall where this meeting took
3    place.
4        Q.   And the -- what was discussed at the
5    meeting on September 11th of 2002 is set forth on
6    Exhibit 2 on page BV 001?
7
8            MS. SHIELDS: Objection.
9            MS. MCCREARY: Object to the form;
10       lacks foundation; calls for speculation.
11            MS. SHIELDS: Same objection.
12            THE WITNESS: As I said before, I
13       don't recall being at the meeting. This
14       appears to be the agenda for that meeting.
15
16   BY MR. COYLE:
17       Q.   Okay. And is this a typical agenda for
18   your board of managers meetings?
19
20            MS. SHIELDS: Objection.
21            THE WITNESS: This agenda sets out the
22       topics we typically talk about, among
23       others, at our board of manager meetings.
24
                                              Page 68

1    BY MR. COYLE:
2        Q.   Okay. And, presumably, this page BV 002
3    was part of the agenda on the first page?
4
5            MS. SHIELDS: Objection; calls for
6        speculation.
7            MS. MCCREARY: Objection. Lacks
8        foundation, calls for speculation, assumes
9        facts not in evidence.
10            THE WITNESS: I have no way of making
11       that determination.
12
13   BY MR. COYLE:
14       Q.   Well, it talks about timetables and an
15   overview, and it mentions all of these different
16   sites: Chattanooga, Baton Rouge, Cincinnati. See
17   where it says that?
18       A.   On which page, please?
19       Q.   On page BV 001.
20       A.   Yes, I see that.
21       Q.   Okay. And it's dated September 11th,
22   2002, and the second page is dated September 10th of
23   2002.
24            So is it -- were these different sites
                                              Page 69

18  (Pages 66 to 69)

1   reviewed at this meeting on September 11th of 2002?
2
3           MS. SHIELDS: Objection.
4           MS. MCCREARY: Objection. Calls for
5       speculation, lacks foundation, asked and
6       answered.
7           THE WITNESS: I have answered that
8       question.
9           My answer is I don't know if these two
10      pages go together or not.
11
12  BY MR. COYLE:
13      Q.  Okay. But you and I can agree that these
14  are true and accurate copies of records that exist
15  in Boston Ventures' files?
16      A.  Yes.
17      Q.  Okay. And I take it that these are --
18  somebody files them, and you were able to access
19  them as a result of -- of somebody asking you to
20  look for them?
21      A.  Upon request of the subpoena, I reviewed
22  the files. This is what I found.
23      Q.  Okay. Now, is it typical, then, to have
24  this theater pipeline document discussed at these

Page 70

1   board of managers meetings?
2
3           MS. MCCREARY: Objection.
4           MS. SHIELDS: Objection.
5           THE WITNESS: At our board of managers
6       meetings, we typically discuss potential
7       deals.
8
9   BY MR. COYLE:
10      Q.  Okay. And -- and this is not -- I mean,
11  this is a lot more simple.
12          You've got this board of -- you've got
13  this agenda meeting. You got all these different
14  sites listed on here. Okay. And then you've got
15  this document that says theater pipeline.
16          Now, there's writing on this particular
17  document; do you see that -- BV 002?
18      A.  Yes, I see the writing.
19      Q.  Can you identify that? Is that your
20  handwriting?
21      A.  As I sit here today, it looks to me that
22  is my handwriting.
23      Q.  Okay. And on the page in front of it,
24  it's got -- it's got some handwriting. Does that

Page 71

1   also appear to be your handwriting?
2       A.  As I sit here today, that looks to me to
3   be my handwriting, yes.
4       Q.  Okay. Does that refresh your recollection
5   that you were actually at the meeting?
6       A.  No. I can not specifically recall being
7   at this meeting. It was more than three years ago.
8   It was almost three years ago.
9       Q.  I understand that. But would it be a fair
10  inference that by virtue of the fact that your --
11  your handwritten notes are on here, that you
12  attended the meeting; specifically, with the times
13  of the different presentations?
14
15          MS. MCCREARY: Object to the form.
16      It's badgering. She's testified as to her
17      recollection in attendance -- whether she
18      attended that meeting or not. You're
19      asking her to speculate --
20          MR. COYLE: All right. No speaking
21      objections, please, Counsel.
22          MS. MCCREARY: Excuse me. Let me
23      finish my objection.
24          MR. COYLE: No; stop. Let's just move

Page 72

1       on.
2           MS. MCCREARY: You're asking this
3       witness to speculate.
4           MR. COYLE: No, I'm not. I'm asking
5       her questions. Now, just stop
6       interrupting.
7           MS. SHIELDS: Join.
8
9   BY MR. COYLE:
10      Q.  It's got your notes on it. Is it probably
11  a fair inference that you attended the meeting?
12
13          MS. MCCREARY: I object to the
14      question. It calls for speculation. It's
15      asking this witness to guess. She's asked
16      and answered the question.
17          THE WITNESS: I really don't want to
18      speculate on this.
19
20  BY MR. COYLE:
21      Q.  Okay. So are you telling the judge and
22  the ladies and gentlemen of the jury that
23  notwithstanding your handwritten notes with specific
24  times of presentations, it's your testimony that you

Page 73

19 (Pages 70 to 73)

1  **don't recall being at this meeting?**
2
3       MS. SHIELDS: Objection; asked and
4    answered.
5       THE WITNESS: I have answered this
6    question.
7       I do not recall being at this meeting.
8    I may have been. I can't recall it. It's
9    more -- it's almost three years ago.
10
11  BY MR. COYLE:
12    **Q.  Okay. But it is your normal practice to**
13  **attend these meetings?**
14    A.  I normally try to be at the meetings, yes.
15    **Q.  All right. Now, at these meetings, the**
16  **theater pipeline is discussed, typically; isn't it?**
17
18       MS. MCCREARY: Object to the form.
19    Lacks foundation; calls for speculation;
20    and it's leading.
21       THE WITNESS: At the board of manager
22    meetings, the theater pipeline is one of
23    the topics that is generally discussed.
24
                                          Page 74

1  BY MR. COYLE:
2    **Q.  Okay. Now, on page BV 002, there's**
3  **writings "A". See that?**
4    A.  Yes, I see that.
5    **Q.  What -- what does that mean?**
6    A.  I don't recall specifically what that
7  means.
8    **Q.  What would be your best estimate as to**
9  **what it means?**
10   A.  I don't think I should speculate about
11  that.
12   **Q.  Well, nobody wants you to, but you can --**
13  **nobody wants you to guess, but you can give us your**
14  **best recollection.**
15
16       MS. MCCREARY: Objection. She's --
17
18  BY MR. COYLE:
19   **Q.  And as long as it's couched in the fact**
20  **that it's -- it's your best recollection, then you**
21  **can answer the question.**
22
23       MS. MCCREARY: Objection. She hasn't
24    testified as to her recollection. It calls
                                          Page 75

1       for speculation.
2       THE WITNESS: As I said before, I
3    don't recall this meeting. I can't recall
4    what those A's mean.
5
6  BY MR. COYLE:
7    **Q.  And is it your testimony that you can't**
8  **even give us your best recollection of what you**
9  **think that means?**
10
11       MS. SHIELDS: Objection; asked and
12    answered.
13       THE WITNESS: Recollection would be
14    the wrong word.
15
16  BY MR. COYLE:
17    **Q.  So you don't have -- you just don't have**
18  **any idea what it means?**
19    A.  I can have an idea of what it means.
20    **Q.  Okay. That's what I'm looking for.**
21
22       MS. MCCREARY: Objection; calls for
23    speculation.
24       MS. SHIELDS: Same objection.
                                          Page 76

1       THE WITNESS: You want me to --
2       MS. SHIELDS: If you can answer the
3    question, you can.
4       THE WITNESS: Okay. I want to be
5    clear I have no specific recollection; but
6    as I sit here today, I can make an estimate
7    guess of what that means.
8
9  BY MR. COYLE:
10    **Q.  Okay. Go ahead.**
11    A.  I --
12
13       MS. SHIELDS: If you're guessing, I
14    would caution the witness not to guess.
15    Guessing is not proper.
16
17  BY MR. COYLE:
18    **Q.  Nobody wants you to guess, but what --**
19    A.  I have an educated opinion of what I think
20  it means.
21    **Q.  Okay. Please, then, go ahead and answer.**
22    A.  But it is not a specific recollection.
23    **Q.  I understand.**
24    A.  I believe that it means that the site has
                                          Page 77

| | Page 78 | | Page 80 |
|---|---|---|---|
| 1 | been reviewed by the board of managers. | 1 | **meetings?** |
| 2 | **Q. Okay. And when you say the board of** | 2 | A. No, I do not. |
| 3 | **managers, that would be the board of managers of** | 3 | **Q. Who does?** |
| 4 | **Boston Ventures?** | 4 | A. We don't have a specific chairperson. |
| 5 | A. No, no. | 5 | **Q. Okay. Who prepares the agenda?** |
| 6 | | 6 | |
| 7 | MS. SHIELDS: Objection. | 7 | MS. MCCREARY: Can we take a break for |
| 8 | THE WITNESS: Rave. | 8 | a minute after these questions, please, |
| 9 | | 9 | Mr. Coyle? |
| 10 | BY MR. COYLE: | 10 | MR. COYLE: Yeah; let me finish this |
| 11 | **Q. Okay. And when you say that that means** | 11 | line of questioning, Counsel. |
| 12 | **that -- what does that mean; that they have actually** | 12 | MS. MCCREARY: Thanks. |
| 13 | **been out there or they've done some kind of due** | 13 | THE WITNESS: I don't know who |
| 14 | **diligence?** | 14 | specifically puts the agenda -- types it |
| 15 | A. For a site to be approved by the board of | 15 | up, puts it together. |
| 16 | managers of Rave, the management team would have | 16 | |
| 17 | completed the majority of its analysis and | 17 | BY MR. COYLE: |
| 18 | assessment of the site and have prepared a | 18 | **Q. Would it be somebody at Boston Ventures?** |
| 19 | substantial board approval package for our review. | 19 | A. No. I do not put the agenda together, but |
| 20 | **Q. Okay. Would that be the approval book** | 20 | I can ask for topics be put on the agenda. |
| 21 | **that you talked about?** | 21 | **Q. Okay. So at this meeting, then, on** |
| 22 | A. That's good, yes. | 22 | **September 11, 2002, were the -- would the approval** |
| 23 | **Q. Okay. And would that -- would "A" stand** | 23 | **book, then, have been gone through for the ones** |
| 24 | **for approval book, then?** | 24 | **where the approval book had been put together?** |

| | Page 79 | | Page 81 |
|---|---|---|---|
| 1 | MS. SHIELDS: Objection; calls for | 1 | MS. MCCREARY: Objection. |
| 2 | speculation. | 2 | MS. SHIELDS: Objection. |
| 3 | THE WITNESS: Yeah; I'd be | 3 | MS. MCCREARY: Lacks foundation; calls |
| 4 | speculating. | 4 | for speculation as to this witness's |
| 5 | | 5 | knowledge as to what that means. |
| 6 | BY MR. COYLE: | 6 | THE WITNESS: Yeah; I mean, I don't |
| 7 | **Q. Okay. So let's go back to this board of** | 7 | recall this meeting, I'm telling you. |
| 8 | **managers meeting of Rave. How often would you have** | 8 | |
| 9 | **these meetings?** | 9 | BY MR. COYLE: |
| 10 | A. We typically have our meetings quarterly, | 10 | **Q. I understand. But if -- if there was a** |
| 11 | with interim telephonic conference calls, if | 11 | **site that had reached the point where the approval** |
| 12 | necessary. | 12 | **book had been put together, would this be the type** |
| 13 | **Q. Okay. So there would be other of these** | 13 | **of meeting where it would be approved by Boston** |
| 14 | **quarterly agenda meeting minutes?** | 14 | **Ventures?** |
| 15 | | 15 | |
| 16 | MS. SHIELDS: Objection; calls for | 16 | MS. SHIELDS: Objection; calls for |
| 17 | speculation. | 17 | speculation. |
| 18 | MS. MCCREARY: Lacks foundation. | 18 | THE WITNESS: Approval books are |
| 19 | THE WITNESS: As I sit here today, | 19 | sometimes a topic at our board of managers |
| 20 | most of our manager meetings would have | 20 | meetings. |
| 21 | agendas to them. | 21 | |
| 22 | | 22 | BY MR. COYLE: |
| 23 | BY MR. COYLE: | 23 | **Q. Okay. So, conceivably, if they had the** |
| 24 | **Q. Okay. Do you -- do you chair the** | 24 | **approval books together, they've completed their due** |

1  diligence and they were ready to -- to take it to
2  Boston Ventures, it could be decided whether to
3  approve it or not to approve it at one of these
4  board of managers meetings?
5
6      MS. MCCREARY: Object to the form.
7  It's leading. It assumes facts not in
8  evidence. It calls for speculation on the
9  part of this witness.
10     MS. SHIELDS: Same objection.
11     THE WITNESS: I think you're going to
12  have to break that question down.
13     MR. COYLE: Is that form or
14  foundation, Lynn? I guess I just can't
15  tell. You know, it's just so bothersome.
16  Please read the question back.
17     THE WITNESS: I just don't understand
18  what you're saying.
19     MR. COYLE: No, no. I think you
20  understand just fine. I think the problem
21  is, is you're getting a speaking objection
22  from Lynn and then you're afraid to answer
23  the question. You're doing fine.
24     Please read the question back.

Page 82

1      MS. MCCREARY: The rules may be
2  bothersome, Mr. Coyle, but the rules are
3  the rules.
4      MR. COYLE: Oh, please, they are not.
5  We'll show these to the judge.
6
7      (The question was read back as
8  follows:
9      "So, conceivably, if they had
10  the approval books together, they've
11  completed their due diligence and
12  they were ready to take it to Boston
13  Ventures, it could be decided whether
14  to approve it or not to approve it at
15  one of these board of managers
16  meetings?")
17
18     MS. MCCREARY: Same objection.
19     THE WITNESS: I'm not going to answer
20  the question to the specifics of the
21  September 2002 meeting because I do not
22  recall that meeting.
23     In general, at board of managers
24  meetings or on interim telephonic

Page 83

1      conference calls, we approve and review
2      board approval books.
3
4  BY MR. COYLE:
5      Q.  Okay. And once the board approval book is
6  approved, then the process can move forward to the
7  execution of a lease?
8      A.  It's a little more complicated than that.
9      Q.  But, generally, that would be the process?
10
11     MS. SHIELDS: Objection.
12     THE WITNESS: The process is we review
13  board books. It takes a series of
14  conference calls, questioning, and analysis
15  by the Board.
16     In some cases, there are subsequent
17  diligence trips out to look at the site.
18  In some cases, we modify.
19     And then it moves in to lease
20  negotiations, which then takes a
21  considerable amount of time.
22
23  BY MR. COYLE:
24     Q.  Okay. But you'll never get to the lease

Page 84

1  part of the game until after you've gone through the
2  approval process that you've just described.
3
4      MS. MCCREARY: Objection; lacks
5  foundation, calls for speculation, assumes
6  facts not in evidence.
7      MS. SHIELDS: Objection. I believe it
8  misstates Ms. Granville-Smith's testimony.
9      THE WITNESS: It does misstate what I
10  just said.
11
12  BY MR. COYLE:
13     Q.  I understand. I'm just -- but -- I think
14  what you're telling me is, is that there's a --
15  there's a procedure that might have -- you might
16  have more questions; you might want them to look up
17  additional information.
18     But, eventually, there is an approval
19  process; and once that's completed, then it would
20  move to, you know, lease negotiations and execution.
21  Is that a fair statement?
22
23     MS. MCCREARY: Objection. It calls
24  for speculation; assumes facts not in

Page 85

22 (Pages 82 to 85)

1    evidence.
2        MS. SHIELDS: Same objection.
3        THE WITNESS: I don't know how the
4    management team at Rave manages the lease
5    process.
6        I don't think it's typical for each
7    site. I think it's highly dependent upon
8    each particular site.
9
10   BY MR. COYLE:
11   Q.  I understand. But the -- all's I'm
12   getting to is that if Boston Ventures is going to
13   put equity in the site, it has to go through this
14   approval process.
15
16       MS. SHIELDS: Objection. It misstates
17   the witness's prior testimony and calls for
18   speculation.
19       THE WITNESS: You're also misstating
20   our relationship with the company.
21
22   BY MR. COYLE:
23   Q.  Well, I'm just trying to get a general
24   procedure, and then I'm going to go back and ask you

Page 86

1    some specifics.
2    A.  But I don't want incorrect facts to be on
3    the record.
4    Q.  I understand.
5    A.  But you keep saying it.
6    Q.  Well, just -- how am I incorrect?
7    A.  Can I?
8
9        MS. SHIELDS: That's not a proper
10       question. You can ask questions that the
11       witness can answer.
12       MR. COYLE: I mean, Kathy, I'm trying
13       to move this as quickly -- this is a very
14       sophisticated person.
15       I mean, I think that if we just let
16       her, she'll tell me the answer. I mean,
17       she really -- she knows more about this
18       than I do.
19       MS. SHIELDS: Mr. Coyle, depositions
20       have rules. We're going to follow the
21       rules of the deposition.
22
23   BY MR. COYLE:
24   Q.  Okay. I mean, I'm just trying to get the

Page 87

1    general -- the process here; and I understand that
2    there might be a difference here and a difference
3    there.
4        But, generally, this due diligence on
5    these different sites is done by Rave; and then,
6    eventually, it reaches a process where they think if
7    it's a site that's suitable for Boston Ventures to
8    consider, they put together this approval book, and
9    then you look at that particular site. Is that,
10   generally, a fair statement?
11
12       MS. MCCREARY: Object to the form. It
13       assumes facts not in evidence; calls for
14       speculation; vague.
15       THE WITNESS: I would like to restate,
16       in my words, how it works.
17
18   BY MR. COYLE:
19   Q.  Okay. Go ahead.
20   A.  Not agreeing to your words, necessarily.
21   As I sit here today, the approval process works as
22   such:
23       The management team of Rave reviews many
24   sites. When they find a site that they believe

Page 88

1    merits being in the Rave portfolio and they have
2    completed the majority of their analysis and
3    diligence on the opportunity, they bring it to the
4    attention of the board of managers.
5    Q.  All right. How many people are on the
6    board of managers?
7    A.  As I sit here today, I believe it's five.
8    Q.  And three of those board of managers would
9    be from Boston Ventures?
10   A.  Yes.
11   Q.  Okay. Was a approval book presented by
12   the Rave management team to the board of managers
13   for the site in Omaha, Nebraska?
14   A.  No, it was not.
15   Q.  Now, are -- can there be sites on the
16   theater pipeline -- and looking at this list of 7
17   through 18 -- where the Rave management team could,
18   on their own, decide that it's not something they
19   want to present to the board of managers of Boston
20   Ventures?
21
22       MS. MCCREARY: Object to the form.
23       Calls for speculation and lacks foundation.
24       MS. SHIELDS: Object; vague.

Page 89

1      THE WITNESS: I think it's complicated
2   the way you phrased it. I'll answer it in
3   my own words.
4      The management team decides to pursue
5   or not pursue sites based upon their own
6   analysis. Only when they decide they want
7   to pursue a site and bring it to the board
8   of managers are we notified.
9
10  BY MR. COYLE:
11  **Q. And -- and it's your testimony that the**
12  **Rave Reviews Cinemas never brought the Omaha,**
13  **Nebraska theater complex to the board of managers**
14  **for Boston Ventures for their approval?**
15  A.  As I said earlier today, I knew about
16  Omaha; that they were looking at it. It was never
17  brought for approval to the board of managers.
18  **Q.  Was it -- so is it your testimony that**
19  **Boston Ventures -- well, let me back up.**
20  **Has a -- has a theater project site been**
21  **brought to the board of managers of Boston Ventures**
22  **where they've -- they've made a decision not to**
23  **invest?**
24
                                            Page 90

1      MS. SHIELDS: Objection; calls for
2   speculation. It's beyond the scope of the
3   subpoena. I'll permit Ms. Granville-Smith
4   to answer the question.
5      THE WITNESS: Okay. One point: You
6   keep saying -- your terminology is
7   incorrect, and I want to make sure it's
8   clear for the record.
9      MR. COYLE: Okay.
10     THE WITNESS: Board of managers of
11  Rave.
12
13  BY MR. COYLE:
14  **Q.  I understand.**
15  A.   Okay. But please be clear.
16  **Q.  Thank you. So has there ever been a -- a**
17  **site that's been brought to the board of managers**
18  **that they decided not to pursue?**
19  A.   As I said earlier today, we spend a lot of
20  time on the approval books and make modifications
21  about sites.
22     I can not recall, as I sit here today, a
23  specific site that was vetoed. But, certainly, many
24  sites have been modified or put on the back burner
                                            Page 91

1   for periods of time as we prioritized the needs of
2   the company.
3      **Q.  Okay. Were you ever presented with an**
4   **approval book on the Omaha theater?**
5   A.   No, I was not.
6      **Q.  Is it your testimony that no such approval**
7   **book was ever submitted to the board of managers?**
8   A.   To the best of my knowledge, I do not
9   believe any approval book was ever submitted to the
10  board of managers.
11     **Q.  Do you -- do you know why no approval book**
12  **was ever submitted to the board of managers**
13  **regarding the proposed Rave site in Omaha, Nebraska?**
14
15     MS. SHIELDS: Objection; calls for
16     speculation.
17     THE WITNESS: I would have to
18     speculate. It wouldn't be within my
19     knowledge base.
20
21  BY MR. COYLE:
22     **Q.  Well, I mean, it's on your list. I take**
23  **it you work with these people every day.**
24     **Did you ever say to Tom, Hey, what**
                                            Page 92

1   **happened to Omaha?**
2      A.   I have vague recollection of a
3   conversation with the management team asking them
4   about Omaha.
5      **Q.  Okay. And who did you have that**
6   **conversation with?**
7      A.   My vague recollection is that Tom
8   Stephenson was present, and others may have been.
9      **Q.  What others? Bob Painter?**
10     A.   I can not give you a specific. It's a
11  vague recollection.
12     **Q.  Was it a person -- I take it that it was**
13  **an in person meeting?**
14     A.   It was an in person conversation.
15     **Q.  Okay. What is your recollection about**
16  **what you were told about Omaha?**
17     A.   As I sit here today, my vague recollection
18  is that he told me, upon my inquiry, that the Omaha
19  site had become less attractive.
20     **Q.  Did he say why?**
21     A.   There may have been a variety of items;
22  but my recollection, as I sit here today, that among
23  many issues, one of the issues was increased
24  competition within the marketplace.
                                            Page 93

| | |
|---|---|
| 1 **Q. Did he tell you anything else?** | 1 A. Yes, I am. |
| 2 A. As I said to you earlier, this is my vague | 2 **Q. I want to go back to this approval book --** |
| 3 recollection. There may have been other items. | 3 **this approval process. Okay.** |
| 4 **Q. When would that conversation have taken** | 4 **Now, is there information that you -- that** |
| 5 **place?** | 5 **is -- you typically see in an approval book?** |
| 6 A. I can not recall. | 6 |
| 7 **Q. Where would that conversation have taken** | 7 MS. SHIELDS: Objection. |
| 8 **place?** | 8 THE WITNESS: Yes, there is typical |
| 9 A. I can not recall. | 9 information in an approval book. |
| 10 **Q. Would you typically see Stephenson at a** | 10 Some sites may require specific |
| 11 **board of managers meeting? Is that -- is that the** | 11 additional information. |
| 12 **normal place you'd see him?** | 12 |
| 13 A. I see Tom Stephenson in many environments; | 13 BY MR. COYLE: |
| 14 not just board of managers meetings. | 14 **Q. What kind of -- what kind of information** |
| 15 **Q. Is there anything that you could look at** | 15 **would you typically see in an approval book?** |
| 16 **to refresh your recollection of when you had this** | 16 A. As I said earlier today, among other |
| 17 **conversation with Mr. Stephenson?** | 17 things, there would be a description of the |
| 18 A. No, I don't believe so. | 18 opportunity; description of the market, including |
| 19 **Q. But there's no question in your mind that** | 19 demographics, size; a description of the competitive |
| 20 **this -- the information that you have this** | 20 situation; and, typically, a description of the |
| 21 **recollection about was reported to you by Tom** | 21 potential lease terms. |
| 22 **Stephenson?** | 22 The approval book might include maps, |
| 23 A. My recollection is that Tom Stephenson -- | 23 among other things. |
| 24 the conversation was between me and Tom Stephenson | 24 **Q. What do you call the -- is there some kind** |
| Page 94 | Page 96 |

| | |
|---|---|
| 1 and potentially other members of the management | 1 **of proforma financial? What do you call that?** |
| 2 team; but I can't specifically recall who else may | 2 **I mean, I take it that there's some** |
| 3 have been a party to the conversation. | 3 **numbers -- analysis of projections of revenue and** |
| 4 **Q. Do you know who else was there?** | 4 **things of that nature. What do you call those? Is** |
| 5 A. As I said to you before, I don't | 5 **that an FY?** |
| 6 specifically recall the circumstances. | 6 |
| 7 **Q. Any other knowledge that you have about** | 7 MS. SHIELDS: Objection; calls for |
| 8 **the timing of this conversation?** | 8 speculation. |
| 9 A. No, I'm sorry. I don't recall when it | 9 |
| 10 occurred. | 10 BY MR. COYLE: |
| 11 | 11 **Q. What is the term? Is there a term you use** |
| 12 MS. MCCREARY: Mike, can we take a | 12 **for that or --** |
| 13 break? I'd appreciate one now. | 13 |
| 14 MR. COYLE: Okay. Before I lose my | 14 MS. SHIELDS: Assumes facts not in |
| 15 train of thought. Would you like to take a | 15 evidence. |
| 16 recess? That's fine. Let's go. | 16 THE WITNESS: I really don't |
| 17 THE WITNESS: I would, please. | 17 understand what you're asking me. |
| 18 | 18 |
| 19 (Whereupon, a break was taken in the | 19 BY MR. COYLE: |
| 20 proceedings.) | 20 **Q. Is there -- is there some type of -- of** |
| 21 | 21 **projections of revenue?** |
| 22 BY MR. COYLE: | 22 |
| 23 **Q. Ms. Granville-Smith, we took a recess.** | 23 MS. MCCREARY: Objection as vague; |
| 24 **Are you ready to proceed?** | 24 assumes facts not in evidence. |
| Page 95 | Page 97 |

| | |
|---|---|
| 1 THE WITNESS: In our approval books, | 1 potentially unique timetables. |
| 2 there would typically be an assessment of | 2 And what I said earlier is that |
| 3 the level of attendance expected to be | 3 typically the lease negotiations occur |
| 4 generated by the potential cinema, which | 4 after we have an approved deal that has |
| 5 would then translate into a revenue | 5 gone through the board of managers approval |
| 6 expectation. | 6 process. |
| 7 | 7 |
| 8 BY MR. COYLE: | 8 BY MR. COYLE: |
| 9 **Q. Okay. Now, let's go back to some of the** | 9 **Q. Okay. Now, when you talk about economic** |
| 10 **other things you described for me.** | 10 **terms from the developer -- and, again, I understand** |
| 11 **A lease: Would you see a lease in your --** | 11 **that each particular site might have some --** |
| 12 **in your approval book?** | 12 **something unique about it -- will -- will the board** |
| 13 A. The approval books typically have, but not | 13 **of Rave ever look at the proposed terms from a** |
| 14 all of them, but they would typically include the | 14 **developer and say, Hey, we need -- you know, we** |
| 15 economic terms that the management team believed | 15 **don't like these terms, see if you can go back and** |
| 16 they could get from the developer. | 16 **get this, this, and this.** |
| 17 **Q. Okay. And would you -- and those are --** | 17 **Would that be unusual for you to have** |
| 18 **the economic terms you'd get from the developer,** | 18 **something like that?** |
| 19 **would you, on occasion, see, then, an actual lease?** | 19 |
| 20 | 20 MS. SHIELDS: Objection; calls for |
| 21 MS. SHIELDS: Objection. | 21 speculation, and compound. |
| 22 THE WITNESS: As I sit here today, I | 22 MS. MCCREARY: Objection as to |
| 23 don't recall a situation where I saw a | 23 definition of board. It's vague. |
| 24 lease at the time of the approval. It | 24 THE WITNESS: As I said earlier today, |
| Page 98 | Page 100 |

| | |
|---|---|
| 1 typically occurs much later. | 1 I can recall various times going back and |
| 2 | 2 asking the management team to modify terms |
| 3 BY MR. COYLE: | 3 about sites. |
| 4 **Q. Okay. And what do you mean it typically** | 4 And then when they get more in to the |
| 5 **occurs much later -- the lease? Could you describe** | 5 lease negotiations, I review those leases |
| 6 **that for me, please; explain.** | 6 and have pushed back on various times on |
| 7 A. What typically occurs is the management | 7 economic terms. |
| 8 team determines what they believe the economics to | 8 |
| 9 be of the lease and the terms of that lease; but we | 9 BY MR. COYLE: |
| 10 wait until we have approval by the Board before | 10 **Q. Okay. And when you say push back, that --** |
| 11 launching into very detailed lease negotiations. | 11 **that's a term where you'll want to negotiate further** |
| 12 That's the way it typically works. But, | 12 **-- the terms?** |
| 13 again, each deal is different. | 13 A. Yes; or just say no. |
| 14 **Q. Well, when you say each -- I understand** | 14 **Q. Okay. So will -- there will be sites** |
| 15 **every -- every site has some unique factors** | 15 **where you'll actually review the lease?** |
| 16 **associated with it; is that what you're saying?** | 16 A. As I sit here today, I can tell you that I |
| 17 | 17 have reviewed the majority, if not all, of the |
| 18 MS. MCCREARY: Objection. | 18 leases that Rave has signed. |
| 19 MS. SHIELDS: Objection. | 19 **Q. Okay. Now, are all of the Rave theater** |
| 20 MS. MCCREARY: Misstates her | 20 **sites -- these are -- these are stadium-type seating** |
| 21 testimony. | 21 **theaters; is that correct?** |
| 22 MS. SHIELDS: Same objection. | 22 |
| 23 THE WITNESS: What I'm saying is that | 23 MS. SHIELDS: Objection. |
| 24 each site has unique elements to it; | 24 THE WITNESS: Yes; all of the cinemas |
| Page 99 | Page 101 |

26 (Pages 98 to 101)

1     have stadium seating in them.
2
3   BY MR. COYLE:
4       **Q. Okay. And these are all brand new**
5   **theaters?**
6
7               MS. SHIELDS: Objection.
8               THE WITNESS: We built all the -- all
9       the cinemas for ourselves, yes.
10
11  BY MR. COYLE:
12      **Q. I mean, you're not -- you're not buying,**
13  **you know, Ajax Cinema on Fourth Street and**
14  **remodeling it.**
15          **These are -- these are sites that Rave is**
16  **building from the ground up.**
17      A.   At this stage, our strategy has not been
18  one of acquisition, but rather of new build.
19      **Q. Okay. Now, I take it that -- are some of**
20  **your sites, then, in new developments?**
21
22              MS. MCCREARY: I'm going to object to
23      the characterization of your sites.
24              She's here on behalf of Boston

                                            Page 102

1   Ventures. She's not produced in accordance
2       with a 30(b)(6) notice for Rave.
3
4   BY MR. COYLE:
5       **Q. You can answer.**
6       A.   At Rave, the company builds in many
7   different locations. One of the locations happens
8   to be within leisure and retail development.
9       **Q. Okay.**
10      A.   That's one scenario, yes.
11      **Q. Okay. And have you had -- have you had**
12  **situations where Rave is going in as one of the --**
13  **the initial tenants of a new development?**
14      A.   That is certainly something we try to
15  avoid; but I can't recall specifically if, in any
16  situation, we were the first tenant.
17      **Q. Well, I guess my point is, is that are**
18  **some of these potential sites driven -- have time**
19  **constraints on them?**
20          **In other words, there's going to be a**
21  **grand opening of a -- of a new retail development**
22  **of, you know, of maybe some stores and some shops**
23  **and -- that Rave would open with at the same time?**
24

                                            Page 103

1               MS. MCCREARY: Objection; lacks
2       foundation, calls for speculation.
3               MS. SHIELDS: Objection; compound and
4       ambiguous.
5               THE WITNESS: I'm going to restate the
6       answer in my own words.
7               It's very difficult to put these
8       general terms against what is really a very
9       specific situation with each site.
10              If you review leases that the company
11      has, in certain of those leases there are
12      times associated upon which the developer
13      would like us to be open at; but,
14      certainly, not in every single case.
15
16  BY MR. COYLE:
17      **Q. Okay. And I understand. And what I'm**
18  **saying is, is that some times in your approval**
19  **process, that could potentially be a factor; that,**
20  **you know, we need to make a decision on this within**
21  **this time period if we're going to be part of this,**
22  **you know, grand opening.**
23
24              MS. MCCREARY: Object to the form;

                                            Page 104

1       leading, calls for speculation, and assumes
2       facts not in evidence.
3               MS. SHIELDS: Same objection.
4               THE WITNESS: I think you're putting
5       your own spin on this. It just doesn't
6       work that way.
7
8   BY MR. COYLE:
9       **Q. Okay. So there's never a time -- as far**
10  **as these potential sites, none of them are time**
11  **sensitive?**
12
13              MS. SHIELDS: Objection; misstates the
14      witness's prior testimony.
15              THE WITNESS: My statement to this
16      question is that there typically is
17      significant time -- lead time -- ahead of
18      an opening such that the board approval
19      process typically is not constrained by
20      time factors.
21              MR. COYLE: Let's -- can we take a
22      recess for just one minute.
23              Let's go off the record, please.
24

                                            Page 105

27 (Pages 102 to 105)

| | |
|---|---|
| 1    (Whereupon, a break was taken in the<br>2    proceedings.)<br>3<br>4  BY MR. COYLE:<br>5    **Q.  Ms. Granville-Smith, we took a short**<br>6  **recess. Are you ready to proceed?**<br>7    A.  Yes, I am.<br>8    **Q.  Okay. Did you ever travel to Omaha to**<br>9  **look at the site?**<br>10   A.  No.<br>11   **Q.  Do you know whether anybody from Boston**<br>12 **Ventures went to Omaha to look at the site?**<br>13   A.  No one from Boston Ventures went to Omaha.<br>14   **Q.  Okay. Are you certain of that?**<br>15   A.  As I sit here today, I'm as certain as I<br>16 can be.<br>17   **Q.  Okay. Let's go back to Exhibit Number 2**<br>18 **that's sitting in front of you; specifically, pages**<br>19 **1 and 2.**<br>20   **You'll have a -- the first item on the**<br>21 **agenda -- on this BV 001 -- there would be a**<br>22 **financial update. Would that be for all of the**<br>23 **theaters?**<br>24<br>Page 106 | 1        MS. SHIELDS: Same objection.<br>2        THE WITNESS: At our board of manager<br>3    meetings, we typically review the financial<br>4    performance of the company typically on a<br>5    theater basis, and typically on a<br>6    consolidated basis.<br>7<br>8  BY MR. COYLE:<br>9    **Q.  Okay. So when it says theater results**<br>10 **versus budget, you will -- you'll see how the**<br>11 **different theaters are doing in the different**<br>12 **markets; how many people are showing up and buying**<br>13 **tickets.**<br>14<br>15       MS. SHIELDS: Objection; misstates the<br>16   witness's testimony.<br>17       MS. MCCREARY: Can you read that<br>18   question back, please.<br>19       MR. COYLE: Let's move on. It's not<br>20   -- this is -- this is not rocket science.<br>21   When you have these -- these --<br>22       MS. MCCREARY: I simply didn't hear<br>23   your question, Mr. Coyle.<br>24       MR. COYLE: -- financial updates -- I<br>Page 108 |
| 1        MS. SHIELDS: Objection; calls for<br>2    speculation.<br>3        MS. MCCREARY: Lacks foundation.<br>4        THE WITNESS: As I said earlier today,<br>5    I don't recall being specifically at this<br>6    meeting.<br>7        I can give an educated statement as to<br>8    what that is.<br>9<br>10 BY MR. COYLE:<br>11   **Q.  Well, I mean, you go to these meetings all**<br>12 **the time. I mean, I know we've got notes -- we've**<br>13 **got your personal notes on here, and you don't have**<br>14 **a specific recollection of being at this meeting.**<br>15 **We've talked about that. We're not going to go back**<br>16 **to that.**<br>17       **But at a board of managers meeting where**<br>18 **it says, Financial Update, theater results versus**<br>19 **budget, is that a typical thing you do at all these**<br>20 **meetings?**<br>21<br>22       MS. MCCREARY: Objection. It's<br>23   argumentative, and it misstates her<br>24   testimony.<br>Page 107 | 1    know, but this is just misery.<br>2        I'm just asking her some questions<br>3    about what kind of financial information.<br>4    And I take it that it's --<br>5        MS. MCCREARY: Mr. Coyle, I simply<br>6    didn't hear it.<br>7<br>8  BY MR. COYLE:<br>9    **Q.  Okay. Sales at -- ticket sales at the**<br>10 **various theaters; is that a fair statement?**<br>11   A.  I would be more comfortable if you<br>12 addressed your question in a more general term<br>13 because I, as I told you before, I don't recall<br>14 specifically being at this meeting.<br>15   **Q.  Okay. And I'm -- and I'm talking about**<br>16 **board of managers meetings that I understand you**<br>17 **have quarterly.**<br>18   A.  Uh-huh.<br>19   **Q.  So is it a fair statement,**<br>20 **Ms. Granville-Smith, that this is -- that you have**<br>21 **these meetings all the time -- at least four times a**<br>22 **year?**<br>23   A.  Yes. As I said to you before, we<br>24 typically meet on a quarterly basis as a board, yes.<br>Page 109 |

1　Q.　And let's just get away from the agenda.
2　A.　Okay.
3　Q.　Would it be typical, at one of these
4　meetings, to discuss the financial results of the
5　various theaters?
6　A.　Yes; among other things, we discuss the
7　financial performance of the company and each of the
8　theaters.
9　Q.　Okay. Now, under Number 3, Real Estate
10　Review, you would -- it says, Status of existing
11　markets.
12　　And I take it that there would be a report
13　on your different locations and whether there's a
14　new theater in town; things of that nature?
15
16　　　MS. MCCREARY: Objection.
17　　　MS. SHIELDS: Objection.
18　　　MS. MCCREARY: Lacks foundation, calls
19　　for speculation, assumes facts not in
20　　evidence.
21　　　MS. SHIELDS: Is your question
22　　generally or --
23
24　BY MR. COYLE:

Page 110

1　Q.　I'm just -- I take it that -- that this
2　agenda is not -- is a typical agenda; these types of
3　things are discussed at these meetings?
4　A.　As I said earlier today, these kinds of
5　topics, among others, are discussed at our board of
6　managers meetings.
7　Q.　Okay. Now, you have Timetables -- 2003.
8　It says, New market opportunities and pipeline. And
9　it says, Timetables -- 2003.
10　　Chattanooga, Baton Rouge, Cincinnati,
11　Melbourne, Destin, Syracuse and Patton Creek.
12　　Did I read that correctly?
13　A.　Yes; that's what it says.
14　Q.　Okay. So then on the other sheet where it
15　says 2003, those would be the theaters that you're
16　hoping to open in 2003; would that be a fair
17　statement?
18
19　　　MS. SHIELDS: Objection; foundation.
20　　　MS. MCCREARY: Objection. It
21　　mistates the witness's testimony.
22　　　THE WITNESS: Again, I would say I
23　　don't want to tie these two documents
24　　together because I don't know if they go

Page 111

1　together or not.
2　　So your question leads me down that
3　　path.
4
5　BY MR. COYLE:
6　Q.　Well, is that the year that -- when it
7　says opening year on this document -- BV 002 -- I
8　take it that that's the year you're planning to open
9　the theater in that location?
10　A.　It's important to note that the top of
11　this document uses the word pipeline. It doesn't
12　necessarily mean that all those cinemas have been
13　approved and are ready to go.
14　　It's like projections. It's planning for
15　the company.
16　Q.　I understand. And so --
17　A.　Okay.
18　Q.　-- to the extent it says timetables, 2003,
19　does that mean that -- that the plan is to open the
20　theater in that year -- 2003?
21
22　　　MS. MCCREARY: Objection; lacks
23　　foundation, calls for speculation.
24　　　THE WITNESS: I would be speculating

Page 112

1　　on this as much as anyone else could
2　　speculate on this.
3
4　BY MR. COYLE:
5　Q.　I'm sorry; I thought that you were on the
6　board of directors at the Rave Reviews Cinemas.
7　A.　I am.
8　Q.　Okay.
9　A.　But as I told you earlier, I don't recall
10　receiving this document.
11　Q.　Okay. I understand. But it says -- this
12　is really simple. Opening year -- I understand that
13　these are projections.
14　　And when it says opening year on this
15　document, I take it that that's the year that you'd
16　like to open that theater if it's going to be built.
17
18　　　MS. MCCREARY: Objection; asked and
19　　answered. You're badgering the witness.
20　　　MS. SHIELDS: Same objection.
21　　　THE WITNESS: As I said before, I
22　　think I would be speculating on that.
23　　　You can ask me questions about this in
24　　general.

Page 113

29　(Pages 110 to 113)

1    BY MR. COYLE:

2      **Q.   Okay. And that's been fine. It's in**

3    **general. Is that the year that you're hoping to**

4    **open it?**

5           MS. SHIELDS: Objection; vague.

6           MS. MCCREARY: Same objection.

7           THE WITNESS: We typically have

8        pipeline reports where we include our

9        expectations of when we would like a cinema

10       to open if that cinema manages its way

11       through the approval process and the lease

12       negotiation process.

13          But it's simply that. It's

14       projections. It's forward planning.

15

16   BY MR. COYLE:

17     **Q.   Okay. Did you open a theater in**

18   **Birmingham, Alabama?**

19

20          MS. SHIELDS: Objection. It's beyond

21       the scope of the subpoena. How is this

22       relevant to the current dispute?

23          MR. COYLE: I'm just going down to see

Page 114

---

1    Patton Creek; and, yes, we have opened that.

2      **Q.   Okay. Chattanooga, Tennessee?**

3      A.   That's unfair. You are excluding one of

4    the cinemas on the list, and I think that's

5    inappropriate.

6      **Q.   Well, I'll go back through it. Did you**

7    **open a theater in Chattanooga?**

8      A.   We have a cinema in Chattanooga. We had

9    several locations in process in Chattanooga. I do

10   not know which cinema it is that was opened.

11     **Q.   Did you open one in Melbourne, Florida?**

12     A.   We have a cinema in Melbourne, Florida.

13   The development situation there changed once during

14   our process; not clear whether or not this is the

15   same deal as we ultimately had at the end.

16     **Q.   Okay. Did you open a theater in Jackson**

17   **-- is that Jackson, Mississippi?**

18     A.   No.

19     **Q.   Jackson. Where is that?**

20     A.   Jackson is in Mississippi. We do not have

21   a cinema there.

22     **Q.   Okay. Do you have one in development**

23   **there?**

24

Page 116

---

1        how many of these theaters opened.

2           MS. SHIELDS: I'll permit

3        Ms. Granville-Smith to answer the question.

4           THE WITNESS: Yes; we opened a theater

5        in Birmingham, Alabama.

6

7    BY MR. COYLE:

8      **Q.   Did you open one in Little Rock, Arkansas?**

9      A.   Yes; we opened a cinema Little Rock.

10     **Q.   Cincinnati, Ohio?**

11     A.   Yes; we opened in Cincinnati.

12     **Q.   Baton Rouge, Louisiana?**

13     A.   We have a cinema in Baton Rouge. I can

14   not recall whether or not that cinema is the cinema

15   that is on this list or not.

16     **Q.   Okay.**

17     A.   I simply don't know. We looked at a

18   variety of cinemas in Baton Rouge

19     **Q.   Did you open a theater in Destin, Florida?**

20     A.   We have opened a cinema in Destin,

21   Florida.

22     **Q.   Did you open a theater in Birmingham,**

23   **Alabama?**

24     A.   You're referring to the second cinema in

Page 115

---

1           MS. SHIELDS: Objection. That borders

2        on planning. That -- that questions asks

3        for proprietary information about Boston

4        Ventures' planning processes -- their

5        current planning processes.

6           I don't think that that's relevant to

7        this case. It's potentially very sensitive

8        and confidential information about their

9        future development plans.

10          I'm not going to permit

11       Ms. Granville-Smith to answer that

12       question.

13          MR. COYLE: You're not going to permit

14       the witness to answer whether they're

15       building a theater in Jackson?

16          MS. SHIELDS: Your question was

17       whether they are currently -- whether it's

18       currently under development.

19

20   BY MR. COYLE:

21     **Q.   Are you building a theater in Jackson?**

22     A.   That's the same question.

23

24          MS. SHIELDS: That's the same

Page 117

| | |
|---|---|
| 1   question. | 1   (Exhibit Number 3 was marked for |
| 2   MR. COYLE: I don't think that is. | 2   identification.) |
| 3   MS. SHIELDS: Are you developing an | 3 |
| 4   as-yet unbuilt theater in Jackson is a | 4   MS. SHIELDS: Mr. Coyle, before we |
| 5   question that calls for the witness to | 5   took a break, you had asked |
| 6   disclose information about their current | 6   Ms. Granville-Smith some questions about |
| 7   planning process. | 7   development in Jackson, Mississippi. |
| 8   That information -- because a theater | 8   If you'd like to ask that question |
| 9   isn't yet built, that's very confidential | 9   again, I'll permit Ms. Granville-Smith to |
| 10  and sensitive information about what the | 10  answer the question. |
| 11  company is planning to do. | 11  MR. COYLE: Okay. Thank you. |
| 12  MR. COYLE: I understand. My question | 12 |
| 13  is simpler. | 13  BY MR. COYLE: |
| 14 | 14  **Q. Is Rave developing a theater in Jackson,** |
| 15  BY MR. COYLE: | 15  **Mississippi?** |
| 16  **Q. Does Rave have a theater under** | 16  A. To the best of my knowledge, no, we are |
| 17  **construction at Jackson?** | 17  not. |
| 18 | 18  **Q. Okay. Look at Exhibit Number 3. It's** |
| 19  MS. SHIELDS: You can answer the | 19  **just off your web site.** |
| 20  question whether there's a theater under | 20  A. I'd like to take a recess, please. |
| 21  construction. | 21 |
| 22  THE WITNESS: To the best of my | 22  (Exhibit Number 4 was marked for |
| 23  knowledge, I do not believe that there is a | 23  identification.) |
| 24  cinema under construction in Jackson. | 24 |
| Page 118 | Page 120 |

| | |
|---|---|
| 1   BY MR. COYLE: | 1   BY MR. COYLE: |
| 2   **Q. Okay. Is -- is Rave building one there?** | 2   **Q. I handed you Exhibit 3, and I think I** |
| 3 | 3   **might have misspoke. That is a web site from Rave** |
| 4   MS. SHIELDS: I'm going to instruct | 4   **Motion Pictures. Are you familiar with that?** |
| 5   the witness not to answer that question. | 5   A. No. I'm not really familiar with their |
| 6   It's inappropriate. It calls for | 6   web site. I don't go there that often. |
| 7   confidential and proprietary information. | 7   **Q. Okay. And the only reason I'm asking is** |
| 8   It's beyond the scope of the subpoena. | 8   **it appears to me that -- that there's no theater in** |
| 9 | 9   **Syracuse, New York; is that correct?** |
| 10  BY MR. COYLE: | 10  A. At this stage, no, there is no theater in |
| 11  **Q. Did you build one in Austin, Texas?** | 11  Syracuse, New York. |
| 12  A. To the best of my knowledge, there is no | 12  **Q. And there's -- there's no theater in** |
| 13  cinema operating currently in Austin, Texas. | 13  **Jackson?** |
| 14  **Q. Okay. Are you building one?** | 14  A. Based upon the web site, no, there's no |
| 15 | 15  theater in Jackson. |
| 16  MS. SHIELDS: Same objection; same | 16  **Q. I understand. And I didn't click on the** |
| 17  instruction. | 17  **press releases. I don't know what they've announced** |
| 18  VIDEOGRAPHER: This is the end of Tape | 18  **they're developing.** |
| 19  1. We are going off the record to change | 19  **But the only reason I ask it is it looks** |
| 20  tapes. | 20  **to me like the only theaters off the pipeline,** |
| 21 | 21  **Exhibit 2, page BV 002, is Omaha, Nebraska;** |
| 22  (Whereupon, a short break was taken | 22  **Syracuse, New York; and Jackson. Is that a fair** |
| 23  in the proceedings.) | 23  **statement?** |
| 24 | 24 |
| Page 119 | Page 121 |

31  (Pages 118 to 121)

| | |
|---|---|
| 1    MS. SHIELDS: Objection; vague. | 1  **lease for Omaha?** |
| 2    THE WITNESS: As I said earlier today, | 2    A.  That's my testimony. I never reviewed a |
| 3    I commented that it wasn't clear to me | 3  lease for Omaha, as I sit here today. |
| 4    whether or not the Baton Rouge site was the | 4    **Q.  Do you know whether a lease -- a proposed** |
| 5    same site or not. | 5  **lease was being negotiated?** |
| 6      In addition, Chattanooga has no site | 6    A.  I have no idea. |
| 7    attached. It's just a market. | 7    **Q.  Did you ever have any conversations with** |
| 8      Austin is another site -- another | 8  **anybody at Rave about lease negotiations for the** |
| 9    market, excuse me -- where we looked at | 9  **Omaha site?** |
| 10   various sites. | 10   A.  I don't remember any discussions; but |
| 11     So please don't make that | 11 there could have been. But I do not remember any |
| 12   generalization about this document. | 12 discussions about the lease in Omaha. |
| 13 | 13   **Q.  Were you ever given terms for a lease in** |
| 14 BY MR. COYLE: | 14 **Omaha?** |
| 15   **Q.  Well, but you have -- you have -- Rave has** | 15   A.  No, I don't recall ever receiving terms |
| 16 **theaters in those cities?** | 16 for the lease in Omaha. |
| 17   A.  Those are very big cities. | 17   **Q.  Did you ever have a conversation with** |
| 18   **Q.  I understand. But you and I can agree** | 18 **anybody at Rave about beginning the lease** |
| 19 **that they've got -- the only theaters that are on** | 19 **negotiation process?** |
| 20 **that list that aren't presently operated is** | 20   A.  No; I don't recall any conversations of |
| 21 **Syracuse, Jackson, and Omaha.** | 21 that nature. |
| 22 | 22   **Q.  Does the -- does the -- does the board of** |
| 23     MS. SHIELDS: Objection. It misstates | 23 **Rave need to give approval for the management team** |
| 24   the document, and it misstates the | 24 **to start such negotiations?** |
|         Page 122 |         Page 124 |

| | |
|---|---|
| 1    witness's prior testimony. | 1      MS. MCCREARY: Objection to the form; |
| 2      THE WITNESS: What I'll say is that we | 2    calls for speculation, lacks foundation. |
| 3    currently are not operating cinemas in | 3      MS. SHIELDS: Join. |
| 4    Jackson, Syracuse, and Omaha. | 4      THE WITNESS: Could you restate his |
| 5 | 5    question, please. |
| 6 BY MR. COYLE: | 6 |
| 7    **Q.  Okay. So is it your testimony that there** | 7      (The question was read back as |
| 8 **isn't any plan development for Jackson or Syracuse?** | 8    follows: |
| 9    A.  As I sit here today, I do not believe we | 9      "Does the board of Rave need to |
| 10 have any plan development for Jackson. | 10   give approval for the management team |
| 11     I do know that the management team likes | 11   to start such negotiations?") |
| 12 the Syracuse market and would like to find an | 12 |
| 13 opportunity there. | 13     MS. SHIELDS: Objection. Also vague |
| 14   **Q.  Did you ever review a lease for the site** | 14   as to negotiations. |
| 15 **in Omaha?** | 15     THE WITNESS: As I stated before, the |
| 16 | 16   lease negotiations process is different for |
| 17     MS. MCCREARY: Objection; lacks | 17   each site transaction. |
| 18   foundation, assumes facts not in evidence. | 18     But a lease can not be signed unless |
| 19     THE WITNESS: As I sit here today, I | 19   the Board has approved the site, and, |
| 20   do not believe I ever saw a lease for | 20   subsequently, Boston Ventures has reviewed |
| 21   Omaha. | 21   the lease. |
| 22 | 22 |
| 23 BY MR. COYLE: | 23 BY MR. COYLE: |
| 24   **Q.  So your testimony is you never reviewed a** | 24   **Q.  Okay. Ms. Granville-Smith, my question** |
|         Page 123 |         Page 125 |

1    was a lot more narrow than that.
2         Does the board of directors need to give
3    the management team at Rave permission to begin
4    lease negotiations?
5
6         MS. SHIELDS: Same objection.
7         THE WITNESS: As I sit here today, I
8    can't give you a specific answer to that.
9    It would be technical, and I just don't
10   know as I sit here today.
11
12   BY MR. COYLE:
13   Q.   Well, what is it that you don't know? I
14   mean, you don't instruct -- doesn't the -- the three
15   members from Boston Ventures sit on the Rave review
16   board. We've talked about that earlier. And you've
17   told me what your typical timeline is for a site.
18        My question to you is: Does senior
19   management at Rave require permission from the board
20   of directors of Rave before they begin lease
21   negotiations?
22
23        MS. SHIELDS: Objection; vague as to
24        lease negotiations.

Page 126

1         THE WITNESS: My response was that I
2    don't know if, technically, they require
3    our approval or not.
4         In practice, they can't complete the
5    lease negotiations unless someone from
6    Boston Ventures has approved it.
7
8    BY MR. COYLE:
9    Q.   Okay.
10   A.   So --
11   Q.   Did you know -- do you know whether senior
12   management at Rave was involved in lease
13   negotiations with representatives of RED Development
14   for the Omaha theater complex in Omaha?
15   A.   As I said to you before, I don't know if
16   they were discussing a lease in Omaha.
17   Q.   So -- so it's your testimony -- okay. I
18   want you to assume that representatives -- senior
19   management at Rave, specifically, Bob Painter, and
20   Mr. Stephenson -- first of all, who's Bob Painter?
21   A.   Bob Painter is a member of our senior
22   management team at Rave.
23   Q.   Okay. Is he still?
24   A.   Yes.

Page 127

1         MS. MCCREARY: Objection; lacks
2         foundation, calls for speculation.
3
4    BY MR. COYLE:
5    Q.   Okay. And he is an officer of Rave?
6
7         MS. MCCREARY: Objection; lacks
8         foundation, calls for speculation.
9
10   BY MR. COYLE:
11   Q.   Do you know who the senior management
12   officers are at Rave?
13   A.   I don't know, technically, the legal
14   classification of each of the senior managers. I
15   know who the senior management team is, obviously.
16   Q.   Okay. Is Bob Painter a member of the
17   senior management team?
18   A.   Yes.
19
20        MS. MCCREARY: Objection; lacks
21        foundation, calls for speculation.
22
23   BY MR. COYLE:
24   Q.   Is Tom Stephenson a member of the Rave

Page 128

1    senior management team?
2    A.   Yes; Tom Stephenson is a member of the
3    senior management team.
4    Q.   And, in fact, directing your attention to
5    Exhibit 3, Rave Motion Pictures web site identifies
6    Thomas W. Stephenson as President and Chief
7    Executive Officer. Am I reading that correctly?
8    A.   Yes; that's what it says.
9    Q.   Is that, in fact, his title?
10
11        MS. SHIELDS: Objection; calls for
12        speculation. The witness has testified she
13        has no knowledge.
14
15   BY MR. COYLE:
16   Q.   Well, you don't have any reason to doubt
17   the information that's contained on the web site
18   that was printed off on June 29th of 2005?
19   A.   I have no reason to disagree with the
20   report from the web site, no.
21   Q.   Okay. So is it your testimony,
22   Ms. Granville-Smith, that you had no knowledge that
23   any lease negotiations were going on between
24   representatives of RED Development and senior

Page 129

1   management at Rave?

2

3          MS. SHIELDS: Objection; asked and

4       answered several times.

5          THE WITNESS: I do believe I have

6       already answered this a couple of times.

7             But I had no knowledge -- I don't know

8       if they were in discussions on the lease

9       terms to the Omaha site.

10

11  BY MR. COYLE:

12      Q.  Okay. Now, earlier in the deposition you

13  talked about a 1999 commitment of $50 million and

14  then a second commitment in 2002. Do you remember

15  that?

16      A.  What I said at that time is that it was in

17  and around 1999 and in and around 2002.

18      Q.  Okay.

19      A.  Those are the approximate dates.

20      Q.  That's fine.

21      A.  Okay.

22      Q.  I understand.

23      A.  Okay.

24      Q.  And in 1999, it was 50 million?

Page 130

1   was printed off yesterday, June 29th, 2005.

2          Do you have any reason to dispute that

3   this is not a copy of what's on the web site as of

4   yesterday?

5

6          MS. SHIELDS: I would note for the

7       record, Mr. Coyle, that a number of the

8       pages appear to be cut off on the -- on the

9       right-hand side.

10          MR. COYLE: Okay. Thank you.

11          THE WITNESS: Based upon a recent

12       review of our web site, the pages look to

13       be from our web site.

14          Again, I'm not responsible for the

15       content, and I'm not sure whether or not

16       it's comprehensive. There may be other

17       pages to our web site that aren't included

18       here. I would have no way of being

19       definitive about that.

20

21  BY MR. COYLE:

22      Q.  Okay. Directing your attention to where

23  it says Traditional Media and Entertainment, it

24  lists Rave Reviews Movie Theater.

Page 132

1       A.  Yes.

2       Q.  And what was the commitment in 2002?

3       A.  In and around that time, we committed an

4   additional $10 million.

5       Q.  And when you talk about this commitment,

6   that is not for any specific site, but for

7   investments in numerous sites.

8

9          MS. SHIELDS: Objection.

10          THE WITNESS: The commitment in the

11       equity is used to fund the operations of

12       the company, including capital expenditures

13       required to build new cinema sites.

14

15  BY MR. COYLE:

16      Q.  Okay. I want you to pick up Exhibit

17  Number 4.

18      A.  Okay.

19      Q.  Are you familiar with the Boston Ventures

20  web site?

21      A.  I've been on the Boston Ventures web site

22  from time to time. I'm not responsible for its

23  content or the updating of it.

24      Q.  I understand. I will tell you that this

Page 131

1          MS. SHIELDS: Are you referring to

2       page 3 of the exhibit?

3          MR. COYLE: Well, there's --

4          THE WITNESS: There's no pages.

5          MS. SHIELDS: The third page of the

6       exhibit?

7          MR. COYLE: Keep going. They're not

8       really numbered well. One more page there.

9          THE WITNESS: I'm uncomfortable

10       responding to a question that's not

11       identified specifically.

12          MR. COYLE: Okay. We'll go ahead and

13       have the court reporter number the pages,

14       please.

15          Let's go off the record while she's

16       numbering those.

17

18          (Whereupon, a short break was taken

19       in the proceedings.)

20

21  BY MR. COYLE:

22      Q.  Ms. Granville-Smith, we took a short

23  recess. Are you ready to proceed?

24      A.  Yes.

Page 133

34  (Pages 130 to 133)

1    Q.   Okay. Let's go to page 20. Who is Gerald
2    Hobbs?
3    A.   Gerald Hobbs is an operating partner at
4    Boston Ventures.
5    Q.   Okay. And is -- what is operating
6    partner? What does that signify?
7    A.   It's a term that we use for people who
8    come to us and join our team who have more operating
9    and management experience.
10   Q.   Okay. Is -- is he your boss?
11   A.   No, he is not. He's my colleague.
12   Q.   Okay. Is he involved in Rave?
13   A.   No; Mr. Hobbs is not involved in Rave
14   Motion Pictures.
15   Q.   And when you say that, as an operating
16   partner, is the investment in the theater complex,
17   is that under his domain, so to speak, or is that a
18   different division than Mr. Hobbs?
19
20        MS. SHIELDS: Objection; vague and
21        ambiguous.
22        THE WITNESS: As I said before, there
23        are four people from Boston Ventures who
24        are assigned to the Rave investment.
                                        Page 134

1    Mr. Hobbs is not one of them.
2
3    BY MR. COYLE:
4    Q.   Okay. And then does your team report to
5    anybody?
6    A.   At Boston Ventures, we work
7    collaboratively as a group, and we have weekly
8    meetings where we discuss the progress of our
9    company.
10   Q.   Okay. So you're the same -- your -- your
11   job title is the same as operating partner?
12
13        MS. SHIELDS: Objection; misstates the
14        witness's testimony.
15        THE WITNESS: As I said before, I'm a
16        managing director.
17        Mr. Hobbs has a different title
18        because he comes to us with a different
19        background, and we would use him as a
20        member of the team in a different way than
21        a normal managing director might be used.
22        It's very typical in the private
23        equity adventure capital environment to
24        have, quote, unquote, operating partners.
                                        Page 135

1    BY MR. COYLE:
2    Q.   Okay. So he -- he might have some
3    specialized knowledge on different industries, then?
4    A.   Yes.
5    Q.   Okay.
6    A.   If you review his background, it's all in
7    publishing information. It's totally irrelevant to
8    this.
9    Q.   Okay. Page 17. This Barbara Ginader, she
10   is currently a director of Rave Reviews Cinemas;
11   correct?
12   A.   Yes.
13   Q.   Page 13. Roy Coppedge, III; he's also the
14   managing director of Rave Reviews Cinemas?
15   A.   No; he is a director of Rave.
16   Q.   Okay. I'm just looking at his title. It
17   says managing director at the top.
18   A.   Of Boston Ventures. You keep getting that
19   mixed up.
20   Q.   Okay. But he's on the board of directors
21   of Rave Reviews Cinemas?
22   A.   He is on the board of managers of Rave
23   Reviews Cinemas, yes.
24   Q.   Okay. And then page 12 before that, you
                                        Page 136

1    are on the board of managers for Rave Reviews
2    Cinemas?
3    A.   Yes, I am on the board of Rave.
4    Q.   And who are the two other that make up the
5    five?
6
7        MS. SHIELDS: Objection; vague and
8        ambiguous.
9        THE WITNESS: As I said before, as I
10       sit here today, I can recall five directors
11       of Rave. There may be more.
12       The other two include Tom Stephenson
13       and Scott Potter; but, as I said, there
14       could be another director. I just can't
15       recall.
16       MR. COYLE: Okay. Let's mark this
17       Number 5.
18
19       (Exhibit Number 5 was marked for
20        identification.)
21
22   BY MR. COYLE:
23   Q.   You can take a look at Exhibit Number 5
24   for a moment, and then I'm going to ask you a couple
                                        Page 137

35 (Pages 134 to 137)

**Page 138**

1  **questions about it.**
2      A.  Again, if you're going to ask me any
3  questions about this, I would like the pages
4  separately numbered, please.
5      **Q.  Sure.**
6      A.  So we don't get confused.
7      **Q.  I can do that. If you just want to hand**
8  **it to the court reporter, she'll do that for you.**
9
10          MS. SHIELDS: Mr. Coyle, before we go
11      back on the record, could you tell me how
12      this is relevant to the subpoena that you
13      served on Boston Ventures?
14          MR. COYLE: Well --
15          MS. SHIELDS: What topic does this
16      cover?
17          MR. COYLE: Sure. This goes in to
18      documents that -- producing a witness who
19      has the most knowledge regarding the issues
20      identified in Exhibit Number 1;
21      specifically, Rave Reviews Cinemas
22      financing or investment by Boston Ventures.
23          MS. SHIELDS: And that's the topic to
24      which we've objected.

**Page 139**

1          MR. COYLE: I understand. And --
2          MS. SHIELDS: I'll permit you some
3      latitude, but we'll go on a
4      question-by-question basis because I don't
5      believe that any documents or
6      correspondence relating to a theater in
7      Fort Wayne is relevant to this dispute.
8
9  BY MR. COYLE:
10      **Q.  Okay. I think -- have the pages been**
11  **numbered, Ms. Granville-Smith?**
12      A.  Yes. I have 11 pages.
13      **Q.  Okay. First of all, you have a theater in**
14  **Jefferson or -- I think it says -- is it Fort Wayne,**
15  **Indiana?**
16      A.  Yes.
17      **Q.  Rave does?**
18      A.  Yes; Rave currently operates a cinema in
19  Fort Wayne, Indiana.
20      **Q.  Okay. And Boston Ventures Limited**
21  **Partnership Number 5 is the majority shareholder in**
22  **that?**
23
24          MS. SHIELDS: Objection.

**Page 140**

1          THE WITNESS: Again, you keep
2      confusing the ownership structure of the
3      company.
4          We are the majority shareholder in
5      Rave Reviews.
6
7  BY MR. COYLE:
8      **Q.  Well, I'm just reading from Exhibit Number**
9  **5.**
10      **It says: The Company is the 100 percent**
11  **stockholder of Rave Motion Pictures Fort Wayne,**
12  **L.L.C. Which would be a subsidiary of Rave;**
13  **correct?**
14
15          MS. SHIELDS: Objection.
16          THE WITNESS: Right; but the way you
17      stated the question was incorrect. As you
18      see in the exhibit, Company is defined as
19      Rave Reviews Cinemas.
20
21  BY MR. COYLE:
22      **Q.  Okay. Now, it says that Boston Ventures**
23  **has allocated a total of $50 million in equity**
24  **capital to support the development of Rave Reviews,**

**Page 141**

1  **which is consistent with what you told me earlier --**
2  **the commitment started in 1999; correct?**
3
4          MS. SHIELDS: Objection.
5          THE WITNESS: The language in this
6      exhibit is very vague.
7          As I said before earlier today, our
8      commitment was to fund corporate purposes,
9      support corporate overhead, and to help
10      fund the capital expenditures required for
11      new cinema developments, among other
12      capital requirements of the company.
13
14  BY MR. COYLE:
15      **Q.  Okay. Now, turning to page Exhibit Number**
16  **2.**
17      A.  It's page number 2.
18      **Q.  Thank you. Page number 2 of Exhibit**
19  **Number 5. These are the consolidated financial**
20  **statements of Rave Reviews Cinema. Now --**
21
22          MS. SHIELDS: I'm going to object on
23      foundational grounds. Are you testifying?
24          MR. COYLE: No, no. I'm going to ask

1    her. I'm just -- I'm just following up on
2    this.
3
4    BY MR. COYLE:
5    **Q.   First of all, getting consolidated**
6    **financial statements of Rave Reviews Cinemas is**
7    **something that is provided to you at Boston**
8    **Ventures?**
9
10        MS. MCCREARY: I need to hear that
11    question, please.
12
13        (The question was read back as
14    follows:
15        "I'm just following up on this.
16        First of all, getting
17    consolidated financial statements of
18    Rave Reviews Cinemas is something
19    that is provided to you at Boston
20    Ventures?")
21
22        THE WITNESS: Annually, we do receive
23    an audit report from our accountants.
24
                                    Page 142

1    BY MR. COYLE:
2    **Q.   Okay. When you say our accountants, is**
3    **that Andersen; at least they were at that time?**
4    A.   Historically, Andersen provided audit
5    services for the company.
6    **Q.   So when you say for the company, is that**
7    **for Boston Ventures or for Rave?**
8    A.   As I said earlier, when I refer to
9    company, I'm talking about Rave; so Rave.
10    **Q.   Okay. Is Andersen still the accountants**
11    **for Rave?**
12    A.   No, they are not.
13    **Q.   Who are they now?**
14    A.   The current audit team comes from KPMG.
15    **Q.   Okay. So the equivalent of these audited**
16    **financial statements that are prepared by KPMG for**
17    **Rave would be in the possession of Boston Ventures?**
18
19        MS. SHIELDS: Objection.
20        THE WITNESS: For what year are you
21    referring to?
22
23    BY MR. COYLE:
24    **Q.   Well, for years -- this is for the --**
                                    Page 143

1    **Exhibit Number 5 appears to be for the period**
2    **through December twenty -- for the year ending**
3    **December 27th, 2001.**
4        **I'm taking it that the years ended**
5    **December 27th, 2002, 2003, 2004 -- that those would**
6    **be in the possession of Boston Ventures.**
7
8        MS. SHIELDS: Objection; calls for
9    speculation. Beyond the scope of the
10    subpoena.
11        MS. MCCREARY: Lacks foundation.
12        THE WITNESS: Certainly, we would have
13    reviewed the audited financials for each of
14    those years.
15        Whether or not we have copies of them,
16    I can't say.
17
18    BY MR. COYLE:
19    **Q.   So if you reviewed them, would they be**
20    **destroyed after you reviewed them?**
21    A.   I just know that I can always get a copy
22    of the audited financials any time I want. So
23    whether or not we keep them or not, I can't say.
24    **Q.   Well, you're aware of the fact that Rave**
                                    Page 144

1    **developed another theater in Fort Wayne, Indiana**
2    **with RED Development; are you not?**
3
4        MS. MCCREARY: Object to the form.
5        MS. SHIELDS: Object. It's beyond the
6    scope of the subpoena. We'll go question
7    by question.
8        THE WITNESS: We have one cinema in
9    Fort Wayne with RED, yes.
10
11    BY MR. COYLE:
12    **Q.   Okay. All right. So you had -- Rave had**
13    **developed at least one new theater site with RED**
14    **Development prior to discussions about Omaha?**
15
16        MS. SHIELDS: Objection; assumes facts
17    not in evidence. This witness has
18    testified she wasn't aware of discussions.
19
20    BY MR. COYLE:
21    **Q.   Well, you don't have any reason to dispute**
22    **that, do you, Ms. Granville-Smith?**
23    A.   I know we have one cinema with RED. I'll
24    leave it there.
                                    Page 145

37 (Pages 142 to 145)

1  **Q. Okay. And that would be in Fort Wayne,**
2  **Indiana?**
3  A.  Fort Wayne, Indiana, yes.
4  **Q. Okay. Now, on page 9, it talks about**
5  **sale-leaseback transactions with W.P. Carey for its**
6  **theaters located in Hickory Creek, Texas; Pensacola,**
7  **Florida; and Port St. Lucie, Florida. Did I read**
8  **that correctly?**
9  A.  I want to be clear that when you refer to
10 page 9, it's the 9 that's itemized by the court
11 reporter, not the fax pages on top?
12 **Q. Yes.**
13 A.  That is what it says here, yes.
14 **Q. Okay. So a sale-leaseback, that's a**
15 **little different arrangement, is it not?**
16
17        MS. SHIELDS: Objection; vague and
18 ambiguous.
19
20 BY MR. COYLE:
21 **Q. Could you describe what a sale-leaseback**
22 **transaction is.**
23 A.  If you recall earlier this morning, I
24 discussed that we have various different ways of

Page 146

1 financing our development opportunities.
2 Sale-leasebacks is one of those.
3 **Q. Okay. Could you describe that for me,**
4 **please.**
5 A.  This gets in to a realm of more technical
6 finance. I will do my best to give you my
7 interpretation of what a sale-leaseback is.
8        It's essentially a third-party financing
9 on a site-by-site basis. So in this circumstance,
10 we partnered with W.P. Carey. They helped finance
11 for us the building of our theaters, and then we
12 lease that back from them. So, in effect, they're
13 the financing source.
14 **Q. Okay.**
15 A.  That is a very general example. It's a
16 very technical area of corporate finance.
17 **Q. Okay. And so to the extent on Exhibit**
18 **Number 2 where it lists all the different locations**
19 **and it says W.P. Carey next to -- and I've got more**
20 **questions on that Exhibit Number 5.**
21 A.  Okay.
22 **Q. Baton Rouge. It says W.P. Carey. Is that**
23 **an engagement in Baton Rouge where you did such an**
24 **engagement with W.P. Carey?**

Page 147

1  A.  I don't know if we specifically used W.P.
2  Carey to finance the Baton Rouge site.
3        As I said before, I'm not certain whether
4  or not the site on this list in Exhibit 2, page 2,
5  is a site that we actually did in Baton Rouge.
6  **Q. Okay. Now, going back to that Exhibit**
7  **Number 2, what's this say here? No -- could you**
8  **read that for me? No parent?**
9  A.  No parent guarantee.
10 **Q. Describe that for me, please.**
11 A.  In simple terms, what that means is that
12 the lease expense does not require a corporate level
13 guarantee.
14 **Q. Okay.**
15 A.  It's held at the subsidiary level.
16 **Q. And so when you say a corporate level**
17 **guarantee, that means there's no guarantee required**
18 **on behalf of Boston Ventures?**
19 A.  No. What I mean is that there's no
20 guarantee required on behalf -- or by, I should say
21 -- Rave Reviews Cinemas, the parent company.
22 **Q. Okay. Now, was there a guarantee at the**
23 **Jefferson Pointe project by Boston Ventures?**
24

Page 148

1        MS. MCCREARY: Object to the form of
2  the question.
3        MS. SHIELDS: I'm sorry, you referred
4  to Jefferson Pointe?
5        MR. COYLE: Fort Wayne.
6        MS. SHIELDS: Objection; calls for
7  speculation. It's beyond the scope of the
8  subpoena.
9        THE WITNESS: I don't know if we have
10 a corporate level guarantee there or not.
11       MR. COYLE: Let's mark this as Number
12 6, please.
13
14       (Exhibit Number 6 was marked for
15 identification.)
16
17 BY MR. COYLE:
18 **Q. I'm handing you what's been marked as**
19 **Exhibit Number 6. Can you identify that, please.**
20 A.  I have no recollection of seeing this
21 before today.
22 **Q. Okay. And are you familiar with what a**
23 **set-aside letter is?**
24 A.  I've been in this business for ten years,

Page 149

1   so I've seen a lot of legal documents.
2       I couldn't tell you specifically what this
3   letter is, no.
4       **Q.   Well, directing your attention to the**
5   **second page. It's Bate stamped RED 0003.**
6       **It basically indicates that Boston**
7   **Ventures Limited Partnership Number 5 will continue**
8   **to fund its obligations under the contribution**
9   **letter.**
10      **In other words, that -- that Boston**
11  **Ventures is going to be good for providing the**
12  **money. Isn't that essentially what this means?**
13
14      MS. SHIELDS: Objection. This is an
15      extensive legal document that
16      Ms. Granville-Smith has never seen before.
17      I'm going to object to asking -- you
18      asking her to characterize the legal
19      meaning of a legal document she's never
20      seen.
21      THE WITNESS: I'd also need some time
22      to review this.
23
24  BY MR. COYLE:
                                        Page 150

1       **Q.   Okay. Go ahead. Take a look at it.**
2   A.   I just don't know what this is relevant
3   for. It's a totally different deal.
4       **Q.   I'm just -- this is -- this was an**
5   **engagement at Fort Wayne, Indiana that Rave did with**
6   **RED. And I'm trying to determine Boston Ventures**
7   **had invested some funds in that, and it's my**
8   **understanding that this Exhibit Number 6 was part of**
9   **that engagement.**
10
11      MS. SHIELDS: Mr. Coyle, it's far
12      beyond the scope of the subpoena. If you'd
13      wanted Ms. Granville-Smith to be prepared
14      to talk about the Fort Wayne, Indiana
15      project, that should have been in the
16      subpoena.
17      I'm going to object to you asking her
18      to review extensive legal documentation
19      that she's told you she's never seen
20      before.
21      MR. COYLE: Well, it's not extensive
22      legal documentation. It's clearly covered
23      by the subpoena. It should have been
24      produced.
                                        Page 151

1       But I'm going to -- in the interest of
2       time, I'm going to move on.
3
4   BY MR. COYLE:
5       **Q.   Let's go to -- let's go to page 10 in**
6   **Exhibit Number 5.**
7       **Now, the Boston Ventures Limited**
8   **Partnership Number 5, is that the entity that has**
9   **provided this $50 million in capital?**
10
11      MS. SHIELDS: Objection; calls for
12      speculation.
13      THE WITNESS: Yes; Fund 5 invested $50
14      million. Just under $50 million, actually.
15
16  BY MR. COYLE:
17      **Q.   Okay. Now, the members equity in Rave**
18  **Reviews Cinemas, according to this Exhibit Number 5,**
19  **is comprised of Class A Units, Class B Units, and**
20  **Class C Units. Did I read that correctly?**
21  A.   That's what it says on these statements as
22  of 2001, yes.
23      **Q.   Okay. And the A Units, majority owned by**
24  **Boston Ventures Limited Partnership 2, except those**
                                        Page 152

1   **granted to W.P. Carey, have all of the voting**
2   **rights, including the ability to elect the Board of**
3   **Managers and certain preferences over B and C Units**
4   **as it relates to return of invested capital, among**
5   **others.**
6       **Did I read that correctly?**
7   A.   No, you didn't, actually. It's Boston
8   Ventures Limited Partnership 5. But all other words
9   were correct.
10      **Q.   Okay. And as far as the ability to elect**
11  **the Board of Managers of Rave Reviews Cinemas,**
12  **Boston Ventures still has that power?**
13
14      MS. SHIELDS: Objection; calls for a
15      legal conclusion.
16      THE WITNESS: I would have to review
17      our current LLC agreement to give you a
18      very specific and certain answer to that.
19
20  BY MR. COYLE:
21      **Q.   Okay. Is it your testimony,**
22  **Ms. Granville-Smith, that Boston Ventures does not**
23  **have that power?**
24
                                        Page 153

1    MS. SHIELDS: Objection; vague and
2    ambiguous.
3        THE WITNESS: That's not what I said.
4    MS. SHIELDS: Calls for a legal
5    conclusion.
6        THE WITNESS: What I said was to
7    answer your question with certainty, I
8    would like to review our LLC documentation
9    so that I'm clear and certain about my
10   answer.
11
12   BY MR. COYLE:
13   **Q.   Okay. Well, I will tell you that I**
14   **clearly believe that was part of what you were**
15   **supposed to be produced to testify to today. So I'm**
16   **going -- I'm going to go through that.**
17       **And I'm going to adjourn the deposition**
18   **for now because I want to go back and have you pick**
19   **up Exhibit Number 1.**
20       **Would you go back and pick up Exhibit**
21   **Number 1, please.**
22
23       MS. SHIELDS: With respect, I'm not
24   sure what you mean by adjourning the

                                        Page 154

1    there are attending documents, analysis, different
2    reports, et cetera.
3        **Q.   Okay. And is it your testimony that you**
4    **were never provided a single piece of paper**
5    **regarding a potential site in Omaha, Nebraska?**
6
7        MS. SHIELDS: Objection; misstates the
8        witness's prior testimony.
9        In addition, it's directly
10       contradicted by the two documents we've
11       produced.
12
13   BY MR. COYLE:
14   **Q.   Those are the only two documents that you**
15   **have relative to the engagement in Omaha, Nebraska?**
16   A.   Based upon my review of all of our
17   documentation, those are the two documents that I
18   found. I can't say this enough times.
19   **Q.   Okay. Number 3: Produce all market**
20   **studies, reports, memoranda or other documents that**
21   **refer to building or operating movie theaters in**
22   **Omaha, Nebraska or the greater Omaha area.**
23       **Did you take the same steps; checked with**
24   **the other directors and your -- and their**

                                        Page 156

1    deposition. What do you mean by that?
2        MR. COYLE: Well, we can go through
3    it. I want to see what efforts this
4    witness went through to -- let's go to --
5    we've already talked about e-mails. Let's
6    -- and correspondence.
7
8    BY MR. COYLE:
9    **Q.   Produce all documents -- under Item Number**
10   **2 -- whether in electronic format or otherwise,**
11   **between Rave Reviews Cinemas, including its agents**
12   **and employees, and Boston Ventures Management,**
13   **including its parents, subsidiaries, agents and**
14   **employees, regarding building and/or operating a**
15   **movie theater in Omaha, Nebraska.**
16       **Is it -- is it your testimony that you**
17   **took the same steps to look for such documents?**
18   A.   As I said before earlier, I went through
19   this request on each of these items and reviewed all
20   the areas where I believed we would find
21   documentation -- potentially find documentation.
22   **Q.   Okay. Aren't you provided with documents**
23   **as part of these quarterly meetings?**
24   A.   When we have board of manager meetings,

                                        Page 155

1    **secretaries?**
2    A.   Yes, I did.
3        **Q.   Okay. Did you do anything else?**
4
5        MS. SHIELDS: Other than what she's
6        previously testified to?
7        MR. COYLE: Yeah; I want to know if
8        she did anything other than that to look
9        for documents under Item Number 3.
10       THE WITNESS: As I said earlier, I
11       went to every member of my team, and I
12       believe I copied their admin support staff,
13       and asked them to respond to this request.
14       And then I personally reviewed all of
15       our company files to respond.
16
17   BY MR. COYLE:
18   **Q.   And you found nothing?**
19   A.   Other than the items that were produced.
20   **Q.   Okay. Number 4: Produce all documents**
21   **relating or referring to Rave Reviews Cinemas'**
22   **decision not to build or operate a theater in Omaha,**
23   **Nebraska or the greater Omaha area.**
24       **Did you take the same steps to look for**

                                        Page 157

| | |
|---|---|

1  **documents as you just described?**
2  A.  Yes, I did.
3  **Q.  And it's your testimony that no such**
4  **documents exist?**
5  A.  No such documents exist.
6  **Q.  So after Exhibit Number 2, was -- was the**
7  **Omaha -- and I understand you don't have any**
8  **recollection of being at this meeting on September**
9  **11th of 2002.**
10  A.  I have no specific recollection of being
11  at that meeting.
12  **Q.  Does anybody take minutes?**
13  A.  It's not our standard to keep minutes of
14  our meetings unless there's some major approval
15  process.  So I don't believe there are any minutes
16  to the meeting.
17  **Q.  Did you look for them?**
18  A.  Yes; I looked through -- as I said before,
19  I looked through all of our documentation.
20  **Q.  Okay.  Now, would there be other directors**
21  **of Boston Ventures that were at this meeting on**
22  **September 11th of 2002 -- sit on Rave's board;**
23  **Mr. Coppedge and --**
24
Page 158

1  BY MR. COYLE:
2  **Q.  Just so I understand.  You don't have any**
3  **specific recollection of discussing the Omaha site**
4  **at this meeting of September 11th, 2002?**
5  A.  As I said before a couple of times, I do
6  remember that the management team was looking at a
7  site in Omaha; but I do not have a specific
8  recollection of being at that meeting.  I may have
9  been there.  I don't know; as I've told you like a
10  couple times already today.
11  **Q.  But you don't have any specific**
12  **recollection of what the management team**
13  **specifically told you about this Omaha site?**
14
15  MS. SHIELDS:  Other than what she's
16  already testified to?
17  MR. COYLE:  Yeah; I'm just asking her
18  what she recalls.
19
20  BY MR. COYLE:
21  **Q.  You said they were looking at an Omaha**
22  **site.  Do you have any other recollection of what**
23  **was discussed or what you were told on September**
24  **11th, 2002?**
Page 160

1  MS. SHIELDS:  Calls for -- objection;
2  calls for speculation.
3  THE WITNESS:  I can't tell you whether
4  or not Mr. Coppedge or Ms. Ginader was at
5  the meeting or not.
6
7  BY MR. COYLE:
8  **Q.  Well, isn't it -- would it be the normal**
9  **practice that all of the directors attend these**
10  **quarterly meetings?**
11  A.  It would be the normal practice for
12  directors to attend meetings; but, you know, you
13  could miss a meeting here or there.
14  **Q.  Sure.  But since you don't have any**
15  **specific recollection of what happened that day,**
16  **then I'd have to depose your two colleagues to**
17  **determine what they remember happening at this**
18  **meeting on September 11th.**
19
20  MS. SHIELDS:  Objection.  It's not an
21  appropriate question for this witness.
22  THE WITNESS:  That's your -- whatever
23  your strategy is.  I don't know the answer.
24
Page 159

1  A.  Again, I've told you before.  You keep
2  trying to put words in my mouth.  I told you I don't
3  have specific recollection of being at that meeting
4  on September 11th.  I could have been there.  I may
5  not have been.
6  But what I've said before is that I did
7  know that they were looking at Omaha, and that's it.
8  I knew they were looking at a site in Omaha, and
9  that's it.
10  **Q.  You don't have any other specific**
11  **recollection of what was discussed?**
12
13  MS. SHIELDS:  Objection; assumes facts
14  not in evidence.
15  MR. COYLE:  I'm just asking --
16  THE WITNESS:  I also really think I've
17  answered the question.
18
19  BY MR. COYLE:
20  **Q.  Okay.  So you don't have any recollection**
21  **of seeing any documents or any pictures or any**
22  **schematics or any maps?**
23  A.  I have no recollection of seeing any
24  supportive materials about a site in Omaha.
Page 161

1      The one thing is I do recall knowing that
2   RED was a developer for Omaha, but that's it.
3      **Q.  So when -- when you have these -- these**
4   **meetings, other than one of the managers saying**
5   **we're looking at a site in Omaha, it wouldn't be**
6   **unusual for you not to have any information?**
7
8           MS. SHIELDS: Objection. That's
9      argumentative.
10          THE WITNESS: You need to be careful
11     about your classification of sites and
12     process. That's, you know, at that time,
13     Omaha was classified in overview of 2004
14     site.
15          They might just be talking about it
16     for a minute. But that's all speculation.
17     I can't --
18
19  BY MR. COYLE:
20     **Q.  I'm just trying --**
21     A.  I've answered your question.
22     **Q.  I'm just trying to --**
23     A.  I've answered your question.
24     **Q.  You're -- listen, you're the person that**
                                    Page 162

1   A.  Or around.
2   **Q.  Okay.**
3   A.  On or around.
4   **Q.  I understand. That's the first time you**
5   **were told about it.**
6           **It's your testimony that you had no**
7   **discussions with anybody from Rave about that until**
8   **Mr. Stephenson told you they were no longer looking**
9   **at that opportunity?**
10  A.  As I said before, as I sit here today, I
11  have no recollection of any other conversations
12  regarding Omaha until I ultimately found out that we
13  had passed on the opportunity.
14     **Q.  Okay. And is it -- is it your testimony**
15  **that -- that the management team has the power to**
16  **pass on any particular site, once it's on an agenda,**
17  **on their own?**
18
19          MS. SHIELDS: Objection; vague and
20     ambiguous.
21          MS. MCCREARY: Objection; calls for
22     speculation and assumes facts not in
23     evidence. It also lacks of foundation.
24          THE WITNESS: The management team at
                                    Page 164

1   **was designated by Boston Ventures, and if you're**
2   **telling me -- I'm trying to figure out if you were**
3   **shown any schematics, drawings, anything.**
4       **And I understand from you that you don't**
5   **recall seeing such things.**
6   A.  That's my answer to you.
7   **Q.  Okay. Now, between September 11, 2002 and**
8   **the day Tom Stephenson said to you we're no longer**
9   **looking at Omaha, did you have a single**
10  **communication with anybody associated with Rave**
11  **about the site in Omaha?**
12  A.  As I said before, I don't recall if it was
13  the September 2002 meeting or a separate discussion
14  with Tom when I first knew about the Omaha site,
15  okay, as a starter.
16      But as I sit here today, I don't recall
17  any additional conversations between that date, or
18  that time, and when, ultimately, I learned that we
19  were no longer pursuing Omaha as an opportunity.
20     **Q.  Okay. So just so -- so you don't recall a**
21  **single communication with anybody from Rave about**
22  **the Omaha site after you were told about it on**
23  **either September 11, 2002 -- or before, as you said,**
24  **by Mr. Stephenson --**
                                    Page 163

1   Rave has the authority to review
2      development opportunities and determine
3      whether or not they believe they would meet
4      the criteria for an approved site. That's
5      within their jurisdiction.
6
7   BY MR. COYLE:
8      **Q.  Okay. And on September 11th, they**
9   **reported at that at a board of managers meeting?**
10
11          MS. MCCREARY: Object to the form.
12     Assumes --
13
14  BY MR. COYLE:
15     **Q.  It's on the agenda.**
16
17          MS. MCCREARY: Assumes facts not in
18     evidence; calls for speculation; misstates
19     this witness's testimony.
20
21  BY MR. COYLE:
22     **Q.  Go ahead. I mean, it's on the agenda;**
23  **right?**
24  A.  Let me see the agenda again. You have
                                    Page 165

1  mine. Can I have it back, please?
2  **Q.  Sure.**
3  A.  Thanks.
4
5      MS. SHIELDS: Just for clarity
6  purposes, what is the "it" that you're
7  referring to?
8      MR. COYLE: About Omaha.
9      THE WITNESS: So could you restate
10 your question, then.
11
12 BY MR. COYLE:
13 **Q.  Well, my question is, is that you and I**
14 **can agree that on Exhibit Number 2 --**
15 A.  I'd like that, please.
16 **Q.  I just want to -- I'm trying to refresh my**
17 **recollection.**
18 A.  You have your own.
19 **Q.  Okay. On Exhibit Number 2, Omaha appears**
20 **on there; correct?**
21 A.  Yes; Omaha is on Exhibit Number 2.
22 **Q.  Okay. Does senior management at Rave have**
23 **the opportunity to then pass on a potential site on**
24 **their own authority?**

Page 166

1  A.  The management team of Rave understands
2  very clearly what are the types of sites that will
3  ultimately get approved or not approved based upon
4  certain characteristics of the cinemas; and if they
5  determine that a site does not meet the standards,
6  they can decide not to go forward with that site.
7      That's why we employ them and give them
8  that job. I mean --
9  **Q.  Okay. So after -- so even after if it's**
10 **on an agenda as a potential site, what you're**
11 **telling me is, is Stephenson had the authority just**
12 **to pass on the site and report to you that they're**
13 **no longer looking at Omaha?**
14
15     MS. MCCREARY: Object to the form.
16 It's argumentative.
17     MS. SHIELDS: Objection. Same
18 objection.
19     MS. MCCREARY: Assumes facts not in
20 evidence.
21     THE WITNESS: Tom Stephenson is the
22 chief executive of the company. He can
23 make determinations about the real estate
24 development pipeline.

Page 167

1      That's what we ask him to do in his
2  role.
3
4  BY MR. COYLE:
5  **Q.  And -- and I -- and there are a number of**
6  **factors, and any one of those factors that you look**
7  **at as a potential site could be the basis for**
8  **Mr. Stephenson to do that -- to make the decision**
9  **not to pursue an opportunity.**
10
11     MS. SHIELDS: Objection; calls for
12 speculation.
13     THE WITNESS: I think you'd have to
14 ask Tom Stephenson that question as to why
15 he decides one characteristic may be more
16 important than another characteristic.
17     We've worked together for a very long
18 time. He understands the kinds of
19 opportunities that the Board will find
20 attractive and not. And it's his job to
21 assess each opportunity and bring it up to
22 the Board that, you know, meet certain
23 benchmarks.
24

Page 168

1  BY MR. COYLE:
2  **Q.  Okay. Well, let's talk about those**
3  **benchmarks.**
4      **First of all, is competition one of the**
5  **benchmarks?**
6  A.  As I said earlier today, I listed out a
7  bunch of benchmarks. It's a very complicated
8  process. Competition, current and potential, is one
9  thing that we look at.
10 **Q.  Okay. So when you say competition,**
11 **current and potential, isn't there also criteria as**
12 **to how close your complex can be to another**
13 **multiplex theater?**
14
15     MS. SHIELDS: Objection; calls for
16 speculation.
17     MS. MCCREARY: Objection to
18 characterization.
19     THE WITNESS: As I said earlier today,
20 every situation is a little different.
21     Certain market densities enable
22 cinemas to be closer to them -- to each
23 other than others.
24     But, certainly, we do look at how far

Page 169

43  (Pages 166 to 169)

1	away a cinema might be and incorporate
2	population density into that equation to
3	determine what our area is.
4
5	BY MR. COYLE:
6	Q.	I understand.
7	A.	But it is -- it is a very complicated
8	discussion, and no one market is the same.
9	Q.	Do you have these benchmarks listed some
10	place?
11	A.	As I sit here today, I don't know if we
12	have benchmarks set out. I just don't know.
13	Q.	Well, who would know? Is it -- is it your
14	testimony -- let me back up.
15		Is it your testimony that Boston Ventures
16	does not have a set list of benchmarks or a written
17	criteria that need to be complied with in order to
18	consider a potential site?
19	A.	That's not what I said. But what I said
20	was that as I sit here today, I don't know if we do.
21		I don't believe that's responsive to what
22	was requested of me today.
23	Q.	Okay. And here's the question: Does
24	Boston Ventures have a written set of criteria for

Page 170

1	benchmarks that need to be followed?
2	A.	I --
3
4		MS. SHIELDS: Objection. It's beyond
5	the scope of the subpoena. The witness has
6	asked -- answered the question previously.
7		MR. COYLE: Well, I disagree with
8	that.
9		MS. SHIELDS: You can answer.
10
11	BY MR. COYLE:
12	Q.	Let me form my question. Does Boston
13	Ventures have a written set of criteria involving
14	items that must be complied with to consider a
15	potential site?
16
17		MS. SHIELDS: Same objection. It's
18	beyond the scope of the subpoena. It's
19	been asked and answered.
20		THE WITNESS: We've been working with
21	this company for a long time, and we have
22	set out certain items which we view as
23	important against -- it's a comprehensive
24	list.

Page 171

1		I've set out earlier today certain
2	items that I think are included in that
3	list. There may be others.
4		But what I said is I don't know, as I
5	sit here today, whether or not there's a
6	written list. It is more likely that a
7	communication, a discussion about the
8	important characteristics of a deal before
9	we would approve its evolution.
10		I don't know if there's a specific
11	list, though.
12
13	BY MR. COYLE:
14	Q.	Okay. Is that -- who would know?
15	A.	I would probably be the person that would
16	know. I would -- it's -- it's just a research item.
17	Q.	But as to -- but you didn't look to see
18	whether such criteria exists between Boston Ventures
19	and Rave?
20
21		MS. SHIELDS: Objection. The question
22	is beyond the scope of the subpoena. The
23	witness has answered the question. It's
24	badgering.

Page 172

1		MR. COYLE: I don't think it is.
2		MS. SHIELDS: This is where we
3	disagree.
4
5	BY MR. COYLE:
6	Q.	Well, so you're -- you don't -- you're not
7	saying that such a list doesn't exist. You just
8	didn't go look for one.
9
10		MS. SHIELDS: Objection. That
11	misstates the witness's prior testimony.
12		THE WITNESS: What I'm saying is I
13	don't know if a detailed list itemizing out
14	all the requirements for a Board approval
15	exists or not. I just don't know.
16		And it had nothing to do with the
17	Omaha requirement. So --
18		MR. COYLE: I guess I -- I think that
19	it's clearly covered under the subpoena,
20	but let's move on.
21		MS. SHIELDS: Point 5 is -- you
22	understand the situation. Point 5, we're
23	objecting to. Okay.
24		MR. COYLE: Well, I learned that this

Page 173

44  (Pages 170 to 173)

1      morning.
2          MS. SHIELDS: With all due respect,
3      Mr. Coyle, you've known that for nearly a
4      year.
5          MR. COYLE: No, I haven't. I have no
6      such thing, Counsel. All's I can believe
7      is what's said in the letter that was sent
8      to me.
9
10  BY MR. COYLE:
11     **Q. Let's go back. So then at this -- I just**
12  **want to make sure that I'm getting down all the**
13  **conversations. You heard about the Omaha matter,**
14  **and then you heard from Stephenson some time later**
15  **that the Omaha deal was off.**
16     **And it's your testimony that you didn't**
17  **have any communications with any representative of**
18  **Rave about this potential investment between those**
19  **two periods of time?**
20
21         MS. SHIELDS: Objection; asked and
22     answered.
23         MS. MCCREARY: Objection; asked and
24     answered, misstates her testimony.
                                        Page 174

1          THE WITNESS: I've already answered
2      that question earlier.
3
4  BY MR. COYLE:
5     **Q.  Please answer it again.**
6
7          MS. SHIELDS: Same objection.
8          THE WITNESS: What I said is that I
9      don't recall, as I sit here today, any
10     communication between the first time I
11     heard about Omaha and then ultimately
12     learning that the deal had fallen out -- we
13     weren't pursuing it.
14         I just don't recall any communication
15     then.
16
17  BY MR. COYLE:
18     **Q.  Okay. Would there have been anybody else**
19  **at Boston Ventures that would have been in such**
20  **communication?**
21
22         MS. SHIELDS: Objection; calls for
23     speculation.
24
                                        Page 175

1  BY MR. COYLE:
2     **Q.  In other words, was there a person, an**
3  **underling, or one of your associates that would have**
4  **had such communications?**
5      **I understand what you've told me about**
6  **your own communications. Would there have been**
7  **others at Boston Ventures that would have been**
8  **communicating with the people at Rave about the**
9  **engagement in Omaha?**
10
11         MS. SHIELDS: Objection; calls for
12     speculation.
13         THE WITNESS: I'd be speculating on
14     that. I can say that I think that I am the
15     best person to answer that question. But
16     I'd be speculating if somebody else had a
17     conversation. I just don't know.
18
19  BY MR. COYLE:
20     **Q.  Okay. Well, that -- you've told me about**
21  **these quarterly meetings, and we're looking at**
22  **Exhibit 2 as a September quarterly meeting agenda.**
23     **It's my understanding that it was March**
24  **22nd or 23rd of 2003 when Mr. Stephenson or folks at**
                                        Page 176

1  **Rave told the people at RED that the deal was dead.**
2      **Where's the agenda from the next quarterly**
3  **meeting?**
4
5          MS. MCCREARY: Objection to form.
6          MS. SHIELDS: Objection. Are you
7      testifying? I mean --
8          MR. COYLE: Well, no. I want to know
9      if Omaha is still pending, why hasn't the
10     next quarterly meeting agenda been
11     produced?
12         MS. SHIELDS: The next quarterly
13     meeting agenda hasn't been produced because
14     it doesn't mention Omaha. It's not
15     responsive to the subpoena.
16         MR. COYLE: Well, the witness
17     testified that it was part of a 2004
18     overview. I mean, is it -- are you saying
19     that it has to say the word Omaha in it?
20         MS. SHIELDS: The subpoena that you
21     sent asked for documents -- a variety of
22     categories of documents relating to the
23     Omaha project. We've produced all such
24     documents.
                                        Page 177

1    If there are -- if there are other
2    board of managers meeting agendas for other
3    periods of time, they didn't mention Omaha.
4        MR. COYLE: So --
5        MS. SHIELDS: We've complied with our
6    obligations under the subpoena.
7
8    BY MR. COYLE:
9    Q. So the -- let me ask Ms. Granville-Smith.
10   Is -- I take it there were quarterly meetings after
11   September of 2002?
12   A. Yes, there are -- there have been
13   quarterly meetings since that date.
14   Q. And I know I asked you this earlier, but
15   is it somebody from Rave that puts together this
16   agenda?
17   A. I answered you earlier about this. I'm
18   not sure who it is at Rave, but Rave puts this
19   together. I typically have had questions; I'll say,
20   Hey, I'd like this on the agenda.
21   Q. Okay. So assuming that since no other
22   documents have been produced, presumably, Rave
23   didn't put this on their next quarterly meeting
24   agenda -- the Omaha engagement?

Page 178

1    heard about Omaha to when I later learned
2    that it had been passed upon. I have no
3    recollection.
4        Number 2, I reviewed our files for any
5    documentation related to Omaha, and this is
6    what I found.
7        I can't tell you if it was on another
8    agenda, but this is what I found. And
9    that's what's been produced. End of story.
10
11   BY MR. COYLE:
12   Q. Okay.
13   A. Okay.
14   Q. So -- so, potentially, there is a board of
15   managers meeting agenda after September 11, 2002 and
16   prior to March 31 of 2003 that could mention Omaha;
17   you just didn't find them.
18
19       MS. SHIELDS: Objection. That
20   misstates the witness's prior testimony.
21   We've been over this.
22       MR. COYLE: I don't think so, Kathy.
23   That's what she just said.
24       MS. SHIELDS: I disagree with you.

Page 180

1        MS. MCCREARY: Object to the form of
2    the question.
3        MS. SHIELDS: Objection; calls for
4    speculation.
5
6    BY MR. COYLE:
7    Q. I mean, did you look at the next quarterly
8    agenda meeting after September of 2002?
9    A. I reviewed all of our files to find
10   documents that included anything to do with Omaha,
11   and I produced what was found in our documentation.
12   Q. Okay. So your testimony, for the record,
13   is that there's no mention of a potential Rave
14   investment in the Omaha market in any quarterly
15   meeting after September 11, 2002 and prior to March
16   31 of 2003?
17
18       MS. MCCREARY: Object to the form.
19   The question misstates the witness's
20   testimony.
21       THE WITNESS: That's not what I said.
22   What I said was two-prong.
23       First is I have no recollection of any
24   conversations from the time which I first

Page 179

1        Object to the form of the question. It's
2    asked and answered.
3        THE WITNESS: I don't know if Omaha
4    was on any subsequent agendas. I have no
5    recollection of any subsequent discussion
6    of Omaha.
7
8    BY MR. COYLE:
9    Q. I didn't get it from Rave either. So
10   don't feel bad.
11       Number 4: Produce all documents
12   relating --
13   A. Could I take a recess for a second here?
14   Q. Yeah; but I'm about done.
15   A. Okay; because I wanted to push something
16   off, if necessary.
17   Q. If you need to make a call, why don't we
18   take a recess because I'm going to run through this,
19   and then I'm going to adjourn.
20   A. Okay. Let me just tell my colleague that
21   I'm going to be a little late.
22   Q. That's fine.
23
24       (Whereupon, a break was taken in the

Page 181

1        proceedings.)

2

3   BY MR. COYLE:

4       **Q.   Ms. Granville-Smith, we took a short**

5   **recess. Are you ready to proceed?**

6       A.   Yes, I am.

7       **Q.   Directing your attention back to Exhibit**

8   **Number 1, Exhibit A, Number 4.**

9           **You did the same search looking to produce**

10  **all documents relating or referring to Rave Reviews**

11  **Cinemas' decision not to build and/or operate a**

12  **theater in Omaha, Nebraska or the greater Omaha**

13  **area.**

14          **You conducted the same search where you**

15  **sent the e-mail out to your colleagues and asked**

16  **them to look and --**

17      A.   I would like to refer to my previous

18  explanation of how I conducted myself.

19          But I followed the same procedures as I

20  have stated that I have done already.

21      **Q.   Okay. Now, Item Number 5: Produce all**

22  **documents relating to Boston Ventures Management,**

23  **Inc.'s financing of or investment in Rave Reviews**

24  **Cinemas.**

Page 182

---

1       **I -- I take it that there are a number of**

2   **documents in the possession of Boston Ventures in**

3   **response to Number 5.**

4

5           MS. SHIELDS: MR. Coyle, this is a

6           topic to which Boston Ventures has

7           objected. The number of documents

8           potentially covered by that broad language

9           is voluminous.

10          Ms. Granville-Smith is not produced to

11          respond on that topic, and I object to the

12          question on those grounds.

13

14  BY MR. COYLE:

15      **Q.   Okay. I just want to -- let me just**

16  **confirm with her. There -- first of all, there are**

17  **documents responsive to Number 5.**

18

19          MS. SHIELDS: That calls for a legal

20          conclusion.

21          Ms. Granville-Smith isn't -- isn't the

22          right person to be making that

23          determination.

24          MR. COYLE: Well, it's a 30(b)(6)

Page 183

---

1   notice, and she's the corporate

2   representative that's been produced; isn't

3   that correct?

4           MS. SHIELDS: That is correct. But in

5   -- making a determination of which

6   documents are responsive to a subpoena

7   involves a legal judgment that her lawyers

8   would make in assistance with Boston

9   Ventures.

10

11  BY MR. COYLE:

12      **Q.   Okay. And I -- I understand that you**

13  **haven't produced them, but you do have written**

14  **documents that set forth the relationship between**

15  **Boston Ventures and Rave Cinemas; isn't that**

16  **correct?**

17

18          MS. SHIELDS: I'll permit

19          Ms. Granville-Smith to answer that question

20          if she understands it.

21          THE WITNESS: I'll answer it as this:

22          Yes, we have documentation that governs our

23          investment in the company.

24

Page 184

---

1   BY MR. COYLE:

2       **Q.   Okay. And your relationship with the**

3   **company?**

4       A.   That's a broad statement. So I'd like to

5   keep it narrowed to the fact that we have

6   documentation that governs our investment in the

7   company.

8       **Q.   Okay. And I take it that there is**

9   **documentation regarding the ability of Boston**

10  **Ventures to elect the board of managers at Rave**

11  **Reviews Cinema?**

12

13          MS. SHIELDS: Objection; calls for a

14          legal conclusion. Calls for speculation.

15          THE WITNESS: And as I said before

16          earlier today, I would have to review those

17          documents to make myself certain as to what

18          our governance is on that.

19

20  BY MR. COYLE:

21      **Q.   Well, according to Exhibit Number 5, the**

22  **Andersen Financial Statements -- and you don't need**

23  **to refer to them -- it does say that there is --**

24  **that voting rights, ability to elect the board of**

Page 185

1   managers, preferences over others invested capital.
2       It appears that there are a number of
3   agreements between Boston Ventures and Rave about
4   these matters; isn't that a fair statement?
5
6           MS. SHIELDS: What page of Exhibit 5
7       are you referring to?
8           MR. COYLE: Page 10 of Exhibit Number
9       5.
10          THE WITNESS: Page 10 of Exhibit 5 is
11      Arthur Andersen's interpretation of our
12      documents as of that time.
13          I really don't want that to be my
14      statement until I've done my own review of
15      the documentation.
16
17  BY MR. COYLE:
18  Q.  I understand, Ms. Granville-Smith; and for
19  purposes of this deposition, I am just simply trying
20  to confirm with you that there are documents that
21  are responsive to Item Number 5 on Exhibit Number A
22  that have not been produced.
23
24          MS. SHIELDS: And I, again, object to
                                                Page 186

1       We have the same kinds of documents
2       that any company would have.
3
4   BY MR. COYLE:
5   Q.  Okay. But none of those have been
6   produced today.
7   A.  No, they have not.
8
9           MS. SHIELDS: Same objection.
10
11  BY MR. COYLE:
12  Q.  Okay. Number 6: Produce all documents,
13  including correspondence, between Rave Reviews
14  Cinemas, its agents or employees, and Boston
15  Ventures Management.
16      You don't have any letters involving the
17  lawsuit or communications of any kind? No e-mails;
18  anything telling you that there's a lawsuit on file?
19  A.  I know there's a lawsuit on file; but I
20  don't have any communications or e-mails regarding
21  that lawsuit when I did my review of the file.
22  Q.  Okay. So you don't have any e-mails or
23  any type of written documents that summarize or talk
24  about the lawsuit?
                                                Page 188

1       that question because it calls for a legal
2       conclusion, and Ms. Granville-Smith has not
3       been designated to testify on that topic.
4           MR. COYLE: Well, I mean, I'm not
5       asking for a legal conclusion.
6           MS. SHIELDS: You're --
7
8   BY MR. COYLE:
9   Q.  There are written documents, are there
10  not, that set forth the relationship between these
11  two companies?
12  A.  I'd appreciate it if you didn't put --
13  change the terminology that I'm using. I'm being
14  very specific in my terms. I think that's
15  important.
16      The way I've responded to you is that
17  there are written documents that govern our
18  investment in the company.
19  Q.  Okay. And detail aspects of your
20  relationship.
21
22          MS. SHIELDS: Same objection.
23          THE WITNESS: I don't fully understand
24      what you mean by the term relationship.
                                                Page 187

1   A.  I reviewed my files and found nothing
2   regarding Omaha other than what has been produced.
3   Q.  Okay. How many conversations have you had
4   with the attorneys representing Rave?
5   A.  As I sit here today, I believe that I've
6   had two conversations with Rave's counsel.
7   Q.  Is that Ms. McCreary and Ms. Donnelli?
8   A.  I know that I've spoken with Ms. McCreary
9   on two occasions, and I believe I've only met
10  Ms. Donnelli. I have not had excessive
11  conversations with her.
12  Q.  Okay. When was the last meeting you had
13  with Ms. McCreary?
14  A.  I met Ms. McCreary yesterday.
15  Q.  Okay. And did that take place here at --
16  at your legal counsel's office?
17  A.  Yes, it did.
18  Q.  And how long did the meeting last?
19  A.  My meeting with Ms. McCreary lasted
20  approximately 45 minutes.
21  Q.  Okay. What was discussed?
22
23          MS. SHIELDS: Objection. I would
24      caution the witness not to reveal any
                                                Page 189

1    communications that were made at the
2    request of her counsel or in the presence
3    of her counsel.
4         MR. COYLE: Well, what I want to know
5    is --
6         MS. SHIELDS: Those materials are
7    protected by the attorney/client privilege.
8         MR. COYLE: I don't want to get
9    anything that's privileged between you and
10   your lawyer. I just want to know what you
11   talked about with Lynn McCreary.
12        MS. SHIELDS: And to the extent -- you
13   can answer that question to the extent any
14   communication you had with Ms. McCreary was
15   not requested by your counsel or in the
16   presence of your counsel or concerning your
17   counsel's advice relating to this
18   deposition.
19        MR. COYLE: Well, I don't -- if -- if
20   the witness was -- was made available to
21   counsel for Rave, I believe I have the
22   right to inquire about everything that was
23   discussed; and whether you're there or not
24   doesn't make any difference.

Page 190

1         MS. SHIELDS: I don't think I agree
2    with you on that -- on those grounds. The
3    conversation --
4         MR. COYLE: Well, let's see how this
5    goes.
6
7    BY MR. COYLE:
8    **Q.  What did you -- did -- tell me what she**
9    **told you.**
10
11        MS. SHIELDS: If you can answer the
12   question given those parameters, do.
13
14   BY MR. COYLE:
15   **Q.  Tell me what you talked about.**
16   A.   It was a very general conversation, giving
17   me some sense of how today might proceed, some -- I
18   got the sense that she was assessing me, as well;
19   and just a general getting to know me. Maybe some
20   general terms about the case, but really nothing
21   specific.
22   **Q.  Okay. But did she ask you -- did she talk**
23   **to you about questions that would be asked of you in**
24   **the deposition?**

Page 191

1         MS. SHIELDS: Same objection -- or
2    same instruction.
3         If you can answer that question
4    without revealing communications you had at
5    the instruction of counsel or to assist
6    counsel in preparing you for your
7    deposition, you can answer.
8         THE WITNESS: I don't believe so. I
9    think all my conversations of that nature
10   were in the presence of my lawyer or with
11   my own counsel.
12
13   BY MR. COYLE:
14   **Q.  Well, you had a conversation with**
15   **Ms. McCreary about questions that were going to be**
16   **asked of you today; isn't that true?**
17
18        MS. SHIELDS: Objection; misstates the
19   witness's prior testimony.
20        THE WITNESS: It does misstate. I
21   don't -- I don't recall that.
22
23   BY MR. COYLE:
24   **Q.  What did you talk about?**

Page 192

1    A.   As I said before, it was getting to know
2    me. I believe she's trying to see how I would do in
3    a deposition.
4         She wanted to know if I had been in a
5    deposition before; gave me some sense of you,
6    Mr. Coyle, and your style. And it was that. And
7    all our conversations, really, were directed by my
8    attorney.
9    **Q.  Did she have a conversation with you about**
10   **questions that were going to be asked of you today?**
11
12        MS. SHIELDS: Is she Ms. McCreary?
13        MR. COYLE: Yes.
14        MS. SHIELDS: Same instruction.
15        THE WITNESS: Actually, I think I
16   already answered that. I don't recall that
17   specifically.
18        What I recall from the conversation is
19   as I had set it out a couple minutes ago.
20
21   BY MR. COYLE:
22   **Q.  Okay. Did you look at any documents?**
23
24        MS. SHIELDS: And I want to instruct

Page 193

49 (Pages 190 to 193)

| | |
|---|---|
| 1    the witness that you can answer that | 1    **Q. Any other representative of the law firm?** |
| 2    question in the context of your discussions | 2    A.  I can't recall whether or not my counsel |
| 3    with Ms. McCreary. | 3    was on that call.  I might -- |
| 4         THE WITNESS:  The only documents that | 4    **Q. Okay.** |
| 5    I recall, as I sit here today, that I | 5    A.  -- inquire.  I don't remember. |
| 6    reviewed were my documents that I produced. | 6    **Q. What did you talk about?** |
| 7 | 7    A.  My recollection at that time was that I |
| 8  BY MR. COYLE: | 8    was requesting information as a member of the Board |
| 9    **Q. Did you look at any other documents?** | 9    to understand what this lawsuit was about. |
| 10   A.  I don't recall looking at any other | 10   **Q. So you called her?** |
| 11   document except for the subpoena rider.  I did look | 11   A.  My recollection is that I did; yes, I |
| 12   at that. | 12   called her. |
| 13   **Q. Did you look at any documents to prepare** | 13   **Q. Okay. And did she describe to you what** |
| 14   **for the deposition -- any other documents?** | 14   **her view of the lawsuit was about?** |
| 15   A.  No, I did not. | 15   A.  Yeah; I can't recall that conversation. |
| 16   **Q. Did your counsel show you any other** | 16   It was a long time ago. |
| 17   **documents?** | 17   **Q. How did you find out that there was a** |
| 18 | 18   **lawsuit?** |
| 19        MS. MCCREARY:  Object to the form. | 19   A.  I don't remember. |
| 20        Mike, it's just because I didn't hear | 20   **Q. Why would you be curious about a lawsuit?** |
| 21   you.  Did you say did counsel or did your | 21   A.  Well, I mean, I'm on the Board of |
| 22   counsel? | 22   Directors of the company.  There's a lawsuit.  I |
| 23        MR. COYLE:  I'm talking about Kathleen | 23   should know about it, and I would inquire. |
| 24   now. | 24   **Q. Okay. How long did that conversation** |
| Page 194 | Page 196 |

| | |
|---|---|
| 1         MS. MCCREARY:  Okay. | 1    **last?** |
| 2         MS. SHIELDS:  And I would object on | 2    A.  I can not remember. |
| 3    privileged grounds. | 3    **Q. Anybody else on the phone besides the two** |
| 4         MR. COYLE:  I understand.  But I think | 4    **of you?** |
| 5    I have the right to inquire if she looked | 5    A.  As I said before, I can't recall whether |
| 6    at any documents in preparation for her | 6    or not anyone else was on that phone or not. |
| 7    deposition. | 7    **Q. Okay. Have you had any other meetings** |
| 8         MS. SHIELDS:  You can answer that | 8    **relative to this lawsuit other than with your own** |
| 9    question yes or no. | 9    **legal counsel?** |
| 10        THE WITNESS:  No; I did not look at | 10        **Have you ever met with Mr. Stephenson or** |
| 11   any other documents other than the three I | 11   **Mr. Painter to talk about the lawsuit?** |
| 12   have stated. | 12   A.  I have told -- I have told Mr. Stephenson |
| 13 | 13   and other members of the Rave management team that I |
| 14  BY MR. COYLE: | 14   was being deposed, but I've not discussed it with |
| 15   **Q. Okay. The meeting lasted about 45** | 15   them at all. |
| 16   **minutes?** | 16   **Q. Let's go back to Exhibit Number 1. Item** |
| 17   A.  She was in the room while I was there for | 17   **Number 7: Are you the person who has the most** |
| 18   about 45 minutes, yes. | 18   **knowledge regarding Boston Ventures' April 2002 site** |
| 19   **Q. Okay. When was the other meeting you had?** | 19   **visit to Omaha?** |
| 20   A.  It was a telephone call a long time ago. | 20        **And I understand it's your testimony that** |
| 21   I think probably at the beginning of this process. | 21   **nobody from Boston Ventures made such a visit.** |
| 22   **Q. Okay. And was -- was Kathleen on the** | 22 |
| 23   **phone -- your counsel here?** | 23        MS. SHIELDS:  I'm going to object to |
| 24   A.  No, she was not. | 24        the question on the grounds that she has |
| Page 195 | Page 197 |

| | |
|---|---|
| 1    been so designated, and that's what RED is | 1    **Omaha.** |
| 2    entitled to under the Federal Rules of | 2    **And then Number 10 asks the same questions** |
| 3    Civil Procedure. You can answer the | 3    **about Rave Reviews Cinemas' communications to Boston** |
| 4    question. | 4    **Ventures regarding the decision not to build.** |
| 5        MS. MCCREARY: Object to the extent it | 5        **Okay. Now, you've been produced for nine** |
| 6    assumes facts not in evidence. This | 6    **and ten; correct?** |
| 7    witness has testified that there was no | 7    A.    Yes. |
| 8    such visit. | 8    **Q.    But did you put your team together and --** |
| 9 | 9    **and conduct an investigation as to who might have** |
| 10  BY MR. COYLE: | 10   **had conversations with Mr. Stephenson or Mr. Painter** |
| 11   **Q.    Are you the person to have most -- did you** | 11   **or any representative of Rave about the decision not** |
| 12   **do an investigation as to anybody that went out** | 12   **to move forward in Omaha?** |
| 13   **there?** | 13 |
| 14   A.    Based upon my position at Boston Ventures, | 14       MS. SHIELDS: Objection. It misstates |
| 15   if anyone went to Omaha, I would be the best person | 15   the witness's prior testimony. |
| 16   to know if they went. | 16       It also suggests that there are |
| 17       And my statement is that nobody, to the | 17   obligations beyond those set forth in the |
| 18   best of my knowledge, went to Omaha. | 18   Federal Rules of Civil Procedure. |
| 19   **Q.    Is there anybody that works for you by the** | 19       MR. COYLE: Well, I understand. |
| 20   **name of Jennifer?** | 20   You've produced a witness who you say has |
| 21   A.    We have members of our secretarial staff | 21   the most knowledge regarding |
| 22   by the name of Jennifer. | 22   communications, and she's told me about her |
| 23   **Q.    Okay. All right. So, to the best of your** | 23   communications. |
| 24   **knowledge, nobody went from Boston Ventures to** | 24       I want to know what she did to |
| Page 198 | Page 200 |

| | |
|---|---|
| 1    **Omaha?** | 1    determine whether other individuals at -- |
| 2    A.    To the best of my knowledge, nobody from | 2    at Boston Ventures had communications with |
| 3    Boston Ventures went to Omaha to look at this site. | 3    Rave between September and March. |
| 4    **Q.    And you are the individual that's been** | 4        MS. SHIELDS: And you can inquire as |
| 5    **produced to have the most knowledge regarding the** | 5    to whether she believes that she is the |
| 6    **issues identified in Items 1 through 7 above?** | 6    person at Boston Ventures with the most |
| 7 | 7    knowledge of such communications. |
| 8        MS. SHIELDS: Again, with respect to | 8        MR. COYLE: Well, that's not really my |
| 9    Items 5 -- or with respect to Item 5, we've | 9    question. |
| 10   objected, and we have not designated | 10 |
| 11   Ms. Granville-Smith to testify on that | 11  BY MR. COYLE: |
| 12   subject. | 12   **Q.    My question is: What did you do to -- did** |
| 13       I've permitted you to ask some | 13   **you investigate that?** |
| 14   questions on that topic without waiving our | 14 |
| 15   objections to it. | 15       MS. SHIELDS: And, again, I'm going to |
| 16 | 16   object on grounds that it suggests that |
| 17  BY MR. COYLE: | 17   there's an obligation beyond those set |
| 18   **Q.    Is that correct?** | 18   forth in the Federal Rules of Civil |
| 19   A.    I would be the person best able to discuss | 19   Procedure. |
| 20   those items, with all the objections that Kathy | 20       You can answer the question if you |
| 21   has -- | 21   can. |
| 22   **Q.    Now, nine and ten involve communications** | 22       THE WITNESS: As I said earlier today |
| 23   **made by Rave to Boston Ventures regarding Rave's** | 23   a couple times, what I did was went to |
| 24   **plans or intent to build or operate a theater in** | 24   every member of my team, notified them of |
| Page 199 | Page 201 |

1    the lawsuit, gave them this Exhibit A first
2    -- when it first came out -- and then the
3    subsequent one, maybe a month ago; and
4    said, look, I need you to respond to all
5    these items. Anything you have about
6    Omaha, I need to get it.
7        And I felt, and still believe, that
8    that is a comprehensive methodology.
9
10   BY MR. COYLE:
11   **Q.  I understand. But, specifically, did --**
12   **did you have communications, meaning that there**
13   **could have been people that talked to them?**
14       **Did you have a specific request to your**
15   **people who talked to Stephenson or Painter or any**
16   **representative from Rave about the decision to build**
17   **or not to build?**
18       **Did you -- did you do anything along that**
19   **regards, specifically, in preparation for your**
20   **deposition today?**
21
22       MS. SHIELDS:  Same objection as
23   before.
24       THE WITNESS:  I don't recall if I

Page 202

---

1    specifically asked them did you have an
2    oral communication on Omaha; and, if you
3    did, you need to document it.
4        But I asked for all correspondence and
5    information regarding to Omaha.
6        MR. COYLE:  Okay.  Counsel, I do
7    disagree on Number 5.  I think that we have
8    a right to this information.
9        With that proviso, I'm going to
10   adjourn the witness's deposition, and I'll
11   just have to take it up -- if I got to file
12   with the federal judge here, I think you
13   had an obligation to produce those records.
14   I know you disagree with that.
15       So I would like to leave it at
16   adjourning it for now.
17       MS. SHIELDS:  And I object, for the
18   record, to your adjournment of the
19   deposition.  Boston Ventures has complied
20   with all of its obligations under the
21   subpoena and under the Federal Rules.
22       We've produced the witness and made
23   her available.  It's our position that the
24   deposition is concluded.

Page 203

---

1        MR. COYLE:  Okay.  I understand.
2    That's it.  That's all I have.  Thank you.
3
4        (Whereupon, the deposition was
5    concluded at 1:07 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 204

---

1                    CERTIFICATE
2
Commonwealth of Massachusetts
3 Norfolk, ss.
4
5        I, Dawn Mack-Boaden, a notary public in
    and for the Commonwealth of Massachusetts, do hereby
6 certify that:
        ELIZABETH GRANVILLE-SMITH, the witness
7 whose testimony is hereinbefore set forth, was duly
    sworn by me, and that such testimony is a true and
8 correct transcription of my stenographic notes taken
    in the forgoing matter, to the best of my knowledge,
9 skill and ability.
10        I FURTHER CERTIFY that I am neither a
    relative nor employee of nor counsel for any of the
11 parties, nor am I financially interested either
    directly or indirectly in the outcome of this
12 action.
13        IN WITNESS WHEREOF, I have hereunto set my
    hand and Notarial Seal this 14th day of July, 2005.
14
15
16
17
18                    Dawn Mack-Boaden
                     Notary Public
19
20
My Notary Commission expires:  September 15, 2006.
21
22
    THE FORGOING CERTIFICATION OF THIS TRANSCRIPTION
23 DOES NOT APPLY TO ANY REPRODUCTION AND/OR
    DISTRIBUTION OF THE SAME BY THE MEANS UNLESS UNDER
24 THE DIRECT CONTROL AND/OR SUPERVISION OF THE
    CERTIFYING COURT REPORTER.

Page 205

**A**

**ability** 153:2,10
185:9,24 205:9
**able** 33:6 38:16
70:18 199:19
**about** 5:2,3 8:2,8
9:3,16 10:17,24
12:9 13:11 20:1,3
20:8 21:2 22:12
27:9 30:11,16
32:9 33:1 39:11
39:12,19 40:19,21
41:1,18 43:7,12
43:18,23 47:14
49:14 51:15 59:7
63:15 64:8 68:22
69:14 75:10 78:21
87:17 90:15 91:21
93:4,15,16 94:21
95:7 100:9,12
101:3 107:15
109:3,15 113:23
117:3,8 118:6,10
120:6 122:12
124:8,12,18
126:16 130:13
131:5 132:19
138:1,3 143:9
145:14 146:4
151:14 154:9
155:5 160:13
161:24 162:11,15
163:11,14,21,22
164:5,7 166:8
167:23 169:2
172:7 174:13,18
175:11 176:5,8,20
178:17 180:1
181:14 186:3
188:24 190:11,22
191:15,20,23
192:15,24 193:9
194:23 195:15,18
196:6,9,14,20,23
197:11 200:3,11
200:22 202:5,16
**above** 26:10 40:17
199:6
**access** 70:18
**accomplished** 11:1
**accordance** 103:1
**according** 152:18
185:21
**accountants** 142:23
143:2,10
**accurate** 70:14

**acquisition** 102:18
**across** 44:4
**action** 205:12
**actual** 98:19
**actually** 6:11 15:11
17:4 18:4 52:1
65:19 67:11 72:5
78:12 101:15
148:5 152:14
153:7 193:15
**addition** 12:12
30:17 31:1 122:6
156:9
**additional** 39:21
40:2,5,10 42:6
85:17 96:11 131:4
163:17
**addressed** 109:12
**addressing** 44:3
**adjourn** 154:17
181:19 203:10
**adjourning** 154:24
203:16
**adjournment**
203:18
**admin** 30:18
157:12
**adventure** 135:23
**advice** 190:17
**affirmative** 15:23
**afraid** 82:22
**after** 13:9 62:22
80:8 85:1 100:4
144:20 158:6
163:22 167:9,9
178:10 179:8,15
180:15
**again** 8:1 11:9,20
14:15 16:8 24:12
26:24 99:13
100:10 111:22
120:9 132:14
138:2 140:1 161:1
165:24 175:5
186:24 199:8
201:15
**against** 4:21 104:8
171:23
**agenda** 13:21 67:8
68:14,17,21 69:3
71:13 79:14 80:5
80:14,19,20
106:21 110:1
111:2,2 164:16
165:15,22,24
167:10 176:22

177:2,10,13
178:16,20,24
179:8 180:8,15
**agendas** 79:21
178:2 181:4
**agent** 16:13
**agents** 15:5,7
155:11,13 188:14
**ago** 72:7,8 74:9
193:19 195:20
196:16 202:3
**agree** 11:21 21:6
23:23 44:12 70:13
122:18 166:14
191:1
**agreed** 40:11
**agreeing** 88:20
**agreement** 153:17
**agreements** 186:3
**ahead** 5:11 10:23
28:22 44:22 77:10
77:21 88:19
105:17 133:12
151:1 165:22
**Ajax** 102:13
**Alabama** 114:19
115:5,23
**allocated** 140:23
**allow** 45:12
**all's** 86:11 174:6
**almost** 72:8 74:9
**along** 202:18
**already** 67:5 130:6
155:5 160:10,16
175:1 182:20
193:16
**always** 64:16 66:8
144:21
**ambiguous** 49:18
52:5 104:4 134:21
137:8 146:18
154:2 164:20
**amended** 38:20
**America** 49:24
**among** 10:16 51:1
68:22 93:22 96:16
96:23 110:6 111:5
141:11 153:4
**amount** 26:8 45:15
46:14,18,19,23
49:6 84:21
**analysis** 53:13,15
63:5 66:20 78:17
84:14 89:2 90:6
97:3 156:1
**Andersen** 143:3,4

143:10 185:22
**Andersen's** 186:11
**and/or** 155:14
182:11 205:23,24
**announced** 121:17
**Annually** 142:22
**another** 36:20
40:24 65:10,14
122:8,8 137:14
145:1 168:16
169:12 180:7
**answer** 5:12,14
10:13 11:6 16:21
19:13 23:19 24:11
25:6,7 28:21
34:16,19 36:18
41:10 45:7,13
47:7 50:11 53:7,8
56:5,8 58:10
60:14 61:1 70:9
75:21 77:2,21
82:22 83:19 87:11
87:16 90:2 91:4
103:5 104:6 115:3
117:11,14 118:19
119:5 120:10
126:8 153:18
154:7,10 159:23
163:6 171:9 175:5
176:15 184:19,21
190:13 191:11
192:3,7 194:1
195:8 198:3
201:20
**answered** 16:19
19:7 20:17 23:2
23:16,17 28:18
33:15 53:5 60:12
70:6,7 73:16 74:4
74:5 76:12 113:19
130:4,6 161:17
162:21,23 171:6
171:19 172:23
174:22,24 175:1
178:17 181:2
193:16
**answering** 46:1
**answers** 5:23
**anybody** 19:21
20:3 23:12 24:7
106:11 124:8,18
135:5 158:12
163:10,21 164:7
175:18 197:3
198:12,19
**anyone** 113:1 197:6

198:15
**anything** 8:1 9:16
33:21 94:1,15
157:3,8 163:3
179:10 188:18
190:9 202:5,18
**apparently** 21:11
**appear** 72:1 132:8
**appears** 68:14
121:8 144:1
166:19 186:2
**APPLY** 205:23
**appreciate** 95:13
187:12
**appropriate** 159:21
**appropriately**
10:18
**approval** 10:8
53:19 64:19 78:19
78:20,24 80:22,24
81:11,18,24 83:10
84:2,5 85:2,18
86:14 88:8,21
89:11 90:14,17
91:20 92:4,6,9,11
96:2,3,5,9,15,21
98:1,12,13,24
99:10 100:5
104:18 105:18
114:12 124:23
125:10 127:3
158:14 173:14
**approve** 39:9 41:16
62:6 82:3,3 83:14
83:14 84:1 172:9
**approved** 45:11,11
78:15 81:13 84:6
100:4 112:13
125:19 127:6
165:4 167:3,3
**approximate**
130:19
**approximately** 6:5
189:20
**April** 197:18
**area** 6:14 25:3
27:10 38:4 56:7
147:16 156:22
157:23 170:3
182:13
**areas** 48:14,22
155:20
**argue** 42:9
**arguing** 42:12
**argumentative**
16:19 23:16 28:17

107:23 162:9
167:16
**Arizona** 40:23
**Arkansas** 115:8
**around** 47:3 49:5,8
52:23 130:17,17
131:3 164:1,3
**arrangement** 60:17
146:15
**Arthur** 186:11
**asked** 12:19,21
15:22 16:18 20:16
21:1,3,11,18 23:1
23:15 28:1 31:24
33:14 35:7 43:11
46:13 53:4 60:12
70:5 73:15 74:3
76:11 113:18
120:5 130:3
157:13 171:6,19
174:21,23 177:21
178:14 181:2
182:15 191:23
192:16 193:10
203:1,4
**asking** 20:23 70:19
72:19 73:2,4,15
93:3 97:17 101:2
109:2 121:7
150:17,18 151:17
160:17 161:15
187:5
**asks** 15:2 117:2
200:2
**aspects** 50:18 51:1
187:19
**assess** 168:21
**assessing** 191:18
**assessment** 78:18
98:2
**assigned** 134:24
**assist** 192:5
**assistance** 184:8
**assistants** 30:19
**associate** 30:24
31:12,17 48:4
**associated** 99:16
104:12 163:10
**associates** 176:3
**assume** 5:14 33:5
127:18
**assumes** 69:8 82:7
85:5,24 88:13
97:14,24 105:1
110:19 123:18
145:16 161:13

164:22 165:12,17
167:19 198:6
**assuming** 45:14
178:21
**as-yet** 118:4
**attached** 13:18
122:7
**attend** 67:16 74:13
159:9,12
**attendance** 72:17
98:3
**attended** 72:12,18
73:11
**attending** 156:1
**attention** 40:13
89:4 129:4 132:22
150:4 182:7
**attorney** 4:17 5:17
7:17 8:2 193:8
**attorneys** 189:4
**attorney/client**
7:21 190:7
**attractive** 51:4
93:19 168:20
**audit** 142:23 143:4
143:14
**audited** 143:15
144:13,22
**Austin** 119:11,13
122:8
**authority** 165:1
166:24 167:11
**available** 190:20
203:23
**avoid** 103:15
**aware** 144:24
145:18
**away** 110:1 170:1
**A's** 76:4
**a.m** 1:21

─────── **B** ───────
**B** 3:6 152:19 153:3
**back** 8:20,23 14:14
14:22 15:22 17:22
18:7,14,23 19:1
20:7 21:21 23:21
23:24 24:1 25:12
29:13,16 32:19,22
33:20,22 34:17,19
36:17 37:1,14
42:18 44:14,24
48:12 62:14,14
63:22 64:1 67:3
79:7 82:16,24
83:7 86:24 90:19

91:24 96:2 98:9
100:15 101:1,6,10
106:17 107:15
108:18 116:6
125:7 138:11
142:13 147:12
148:6 154:18,20
166:1 170:14
174:11 182:7
197:16
**background** 135:19
136:6
**bad** 181:10
**badgering** 53:5
72:16 113:19
172:24
**Barbara** 31:9 136:9
**barring** 60:7 61:19
**base** 92:19
**based** 16:6,23 23:5
33:4 90:5 121:14
132:11 156:16
167:3 198:14
**basically** 150:6
**basis** 11:12,15 22:5
22:9,12,16 25:23
33:9 44:8,11 52:7
56:14,18 108:5,6
109:24 139:4
147:9 168:7
**Bate** 14:4 150:5
**Baton** 69:16 111:10
115:12,13,18
122:4 147:22,23
148:2,5
**become** 93:19
**before** 1:16 4:23
18:12 24:14 29:24
39:16 41:24 46:12
68:12 76:2 95:5
95:14 99:10
109:13,23 113:21
120:4 125:15
126:20 127:15
134:22 135:15
136:24 137:9
138:10 141:7
148:3 149:21
150:16 151:20
155:18 158:18
160:5 161:1,6
163:12,23 164:10
172:8 185:15
193:1,5 197:5
202:23
**begin** 126:3,20

**beginning** 41:11
124:18 195:21
**behalf** 1:15 2:5,10
2:15 102:24
148:18,20
**being** 6:6 12:9,12
38:8,12 68:13
72:6 74:1,7 89:1
107:5,14 109:14
124:5 132:18
158:8,10 160:8
161:3 187:13
197:14
**believe** 16:24 30:18
34:1,8 57:7 61:23
77:24 85:7 88:24
89:7 92:9 94:18
99:8 118:23 123:9
123:20 130:5
139:5 154:14
157:12 158:15
165:3 170:21
174:6 189:5,9
190:21 192:8
193:2 202:7
**believed** 98:15
155:20
**believes** 201:5
**benchmarks**
168:23 169:3,5,7
170:9,12,16 171:1
**besides** 197:3
**best** 55:4 56:11,21
56:23 57:6 75:8
75:14,20 76:8
92:8 118:22
119:12 120:16
147:6 176:15
198:15,18,23
199:2,19 205:8
**better** 47:14
**between** 15:4 16:3
16:13 21:4 28:13
29:20 34:3 94:24
129:23 155:11
163:7,17 172:18
174:18 175:10
184:14 186:3
187:10 188:13
190:9 201:3
**beyond** 60:24 91:2
114:21 119:8
144:9 145:5 149:7
151:12 171:4,18
172:22 200:17
201:17

**big** 122:17
**Birmingham**
114:19 115:5,22
**bit** 59:12
**BLOCH** 2:3
**board** 13:20 31:15
34:14,23 35:9,14
35:15 36:1,6,10
36:14 37:5,9 51:3
51:10,11 53:19,22
53:23 54:2,7,10
54:13,15,17 63:8
63:14 64:7,19
67:7 68:18,23
71:1,5,12 74:21
78:1,2,3,15,19
79:7 81:19 82:4
83:15,23 84:2,5
84:13,15 89:4,6,8
89:12,19 90:7,13
90:17,21 91:10,17
92:7,10,12 94:11
94:14 99:10 100:5
100:12,23 105:18
107:17 108:2
109:16,24 111:5
113:6 124:22
125:9,19 126:2,16
126:19 136:20,22
137:1,3 153:2,11
155:24 158:22
165:9 168:19,22
173:14 178:2
180:14 185:10,24
196:8,21
**Bob** 93:9 127:19,20
127:21 128:16
**book** 53:19 78:20
78:24 80:23,24
81:12 84:5 88:8
89:11 92:4,7,9,11
96:2,5,9,15,22
98:12
**books** 81:18,24
83:10 84:2,13
91:20 98:1,13
**borders** 117:1
**boss** 134:10
**Boston** 1:19,24 2:9
3:11 6:2,8,11 7:8
8:4,7,12 9:2,20,23
10:7,17 11:5 12:6
15:5 16:4,11,13
17:11 18:17 19:22
20:12 21:1,4,24
23:11 24:6 25:21

27:4 28:13,18
29:2,6,20 30:21
31:18 35:15 36:9
36:12 37:3,15,15
37:21 38:1 39:8
40:22 41:14 45:3
46:15 47:2,14,18
47:19 48:13 49:14
51:12 52:2,16
53:23 54:17,18
55:9,13 57:14
58:6 62:4,6 63:15
64:7 65:7 66:7
67:21 70:15 78:4
80:18 81:13 82:2
83:12 86:12 88:7
89:9,19 90:14,19
90:21 102:24
106:11,13 117:3
125:20 126:15
127:6 131:19,21
134:4,23 135:6
136:18 138:13,22
139:20 140:22
142:7,19 143:7,17
144:6 148:18,23
150:6,10 151:6
152:7,24 153:7,12
153:22 155:12
158:21 163:1
170:15,24 171:12
172:18 175:19
176:7 182:22
183:2,6 184:8,15
185:9 186:3
188:14 197:18,21
198:14,24 199:3
199:23 200:3
201:2,6 203:19
**both** 112:3 31:13
31:15 51:11
**bothersome** 82:15
83:2
**bottom** 14:4
**BOYER** 2:3
**brand** 102:4
**break** 45:23 46:5
80:7 82:12 95:13
95:19 106:1
119:22 120:5
133:18 181:24
**Brian** 31:11,17
**bring** 12:19 21:3
53:18 89:3 90:7
168:21
**broad** 12:2,4 183:8

185:4
**brought** 43:13
90:12,17,21 91:17
**BROWN** 1:6
**BRYAN** 2:12
**budget** 107:19
108:10
**build** 45:17 49:24
50:4 63:1 102:18
119:11 131:13
157:22 182:11
199:24 200:4
202:16,17
**building** 50:20 60:2
102:16 117:15,21
119:2,14 147:11
155:14 156:21
**builds** 103:6
**built** 102:8 113:16
118:9
**bunch** 169:7
**burdensome** 12:6
**Burdette** 2:7
**burner** 91:24
**business** 9:23 49:1
149:24
**businesses** 37:19
**buying** 102:12
108:12
**BV** 3:9,9 14:5,6,18
14:18 64:24 67:3
68:6 69:2,19
71:17 75:2 106:21
112:7 121:21

_____ **C** _____

**C** 2:1 4:1 152:20
153:3 205:1,1
**call** 96:24 97:1,4
181:17 195:20
196:3
**called** 1:15 4:21
39:19 40:1,4
47:16 196:10,12
**calls** 7:20 32:12
50:8,22 52:20
54:24 55:24 57:4
58:9 59:21 60:11
63:3,19 65:17
68:10 69:5,8 70:4
73:14 74:19 75:24
76:22 79:1,11,16
81:3,16 82:8 84:1
84:14 85:5,23
86:17 88:13 89:23
91:1 92:15 97:7

100:20 104:2
105:1 107:1
110:18 112:23
118:5 119:6 125:2
128:2,8,21 129:11
144:8 149:6
152:11 153:14
154:4 159:1,2
164:21 165:18
168:11 169:15
175:22 176:11
179:3 183:19
185:13,14 187:1
**came** 202:2
**capital** 131:12
135:23 140:24
141:10,12 152:9
153:4 186:1
**careful** 162:10
**Carey** 146:5 147:10
147:19,22,24
148:2 153:1
**case** 5:23 43:1,24
104:14 117:7
191:20
**cases** 67:19 84:16
84:18
**categories** 177:22
**cause** 51:1
**caution** 26:18
32:13 77:14
189:24
**CAVE** 2:12
**Center** 15:8
**central** 15:18
**certain** 23:9 24:4
26:10 37:24 45:2
45:14 46:14,18,19
47:8 49:6 50:18
50:24 58:12 61:14
62:24 104:11
106:14,15 148:3
153:3,18 154:9
167:4 168:22
169:21 171:22
172:1 185:17
**certainly** 22:3
38:10,21 51:18
91:23 103:14
104:14 144:12
169:24
**certainty** 154:7
**CERTIFICATI...**
205:22
**certify** 205:6,10
**CERTIFYING**

205:24
**cetera** 15:20 156:2
**chair** 79:24
**chairperson** 80:4
**chance** 13:9
**change** 119:19
187:13
**changed** 116:13
**characteristic**
168:15,16
**characteristics**
167:4 172:8
**characterization**
43:21 102:23
169:18
**characterize**
150:18
**Chattanooga** 69:16
111:10 116:2,7,8
116:9 122:6
**check** 30:9
**checked** 156:23
**chief** 129:6 167:22
**Choate** 1:18 2:7
**choose** 43:7
**Cincinnati** 69:16
111:10 115:10,11
**cinema** 17:12 18:19
22:3 66:18 98:4
102:13 114:10,11
115:9,13,14,14,20
115:24 116:8,10
116:12,21 118:24
119:13 131:13
139:18 141:11,20
145:8,23 170:1
185:11
**cinemas** 1:10 4:22
15:4 16:4,14
46:15 54:21 60:17
65:20 66:18 90:12
101:24 102:9
112:12 113:6
115:18 116:4
123:3 136:10,14
136:21,23 137:2
138:21 140:19
142:6,18 148:21
152:18 153:11
155:11 157:21
167:4 169:22
182:11,24 184:15
188:14 200:3
**circumstance** 147:9
**circumstances** 46:2
60:7 95:6

**cities** 122:16,17
**city** 2:13,14 6:15
49:24
**Civil** 29:9 198:3
200:18 201:18
**clarity** 30:23 166:5
**Class** 152:19,19,20
**classification**
128:14 162:11
**classifications**
47:18
**classified** 162:13
**clean** 26:11
**clear** 77:5 91:8,15
116:14 122:3
146:9 154:9
**clearly** 151:22
154:14 167:2
173:19
**click** 121:16
**close** 169:12
**closer** 169:22
**collaboratively**
135:7
**colleague** 134:11
181:20
**colleagues** 21:10
54:9 159:16
182:15
**come** 31:24 40:22
42:18 134:8
**comes** 135:18
143:14
**comfortable** 46:1
56:8 109:11
**commencing** 1:21
**commented** 122:3
**Commission**
205:20
**commit** 46:20
**commitment** 49:3
49:13 130:13,14
131:2,5,10 141:2
141:8
**commitments** 47:2
**committed** 38:1
45:4 46:14,20,23
49:7,8 131:3
**common** 57:17
**Commonwealth**
1:17 205:2,5
**communicate**
27:14
**communicated**
33:22
**communicating**

176:8
**communication**
16:12 163:10,21
172:7 175:10,14
175:20 190:14
203:2
**communications**
20:11 27:5 28:2
37:18 48:21
174:17 176:4,6
188:17,20 190:1
192:4 199:22
200:3,22,23 201:2
201:7 202:12
**companies** 37:21
187:11
**company** 1:7 4:19
4:21 26:16 34:2
34:13,21 35:3,8
35:11 37:16,17
47:15 48:13 55:5
57:15 58:3,13
60:2 66:4,6,9
86:20 92:2 103:6
104:10 108:4
110:7 112:15
118:11 131:12
135:9 140:3,10,18
141:12 143:5,6,9
148:21 157:15
167:22 171:21
184:23 185:3,7
187:18 188:2
196:22
**competency** 33:5
**competition** 51:21
93:24 169:4,8,10
**competitive** 96:19
**complete** 127:4
**completed** 78:17
81:24 83:11 85:19
89:2
**completely** 25:6
**complex** 19:23
90:13 127:14
134:16 169:12
**complicated** 62:17
84:8 90:1 169:7
170:7
**complied** 29:7
170:17 171:14
178:5 203:19
**compound** 62:9
100:21 104:3
**comprehensive**
132:16 171:23

202:8
**comprised** 152:19
**conceivably** 81:23
83:9
**concerning** 190:16
**conclude** 63:13
64:5
**concluded** 203:24
204:5
**conclusion** 55:1
57:5 58:10 153:15
154:5 183:20
185:14 187:2,5
**conduct** 62:23 63:5
200:9
**conducted** 10:2
26:5 182:14,18
**conference** 79:11
84:1,14
**confident** 43:14
**confidential** 9:22
11:22 12:13 40:7
117:8 118:9 119:7
**confirm** 183:16
186:20
**confused** 138:6
**confuses** 61:24
**confusing** 140:2
**consider** 88:8
170:18 171:14
**considerable** 84:21
**consistent** 141:1
**consists** 13:24
**consolidated** 108:6
141:19 142:5,17
**constrained** 105:19
**constraints** 103:19
**construction**
118:17,21,24
**contained** 8:9 9:4
129:17
**content** 131:23
132:15
**context** 194:2
**continue** 150:7
**contradicted**
156:10
**contribution** 150:8
**control** 10:7,8 58:7
58:14 59:3 205:24
**conversation** 93:3,6
93:14 94:4,7,17
94:24 95:3,8
124:17 176:17
191:3,16 192:14
193:9,18 196:15

196:24
**conversations**
11:17 49:1 124:7
124:20 163:17
164:11 174:13
179:24 189:3,6,11
192:9 193:7
200:10
**Copey** 31:4
**copied** 30:18
157:12
**copies** 70:14 144:15
**Coppedge** 31:4,7
31:13 47:23 54:12
136:13 158:23
159:4
**copy** 6:19 16:1
21:10 132:3
144:21
**corporate** 141:8,9
147:16 148:12,16
149:10 184:1
**Corporation** 1:11
**correct** 6:9 7:8 9:17
12:23 14:1,6,21
25:18 36:7 47:16
48:1 59:19 62:20
101:21 121:9
136:11 140:13
141:2 153:9
166:20 184:3,4,16
199:18 200:6
205:8
**correctly** 15:9
111:12 129:7
146:8 152:20
153:6
**correspondence**
11:17 15:3 16:7
17:1 21:19 38:19
139:6 155:6
188:13 203:4
**couched** 75:19
**counsel** 2:5,10,15
8:19 32:16 40:13
42:9 72:21 80:11
174:6 189:6 190:2
190:3,15,16,21
192:5,6,11 194:16
194:21,22 195:23
196:2 197:9 203:6
205:10
**counsel's** 189:16
190:17
**country** 67:23
**couple** 25:3 130:6

137:24 160:5,10
193:19 201:23
**court** 1:3,16,23
3:16 4:20 13:2
17:21,24 23:21
44:2,20 133:13
138:8 146:10
205:24
**courthouse** 44:4
**cover** 138:16
**covered** 11:7 39:13
41:19 151:22
173:19 183:8
**covers** 12:3
**Coyle** 2:2 3:4 4:12
4:16 7:5,22,24
8:18 9:10,14,20
10:15 11:9,19
12:15,17 13:8
17:3,9 18:22 19:6
19:16 20:22 21:23
22:11,20 23:8,20
24:20 25:5,20
26:23 27:12 28:10
28:24 29:3,6,11
30:4 32:15 33:8
33:19 34:11,16
35:1,24 36:4
37:12 38:10,14,22
39:18 40:1,4,12
41:2,21 42:2,8,13
43:2,19 44:7,13
44:18,22 45:9
46:3,8 47:12
48:19 49:20 50:14
51:6 52:9 53:1,21
54:5 55:3,11,19
56:16 57:11,22
58:5,16,23 59:5
59:15 60:5,20
61:6,18 62:1,13
63:10 64:22 65:23
66:23 68:16 69:1
69:13 70:12 71:9
72:20,24 73:4,9
73:20 74:11 75:1
75:18 76:6,16
77:9,17 78:10
79:6,23 80:9,10
80:17 81:9,22
82:13,19 83:2,4
84:4,23 85:12
86:10,22 87:12,19
87:23 88:18 90:10
91:9,13 92:21
95:14,22 96:13

97:10,19 98:8
99:3 100:8 101:9
102:3,11 103:4
104:16 105:8,21
106:4 107:10
108:8,19,23,24
109:5,8 110:24
112:5 113:4 114:1
114:17,24 115:7
117:13,20 118:2
118:12,15 119:1
119:10 120:4,11
120:13 121:1
122:14 123:6,23
125:23 126:12
127:8 128:4,10,23
129:15 130:11
131:15 132:7,10
132:21 133:3,7,12
133:21 135:3
136:1 137:16,22
138:10,14,17
139:1,9 140:7,21
141:14,24 142:4
143:1,23 144:18
145:11,20 146:20
149:5,11,17
150:24 151:11,21
152:4,16 153:20
154:12 155:2,8
156:13 157:7,17
159:7 160:1,17,20
161:15,19 162:19
165:7,14,21 166:8
166:12 168:4
169:1 170:5 171:7
171:11 172:13
173:1,5,18,24
174:3,5,10 175:4
175:17 176:1,19
177:8,16 178:4,8
179:6 180:11,22
181:8 182:3 183:5
183:14,24 184:11
185:1,20 186:8,17
187:4,8 188:4,11
190:4,8,19 191:4
191:7,14 192:13
192:23 193:6,13
193:21 194:8,23
195:4,14 198:10
199:17 200:19
201:8,11 202:10
203:6 204:1
**Creek** 111:11 116:1
146:6

169:11 170:17,24
171:13 172:18
**Cross** 3:2
**curious** 196:20
**current** 114:23
117:5 118:6
143:14 153:17
169:8,11
**currently** 117:17
117:18 119:13
123:3 136:10
139:18
**cut** 132:8
**C-O-P-E-Y** 31:6
**C-O-P-P-E-D-G-E**
31:7

---
**D**
**D** 3:1 4:1
**daily** 22:5,9
**date** 10:22 66:10,24
163:17 178:13
**dated** 69:21,22
**dates** 130:19
**Dawn** 1:16 205:5
205:18
**day** 92:23 159:15
163:8 205:13
**days** 41:24
**dead** 177:1
**deal** 15:19 99:13
100:4 116:15
151:3 172:8
174:15 175:12
177:1
**dealings** 31:18
48:23
**deals** 43:7 71:7
**December** 144:2,3
144:5
**decide** 89:18 90:6
167:6
**decided** 82:2 83:13
91:18
**decides** 90:4 168:15
**deciding** 41:15
**decision** 90:22
104:20 157:22
168:8 182:11
200:4,11 202:16
**deep** 64:16
**Defendant** 1:12
2:15
**defined** 140:18
**definition** 100:23
**definitive** 132:19

**delivered** 3:16
**demographics**
51:22 96:19
**densities** 169:21
**density** 170:2
**dependent** 86:7
**depending** 5:22
55:22
**depends** 52:6 59:23
**depose** 159:16
**deposed** 197:14
**deposition** 1:14 3:8
6:6,8,17,20 7:7,16
10:20 13:14 39:17
40:24 41:12 42:1
42:14 43:10 87:21
130:12 154:17
155:1 186:19
190:18 191:24
192:7 193:3,5
194:14 195:7
202:20 203:10,19
203:24 204:4
**depositions** 87:19
**describe** 37:14,15
56:20 99:5 146:21
147:3 148:10
196:13
**described** 28:3
48:15 60:8 85:2
98:10 158:1
**description** 3:7
96:17,18,19,20
**designated** 8:3,7
9:2 39:3 56:3
163:1 187:3 198:1
199:10
**desktop** 26:11
**despite** 56:9,9
**Destin** 111:11
115:19,20
**destroyed** 144:20
**detail** 35:14 36:6
187:19
**detailed** 99:11
173:1
**determination**
53:17 69:11
183:23 184:5
**determinations**
167:23
**determine** 63:6
151:6 159:17
165:2 167:5 170:3
201:1
**determines** 99:8

**determining** 39:9
**developed** 145:1,13
**developer** 98:16,18
100:10,14 104:12
162:2
**developing** 23:13
24:8 118:3 120:14
121:18
**development** 1:7
4:18 19:23 35:13
64:15 66:19 103:8
103:13,21 116:13
116:22 117:9,18
120:7 123:8,10
127:13 129:24
140:24 145:2,14
147:1 165:2
167:24
**developments**
102:20 141:11
**difference** 88:2,2
190:24
**different** 25:6
47:17 48:4,14
52:15 53:13 55:22
56:13,17,22 57:1
59:7 62:23 66:1,3
66:11 69:15,24
71:13 72:13 88:5
99:13 103:7
108:11,11 110:13
125:16 134:18
135:17,18,20
136:3 146:15,24
147:18 151:3
156:1 169:20
**difficult** 104:7
**dilemma** 27:24
**diligence** 53:14
62:24 63:6 78:14
82:1 83:11 84:17
88:4 89:3
**direct** 3:2 4:10
17:14,17 19:8,9
20:6,8 205:24
**directed** 193:7
**directing** 40:13
129:4 132:22
150:4 182:7
**directly** 156:9
205:11
**director** 31:22 48:6
48:7,8 135:16,21
136:10,14,15,17
137:14
**directories** 27:21

**directors** 30:14,20
30:24 31:14 47:16
51:10 113:6 126:2
126:20 136:20
137:10 156:24
158:20 159:9,12
196:22
**disagree** 11:2,21
43:2 44:12 129:19
171:7 173:3
180:24 203:7,14
**disagreement**
10:16
**disapproval** 10:9
**disapprove** 39:10
41:16
**disclose** 118:6
**discovery** 24:18
**discuss** 22:17 35:16
45:24 71:6 110:4
110:6 135:8
199:19
**discussed** 35:14
36:5,13 37:5,9
38:17 41:11 68:4
70:24 74:16,23
111:3,5 146:24
160:23 161:11
189:21 190:23
197:14
**discussing** 127:16
160:3
**discussion** 36:17,21
43:23 163:13
170:8 172:7 181:5
**discussions** 20:3
124:10,12 130:8
145:14,18 164:7
194:2
**dispute** 12:8,9
114:23 132:2
139:7 145:21
**DISTRIBUTION**
205:23
**District** 1:3,4 4:20
4:21 6:7 44:2
**division** 134:18
**document** 3:9,12
65:2,5 66:10,24
67:4,5 70:24
71:15,17 112:7,11
113:10,15 122:12
122:24 150:15,19
194:11 203:3
**documentation**
14:14 23:5 151:18

151:22 154:8
155:21,21 156:17
158:19 179:11
180:5 184:22
185:6,9 186:15
**documents** 7:10
10:2,11 12:4,7,11
12:19,21 13:16,19
14:3,9,9,11,15,18
14:19 15:15,24
28:19 38:15 39:1
39:21 40:3,5,10
40:11,18 42:3,6
111:23 138:18
139:5 150:1 155:9
155:17,22 156:1
156:10,14,17,20
157:9,20 158:1,4
158:5 161:21
177:21,22,24
178:22 179:10
181:11 182:10,22
183:2,7,17 184:6
184:14 185:17
186:12,20 187:9
187:17 188:1,12
188:23 193:22
194:4,6,9,13,14
194:17 195:6,11
**Dodge** 1:5,7 4:18
**doing** 8:18 82:23
108:11
**dollars** 45:19 49:11
**domain** 134:17
**done** 41:23 56:23
78:13 88:5 181:14
182:20 186:14
**Donnelli** 2:12 189:7
189:10
**doubt** 129:16
**down** 6:16 62:15
82:12 112:2
114:24 174:12
**drawings** 163:3
**driven** 103:18
**duces** 7:7 10:20
43:10
**due** 62:24 78:13
81:24 83:11 88:4
174:2
**duly** 4:7 205:7
**during** 53:15
116:13

---
**E**
**E** 2:1,1 3:1,6 4:1,1

205:1,1
**each** 14:18 16:1
  26:8 56:22 60:8
  86:6,8 99:13,14
  99:24 100:11
  104:9 110:7
  125:17 128:14
  144:13 155:19
  168:21 169:22
**earlier** 14:11 36:17
  47:23 67:6 90:15
  91:19 94:2 96:16
  100:2,24 107:4
  111:4 113:9 122:2
  126:16 130:12
  141:1,7 143:8
  146:23 155:18
  157:10 169:6,19
  172:1 175:2
  178:14,17 185:16
  201:22
**economic** 98:15,18
  100:9 101:7
**economics** 99:8
**educated** 77:19
  107:7
**effect** 147:12
**efforts** 64:16 155:3
**either** 15:23 42:21
  163:23 181:9
  205:11
**elect** 153:2,10
  185:10,24
**electronic** 15:3,17
  21:19 155:10
**element** 61:23
**elements** 99:24
**Eleven-Page** 3:12
**Elizabeth** 1:14 3:3
  4:6,15 30:8,9
  205:6
**employ** 167:7
**employed** 6:1,4
**employee** 16:13
  205:10
**employees** 15:5,7
  155:12,14 188:14
**enable** 169:21
**end** 116:15 119:18
  180:9
**ended** 144:4
**ending** 144:2
**Energy** 2:3
**engage** 15:11
**engagement** 16:5
  17:5 21:5 28:14

29:22 147:23,24
  151:5,9 156:15
  176:9 178:24
**enough** 156:18
**entertainment**
  37:18 48:22
  132:23
**entities** 57:9
**entitled** 13:20,22
  198:2
**entity** 54:21 55:8
  152:8
**environment**
  135:23
**environments**
  94:13
**equation** 170:2
**equity** 37:17,24
  45:3 46:14 48:14
  49:3 62:5 86:13
  131:11 135:23
  140:23 152:17
**equivalent** 143:15
**Esquire** 2:2,7,11
**essentially** 147:8
  150:12
**estate** 110:9 167:23
**estimate** 75:8 77:6
**et** 15:20 156:2
**even** 63:15 64:8
  76:8 167:9
**eventually** 85:18
  88:6
**ever** 20:2,11 23:11
  24:6 30:9 63:15
  91:16 92:3,7,9,12
  92:24 100:13
  106:8 123:14,20
  124:7,13,15,17
  197:10
**every** 15:21 45:16
  49:24 52:14,22
  92:23 99:15,15
  104:14 157:11
  169:20 201:24
**everything** 190:22
**evidence** 69:9 82:8
  85:6 86:1 88:13
  97:15,24 105:2
  110:20 123:18
  145:17 161:14
  164:23 165:18
  167:20 198:6
**evolution** 172:9
**EXAMINATION**
  4:10

**examine** 10:23
**example** 54:6
  147:15
**except** 152:24
  194:11
**excessive** 189:10
**Exchange** 2:8
**exchanged** 23:11
  24:6,22 25:16
**excluding** 116:3
**excuse** 72:22 122:9
**execution** 60:8 84:7
  85:20
**executive** 129:7
  167:22
**exhibit** 4:3 6:19,24
  8:9 9:5 12:18 13:3
  13:5,14,18,24
  14:10,19,22,24
  21:1 30:10 64:23
  68:6 106:17 120:1
  120:18,22 121:2
  121:21 129:5
  131:16 133:2,6
  137:19,23 138:20
  140:8,18 141:6,15
  141:18 144:1
  147:17,20 148:4,6
  149:14,19 151:8
  152:6,18 154:19
  154:20 158:6
  166:14,19,21
  176:22 182:7,8
  185:21 186:6,8,10
  186:21 197:16
  202:1
**Exhibits** 1:2 3:16
**exist** 23:6 28:13
  29:20 70:14 158:4
  158:5 173:7
**existing** 60:21
  110:10
**exists** 55:22 172:18
  173:15
**expectation** 98:6
**expectations**
  114:10
**expected** 98:3
**expenditures**
  131:12 141:10
**expense** 148:12
**experience** 134:9
**expires** 205:20
**explain** 52:10 99:6
**explained** 7:17
  11:16

**explanation** 182:18
**extensive** 150:15
  151:18,21
**extent** 8:15 41:6,9
  63:11 64:3 112:18
  147:17 190:12,13
  198:5
**extremely** 43:14
**EYAL** 1:23
**e-mail** 16:7,12 17:1
  19:10,21 20:1,11
  21:18 22:1 23:11
  24:7 27:4,14 28:2
  28:12 29:19 30:2
  33:20,23 34:3
  182:15
**e-mails** 16:3 20:20
  21:4,12 22:24
  23:6 24:15,22
  25:15,22 26:9,16
  27:18,22 29:1
  30:12,15,15 32:1
  32:5,10 33:2,6
  155:5 188:17,20
  188:22

---

**F**

**F** 2:2 205:1
**fact** 43:5 72:10
  75:19 129:4,9
  144:24 185:5
**factor** 104:19
**factors** 51:14,17,20
  52:15 99:15
  105:20 168:6,6
**facts** 69:9 82:7 85:6
  85:24 87:2 88:13
  97:14,24 105:2
  110:19 123:18
  145:16 161:13
  164:22 165:17
  167:19 198:6
**fair** 22:5 50:5 59:9
  72:9 73:11 85:21
  88:10 109:10,19
  111:16 121:22
  186:4
**faith** 42:15 44:8,11
**fallen** 175:12
**familiar** 121:4,5
  131:19 149:22
**FANEUIL** 1:23
**far** 10:6 105:9
  151:11 153:10
  169:24
**favorable** 50:3,19

**fax** 146:11
**federal** 29:8 198:2
  200:18 201:18
  203:12,21
**feel** 50:19 181:10
**feels** 46:1
**felt** 202:7
**few** 58:21
**Fifty** 49:11
**figure** 22:21 35:10
  163:2
**file** 25:24 188:18,19
  188:21 203:11
**files** 15:17,17,18
  16:6,24 21:19,20
  70:15,18,22
  157:15 179:9
  180:4 189:1
**finance** 45:16 147:6
  147:10,16 148:2
**financial** 97:1
  106:22 107:18
  108:3,24 109:3
  110:4,7 141:19
  142:6,17 143:16
  185:22
**financially** 205:11
**financials** 144:13
  144:22
**financing** 59:24
  61:16 138:22
  147:1,8,13 182:23
**find** 16:7 19:19
  20:10 28:4,12
  29:3,19 33:21
  88:24 123:12
  155:20,21 168:19
  179:9 180:17
  196:17
**fine** 11:3 43:15 46:3
  82:20,23 95:16
  114:2 130:20
  181:22
**finish** 72:23 80:10
**firm** 15:19 196:1
**first** 4:7 7:2 12:2
  13:20 14:12 15:2
  31:6 47:3 48:23
  49:3,8 65:1 69:3
  103:16 106:20
  127:20 139:13
  142:5,16 163:14
  164:4 169:4
  175:10 179:23,24
  183:16 202:1,2
**Fisher** 30:8,10

**five** 41:14 53:12
    89:7 137:5,10
**Flemming** 31:12,17
    47:24
**Florida** 115:19,21
    116:11,12 146:7,7
**flown** 40:22
**folks** 176:24
**follow** 19:7 35:2
    87:20
**followed** 43:1 49:14
    171:1 182:19
**following** 16:8 35:6
    142:1,15
**follows** 4:8 8:24
    18:8,15 19:2 24:2
    25:13 29:17 32:23
    34:20 37:2 41:15
    45:1 64:2 83:8
    125:8 142:14
**forgoing** 205:8,22
**form** 68:9 72:15
    74:18 82:6,13
    88:12 89:22
    104:24 125:1
    145:4 149:1
    165:11 167:15
    171:12 177:5
    179:1,18 181:1
    194:19
**format** 15:3 155:10
**Fort** 139:7,14,19
    140:11 145:1,9
    146:1,3 149:5
    151:5,14
**forth** 30:10 68:5
    184:14 187:10
    200:17 201:18
    205:7
**forward** 53:17 84:6
    114:15 167:6
    200:12
**found** 15:24 17:1
    24:17 70:22
    156:18 157:18
    164:12 179:11
    180:6,8 189:1
**foundation** 20:18
    52:20 60:13 61:3
    61:12 63:4,19
    68:10 69:8 70:5
    74:19 79:18 81:3
    82:14 85:5 89:23
    104:2 107:3
    110:18 111:19
    112:23 123:18

125:2 128:2,8,21
    144:11 164:23
**foundational** 17:22
    18:1 32:15 141:23
**four** 31:2 109:21
    134:23
**Fourth** 102:13
**FRASER** 2:3
**from** 4:17 14:12
    25:22 33:20 40:23
    51:11 54:17,18
    55:9 60:2 63:14
    64:7 82:22 89:9
    98:16,18 100:10
    100:13 102:16
    106:11,13 110:1
    121:3 126:15,19
    127:5 129:20
    131:22 132:13
    134:23 140:8
    142:23 143:14
    147:12 163:4,21
    164:7 174:14
    177:2 178:15
    179:24 181:9
    193:18 197:21
    198:24 199:2
    202:16
**front** 71:23 106:18
**fully** 187:23
**fund** 131:11 141:8
    141:10 150:8
    152:13
**funds** 151:7
**further** 36:20
    101:11 205:10
**future** 117:9
**FY** 97:5
**f/k/a** 1:6

—————— **G** ——————
**G** 4:1
**game** 85:1
**games** 43:5
**gave** 21:12 24:22
    25:16 28:6 43:11
    47:23 193:5 202:1
**general** 26:3,7 27:2
    39:12 53:2,10
    62:19 83:23 86:23
    88:1 104:8 109:12
    113:24 114:3
    147:15 191:16,19
    191:20
**generalization**
    122:12

**generally** 37:16
    48:20 49:13 50:4
    51:15 60:6 74:23
    84:9 88:4,10
    110:22
**generated** 98:4
**gentlemen** 16:11
    73:22
**Gerald** 134:1,3
**gets** 52:17 62:6
    147:5
**getting** 62:15 82:21
    86:12 136:18
    142:5,16 174:12
    191:19 193:1
**Ginader** 31:9,13
    47:23 54:14,15
    136:9 159:4
**give** 27:1 32:2 52:1
    53:2 75:13 76:8
    93:10 107:7
    124:23 125:10
    126:2,8 147:6
    153:17 167:7
**given** 16:1 26:8
    54:17 124:13
    191:12
**giving** 38:14 191:16
**go** 5:11 10:23 14:22
    20:7 28:21 42:18
    43:16 44:22 45:9
    53:17 62:14,14
    64:24 67:3,11
    70:10 77:10,21
    79:7 86:13,24
    88:19 95:16 96:2
    98:9 100:15
    105:23 106:17
    107:11,15 111:24
    112:13 116:6
    121:6 133:12,15
    134:1 138:10
    139:3 145:6 151:1
    152:5,5 154:16,18
    154:20 155:2,4
    165:22 167:6
    173:8 174:11
    197:16
**goes** 36:16 62:18
    138:17 191:5
**going** 5:1,14 13:2
    17:20,21 36:12
    37:3 38:16,23
    39:20 42:3,8 43:4
    43:8,15 44:21
    45:6,12 49:23

50:2 51:15 59:17
    59:18 62:4 82:11
    83:19 86:12,24
    87:20 101:1
    102:22 103:12,20
    104:5,21 107:15
    113:16 114:24
    117:10,13 119:4
    119:19 129:23
    133:7 137:24
    138:2 141:22,24
    148:6 150:11,17
    151:17 152:1,2
    154:16,16,17
    181:18,19,21
    192:15 193:10
    197:23 201:15
    203:9
**gone** 80:23 85:1
    100:5
**good** 4:24 42:14
    44:8,10,11 78:22
    150:11
**govern** 187:17
**governance** 185:18
**governess** 58:13
**governs** 184:22
    185:6
**grand** 103:21
    104:22
**granted** 153:1
**Granville-Smith**
    1:15 2:10 3:3 4:6
    4:15 8:14 10:12
    16:2 19:20 23:17
    27:13 34:1 36:18
    38:7 39:2 41:7
    42:17 45:24 46:9
    47:7 91:3 95:23
    106:5 109:20
    115:3 117:11
    120:6,9 125:24
    129:22 133:22
    139:11 145:22
    150:16 151:13
    153:22 178:9
    182:4 183:10,21
    184:19 186:18
    187:2 199:11
    205:6
**Granville-Smith's**
    85:8
**greater** 156:22
    157:23 182:12
**ground** 60:2 102:16
    **grounds** 141:23

183:12 191:2
    195:3 197:24
    201:16
**group** 135:7
**guarantee** 148:9,13
    148:17,17,20,22
    149:10
**guess** 17:18 44:18
    73:15 75:13 77:7
    77:14,18 82:14
    103:17 173:18
**guessing** 77:13,15
**G-I-N-A-D-E-R**
    31:11

—————— **H** ——————
**H** 3:6
**Hall** 1:19,23 2:7
**hand** 13:1 138:7
    205:13
**handed** 121:2
**handing** 149:18
**handle** 44:19
**handwriting** 71:20
    71:22,24 72:1,3
**handwritten** 72:11
    73:23
**happened** 43:22
    93:1 159:15
**happening** 159:17
**happens** 103:7
**happy** 44:5
**hard** 19:18
**having** 4:7
**hear** 108:22 109:6
    142:10 194:20
**heard** 174:13,14
    175:11 180:1
**held** 1:18 148:15
**help** 141:9
**helped** 147:10
**helps** 30:24
**her** 23:18 31:10
    43:10 45:17 66:15
    72:16,19 73:5
    75:24 87:16 99:20
    107:23 109:2
    142:1 150:18
    151:17 160:17
    174:24 183:16
    184:7 189:11
    190:2,3 195:6
    196:10,12,14
    200:22 203:23
**hereinbefore** 205:7
**hereunto** 205:13

**Hey** 92:24 100:14
178:20
**Hickory** 146:6
**highly** 12:13 86:7
**him** 94:12 135:19
168:1
**Historically** 143:4
**Hobbs** 134:2,3,13
134:18 135:1,17
**home** 42:18 43:16
**hoping** 111:16
114:3

**I**

**idea** 76:18,19 124:6
**identification** 4:4
13:6 120:2,23
137:20 149:15
**identified** 40:17
133:11 138:20
199:6
**identifies** 129:5
**identify** 13:16 65:1
67:4 71:19 149:19
**III** 136:13
**imagine** 60:1
**impact** 52:16
**important** 112:10
168:16 171:23
172:8 187:15
**improper** 28:23
38:5
**inappropriate**
116:5 119:6
**Inc** 1:23 15:6
182:23
**include** 96:22 98:14
114:9 137:12
**included** 132:17
172:2 179:10
**including** 15:5,6
96:18 131:12
153:2 155:11,13
188:13
**incorporate** 170:1
**incorporates** 41:9
**incorrect** 35:22
62:11 87:2,6 91:7
140:17
**increased** 93:23
**independent** 55:5
**Indiana** 139:15,19
145:1 146:2,3
151:5,14
**indicates** 150:6
**indirectly** 205:11

**individual** 49:15
199:4
**individuals** 31:24
32:5,9 33:1 36:9
201:1
**industries** 136:3
**inference** 72:10
73:11
**information** 9:23
85:17 94:20 96:4
96:9,11,14 109:3
117:3,8 118:6,8
118:10 119:7
129:17 136:7
162:6 196:8 203:5
203:8
**informed** 38:24
41:4
**initial** 103:13
**inquire** 39:7 190:22
195:5 196:5,23
201:4
**inquiry** 93:18
**installment** 49:9
**instruct** 45:7 119:4
126:14 193:24
**instruction** 119:17
192:2,5 193:14
**intended** 59:16
**intending** 62:16
**intent** 199:24
**interest** 42:11
55:21 57:15,23
152:1
**interested** 10:6
44:3 63:14 64:6
205:11
**interim** 79:11 83:24
**interpretation**
147:7 186:11
**interrupting** 73:6
**introduced** 4:22
**invest** 36:13 37:4
48:14,21 90:23
**invested** 151:7
152:13 153:4
186:1
**investigate** 201:13
**investigation** 32:7
198:12 200:9
**investment** 1:6
17:11 18:18 20:4
39:11,12 41:18
134:16,24 138:22
174:18 179:14
182:23 184:23

185:6 187:18
**investments** 131:7
**invests** 37:18
**involve** 59:8 60:8
199:22
**involved** 31:2 45:15
45:20 52:2,16,17
127:12 134:12,13
**involvement** 17:5
17:10,13,14,16,17
18:10,16 19:4,8,9
20:6,8
**involves** 9:22 184:7
**involving** 20:13
171:13 188:16
**irrelevant** 12:13
136:7
**issue** 10:12,14
**issued** 10:19
**issues** 40:16 44:4
93:23,23 138:19
199:6
**item** 9:16 38:17
40:12,13,19
106:20 155:9
157:9 172:16
182:21 186:21
197:16 199:9
**itemized** 146:10
**itemizing** 173:13
**items** 40:17 43:11
58:12,17,21 59:3
93:21 94:3 155:19
157:19 171:14,22
172:2 199:6,9,20
202:5

**J**

**Jackson** 116:16,17
116:19,20 117:15
117:21 118:4,17
118:24 120:7,14
121:13,15,22
122:21 123:4,8,10
**Jefferson** 139:14
148:23 149:4
**Jennifer** 2:12
198:20,22
**job** 47:17 135:11
167:8 168:20
**join** 73:7 125:3
134:8
**judge** 16:10 43:3,23
73:21 83:5 203:12
**judgment** 184:7
**July** 205:13

**June** 1:20 39:21
42:2 129:18 132:1
**jurisdiction** 165:5
**jury** 16:11 73:22
**just** 5:19 9:10 11:3
11:11,20 14:17
19:19 22:21 23:9
23:9 24:3,3 27:1
29:3 35:6,10
37:13,13 42:16
43:15 45:9,20
47:23 53:2 60:7
72:24 73:5 76:17
82:14,15,17,20
85:2,10,13 86:23
87:6,15,24 94:14
101:13 105:5,22
109:1,2 110:1
111:1 114:24
120:19 122:7
126:9 136:16
137:14 138:7
140:8 142:1,1,15
144:21 151:2,4
152:14 158:1
160:2,17 161:15
162:15,20,22
163:20 166:5,16
167:11 170:12
172:16 173:7,15
174:11 175:14
176:17 180:17,23
181:20 183:15,15
186:19 190:10
191:7 194:20
203:11

**K**

**Kansas** 2:13,14
**Kathleen** 2:7 5:18
25:6 28:24 194:23
195:22
**Kathy** 39:18 45:9
87:12 180:22
199:20
**keep** 15:18,19
29:11 44:21 87:5
91:6 133:7 136:18
140:1 144:23
158:13 161:1
185:5
**kind** 78:13 96:14
96:14,24 109:3
188:17
**kindly** 43:4
**kinds** 111:4 168:18

188:1
**knew** 90:15 161:8
163:14
**know** 11:11,20
17:18 19:24 20:19
21:11 23:22 24:15
24:21 25:15 26:2
26:3,20 27:9 28:5
29:1 30:5,6,7 32:4
32:6,8,16,17,24
33:11,11,12,16
49:24 50:15 51:14
56:19 61:4 63:15
64:8 65:3 67:24
70:9 80:13 82:15
85:20 86:3 92:11
95:4 100:14
102:13 103:22
104:20,22 106:11
107:12 109:1
111:24 115:17
116:10 121:17
123:11 124:4
126:10,13 127:2
127:11,11,15
128:11,13,15
130:7 144:21
145:23 148:1
149:9 151:2 157:7
159:12,23 160:9
161:7 162:12
168:22 170:11,12
170:13,20 172:4
172:10,14,16
173:13,15 176:17
177:8 178:14
181:3 188:19
189:8 190:4,10
191:19 193:1,4
196:23 198:16
200:24 203:14
**knowing** 162:1
**knowledge** 5:3 20:5
30:1 32:9 33:1,9
40:16,21 55:4
56:12,21,24 57:7
81:5 92:8,19 95:7
118:23 119:12
120:16 129:13,22
130:7 136:3
138:19 197:18
198:18,24 199:2,5
200:21 201:7
205:8
**known** 174:3
**knows** 87:17

**KPMG** 143:14,16

**L**

lacks 52:19 60:13
  61:12 63:4,19
  68:10 69:7 70:5
  74:19 79:18 81:3
  85:4 89:23 104:1
  107:3 110:18
  112:22 123:17
  125:2 128:1,7,20
  144:11 164:23
ladies 16:11 73:22
lady 43:13
landlord 60:18
language 141:5
  183:8
last 7:13 17:24
  18:22 31:6,10
  189:12,18 197:1
lasted 189:19
  195:15
late 181:21
later 10:22 99:1,5
  174:14 180:1
latitude 139:3
launching 99:11
law 1:18 196:1
lawsuit 4:19 5:4
  11:14 188:17,18
  188:19,21,24
  196:9,14,18,20,22
  197:8,11 202:1
lawyer 190:10
  192:10
lawyers 184:7
lead 105:17
leading 74:20 82:7
  105:1
leads 112:2
learned 163:18
  173:24 180:1
learning 175:12
lease 59:18 60:3,9
  60:17 61:8,20
  62:6 84:7,19,24
  85:20 86:4 96:21
  98:11,11,19,24
  99:5,9,9,11 100:3
  101:5,15 114:12
  123:14,20 124:1,3
  124:4,5,8,12,13
  124:16,18 125:16
  125:18,21 126:4
  126:20,24 127:5
  127:12,16 129:23

130:8 147:12
  148:12
leases 59:2,7,8
  60:22 101:5,18
  104:10,11
least 109:21 143:3
  145:13
leave 145:24 203:15
legal 55:1 57:5
  58:10 128:13
  150:1,15,18,19
  151:18,22 153:15
  154:4 183:19
  184:7 185:14
  187:1,5 189:16
  197:9
leisure 103:8
less 93:19
let 6:21 9:10 13:1
  19:7 20:23 29:11
  35:2 54:19 72:22
  80:10 87:15 90:19
  165:24 170:14
  171:12 178:9
  181:20 183:15
letter 3:9,13 41:2,5
  149:23 150:3,9
  174:7
letters 188:16
let's 12:15 14:22
  20:7 44:17 62:14
  62:14 64:23,24
  67:3 72:24 79:7
  95:16 98:9 105:21
  105:23 106:17
  108:19 110:1
  133:15 134:1
  137:16 149:11
  152:5,5 155:4,5
  169:2 173:20
  174:11 191:4
  197:16
level 26:10 33:4
  34:14,22 35:9,13
  35:14 36:6,14
  37:6,10,24 45:2
  98:3 148:12,15,16
  149:10
levels 53:13
Liability 1:7,11
like 5:2,13,18 33:20
  40:23 41:1 42:16
  43:16 50:10 65:9
  88:15 95:15
  100:15,18 104:13
  112:14 113:16

114:10 120:8,20
  121:20 123:12
  138:3 154:8 160:9
  166:15 178:20
  182:17 185:4
  203:15
likely 172:6
likes 123:11
Limited 1:6,7,11
  139:20 150:7
  152:7,24 153:8
line 80:11
list 52:1 89:16
  92:22 115:15
  116:4 122:20
  148:4 170:16
  171:24 172:3,6,11
  173:7,13
listed 71:14 169:6
  170:9
listen 162:24
lists 132:24 147:18
little 8:19 47:14
  84:8 115:8,9
  146:15 169:20
  181:21
live 6:11,13,14,15
LLC 1:7,10 153:17
  154:8
LLP 2:12
locate 30:11,15
  32:5
located 42:6 146:6
location 50:4 112:9
locations 50:16,17
  67:22 103:7,7
  110:13 116:9
  147:18
long 6:3 75:19
  168:17 171:21
  189:18 195:20
  196:16,24
longer 163:8,19
  164:8 167:13
look 6:21 13:9,13
  15:14 21:11 41:4
  43:4 50:17 51:15
  64:23 70:20 84:17
  85:16 88:9 94:15
  100:13 106:9,12
  120:18 132:12
  137:23 151:1
  155:17 157:8,24
  158:17 168:6
  169:9,24 172:17
  173:8 179:7

182:16 193:22
  194:9,11,13
  195:10 199:3
  202:4
looked 27:22 62:23
  63:12 64:4 115:17
  122:9 158:18,19
  195:5
looking 17:11
  18:17 20:5 66:12
  66:20 76:20 89:16
  90:16 136:16
  160:6,21 161:7,8
  162:5 163:9 164:8
  167:13 176:21
  182:9 194:10
looks 50:15 62:19
  65:9 71:21 72:2
  121:19
lose 95:14
lot 20:9 71:11 91:19
  126:1 150:1
Louisiana 115:12
LTD 1:6
Lucie 146:7
Lynn 2:11 82:14,22
  190:11
L.L.C 15:4 140:12
L.P 1:5

**M**

M 2:18
Mack-Boaden 1:16
  205:5,18
made 47:2 90:22
  190:1,20 197:21
  199:23 203:22
Main 2:13
major 158:14
majority 57:23
  58:2 78:17 89:2
  101:17 139:21
  140:4 152:23
make 43:7 62:16
  77:6 91:7,20
  104:20 122:11
  137:4 167:23
  168:8 174:12
  181:17 184:8
  185:17 190:24
makes 53:16
making 69:10
  183:22 184:5
manage 30:2
management 6:2
  7:8 15:6 22:17

26:1,9 49:2 51:2,7
  51:8,24 53:11,16
  62:18 78:16 86:4
  88:23 89:12,17
  90:4 93:3 95:1
  98:15 99:7 101:2
  123:11 124:23
  125:10 126:3,19
  127:12,19,22
  128:11,15,17
  129:1,3 130:1
  134:9 155:12
  160:6,12 164:15
  164:24 166:22
  167:1 182:22
  188:15 197:13
manager 30:6
  68:23 74:21 79:20
  108:2 155:24
managers 13:20
  31:15 34:14,23
  35:9,14,15 36:2,6
  36:10,14 37:6,10
  51:3,11 53:19,22
  53:23 54:3,7,10
  63:8,14 64:7,20
  67:8 68:18 71:1,5
  78:1,3,3,16 79:8
  81:19 82:4 83:15
  83:23 89:4,6,8,12
  89:19 90:8,13,17
  90:21 91:10,17
  92:7,10,12 94:11
  94:14 100:5
  107:17 109:16
  111:6 128:14
  136:22 137:1
  153:3,11 162:4
  165:9 178:2
  180:15 185:10
  186:1
manages 86:4
  114:11
managing 48:5,7,8
  135:16,21 136:14
  136:17
mannerism 26:15
many 30:16 51:1
  53:11 88:23 89:5
  91:23 93:23 94:13
  103:6 108:12
  115:1 189:3
maps 96:22 161:22
**March** 176:23
  179:15 180:16
  201:3

**mark** 13:2 137:16
149:11
**marked** 4:3 13:5
120:1,22 137:19
149:14,18
**market** 51:16,21,21
96:18 111:8 122:7
122:9 123:12
156:19 169:21
170:8 179:14
**marketplace** 1:23
93:24
**markets** 50:3,18
108:12 110:11
**Massachusetts** 1:18
1:20,24 2:9 6:9
44:2 205:2,5
**material** 7:20
**materials** 161:24
190:6
**matter** 34:13,21
35:3,8,11 174:13
205:8
**matters** 5:4 8:8 9:4
21:3 41:23 186:4
**Maun** 2:18 36:1
40:22
**may** 5:3,3 11:4
36:20 43:23,24
48:3 63:13,13
64:6,6,18,18 74:8
83:1 93:8,21 94:3
95:2 96:10 132:16
137:11 160:8
161:4 168:15
172:3
**maybe** 37:14 47:13
103:22 191:19
202:3
**McCreary** 2:11
16:18 17:20 18:1
18:12,21 20:18
22:15 23:3 35:20
50:8 52:19 53:4
56:2 60:13 61:3
61:10,12 63:3,17
63:19 64:11 66:14
68:9 69:7 70:4
71:3 72:15,22
73:2,13 74:18
75:16,23 76:22
79:18 80:7,12
81:1,3 82:6 83:1
83:18 85:4,23
88:12 89:22 95:12
97:23 99:18,20

100:22 102:22
104:1,24 107:3,22
108:17,22 109:5
110:16,18 111:20
112:22 113:18
114:7 123:17
125:1 128:1,7,20
142:10 144:11
145:4 149:1
164:21 165:11,17
167:15,19 169:17
174:23 177:5
179:1,18 189:7,8
189:13,14,19
190:11,14 192:15
193:12 194:3,19
195:1 198:5
**mean** 17:15,15 18:4
18:9 19:3,17
22:21 29:4 30:16
35:3,11 42:14
43:6 44:8 48:20
50:1,2 55:4 62:2
71:10 75:5 76:4
78:12 81:6 87:12
87:15,16,24 92:22
97:2 99:4 102:12
107:11,12 112:12
112:19 126:14
148:19 154:24
155:1 165:22
167:8 177:7,18
179:7 187:4,24
196:21
**meaning** 150:19
202:12
**means** 17:18 19:9
56:19 75:7,9 76:9
76:18,19 77:7,20
77:24 78:11 81:5
148:11,17 150:12
205:23
**meant** 19:17 35:11
**mechanism** 59:24
**media** 37:18 48:21
48:22 132:23
**meet** 109:24 165:3
167:5 168:22
**meeting** 13:21 67:8
67:12,14,24 68:2
68:5,13,14 70:1
71:13 72:5,7,12
72:18 73:11 74:1
74:7 76:3 79:8,14
80:21 81:7,13
83:21,22 93:13

94:11 107:6,14,17
109:14 158:8,11
158:16,21 159:5
159:13,18 160:4,8
161:3 163:13
165:9 176:22
177:3,10,13 178:2
178:23 179:8,15
180:15 189:12,18
189:19 195:15,19
**meetings** 67:16,19
68:18,23 71:1,6
74:13,14,15,22
79:9,10,20 80:1
81:20 82:4 83:16
83:24 94:14
107:11,20 108:3
109:16,21 110:4
111:3,6 135:8
155:23,24 158:14
159:10,12 162:4
176:21 178:10,13
197:7
**Melbourne** 111:11
116:11,12
**member** 15:21
127:21 128:16,24
129:2 135:20
157:11 196:8
201:24
**members** 22:4 49:2
95:1 126:15
152:17 197:13
198:21
**memoranda** 15:20
156:20
**mention** 177:14
178:3 179:13
180:16
**mentions** 69:15
**merits** 89:1
**met** 189:9,14
197:10
**methodology** 202:8
**MEUSEY** 2:3
**Michael** 2:2 4:16
**might** 32:17 63:15
64:8 85:15,15,16
88:2 96:22 100:11
121:3 135:21
136:2 162:15
170:1 191:17
196:3 200:9
**Mike** 95:12 194:20
**million** 49:11,12
130:13,24 131:4

140:23 152:9,14
152:14
**mind** 94:19
**mine** 166:1
**minute** 80:8 105:22
162:16
**minutes** 79:14
158:12,13,15
189:20 193:19
195:16,18
**minutia** 62:15
**misery** 109:1
**miss** 159:13
**Mississippi** 116:17
116:20 120:7,15
**Missouri** 1:7 2:14
**misspoke** 121:3
**misstate** 85:9
192:20
**misstates** 21:15
25:2 66:14 85:8
86:16 99:20
105:13 107:23
108:15 111:21
122:23,24 135:13
156:7 165:18
173:11 174:24
179:19 180:20
192:18 200:14
**misstating** 86:19
**mixed** 136:19
**modifications**
91:20
**modified** 91:24
**modify** 84:18 101:2
**moment** 13:10
137:24
**money** 45:15 46:18
46:19,23 49:6
150:12
**month** 202:3
**more** 20:9 23:19
35:5 41:24 42:3
46:21 50:19 62:2
62:17 71:11 72:7
74:9 84:8 85:16
87:17 101:4
109:11,12 126:1
133:8 134:8
137:11 147:5,19
168:15 172:6
**morning** 4:24 5:1
7:11 146:23 174:1
**most** 38:10,19,20
40:16,20 67:19
79:20 138:19

197:17 198:11
199:5 200:21
201:6
**Motion** 3:10 54:3
121:4 129:5
134:14 140:11
**mouth** 161:2
**move** 12:15 44:16
72:24 84:6 85:20
87:13 108:19
152:2 173:20
200:12
**moves** 84:19
**movie** 132:24
155:15 156:21
**much** 10:13 36:19
49:10 99:1,5
113:1
**multiplex** 169:13
**must** 171:14
**myself** 4:22 30:17
31:2 182:18
185:17

**N**

**N** 2:1 3:1 4:1
**name** 4:13,16 27:21
30:7 31:6,6,10
51:17,18 198:20
198:22
**names** 31:3 47:22
66:3
**narrow** 20:9 41:10
126:1
**narrowed** 185:5
**narrower** 10:6,11
10:14 41:13
**nature** 97:4 110:14
124:21 192:9
**nearly** 174:3
**Nebraska** 1:4,5 2:4
4:17,21 6:7 11:14
15:9 16:5,15
17:13 18:19 19:23
20:4,14 21:6
23:13 24:9 28:14
29:22 34:5 89:13
90:13 92:13
121:21 155:15
156:5,15,22
157:23 182:12
**necessarily** 88:20
112:12
**necessary** 46:21
79:12 181:16
**need** 11:11 26:10

43:20 47:13
100:14 104:20
124:23 125:9
126:2 142:10
150:21 162:10
170:17 171:1
181:17 185:22
202:4,6 203:3
**needs** 46:20 92:1
**negotiate** 101:11
**negotiated** 124:5
**negotiation** 114:13
124:19
**negotiations** 84:20
85:20 99:11 100:3
101:5 124:8,24
125:11,14,16
126:4,21,24 127:5
127:13 129:23
**neither** 205:10
**never** 19:10,21
38:17 56:12,17,23
64:18 84:24 90:12
90:16 105:9
123:24 124:2
150:16,19 151:19
156:4
**new** 6:15 37:8
50:20 58:24 59:17
60:8 62:5 63:1
102:4,18,20
103:13,21 110:14
111:8 121:9,11,22
131:13 141:11
145:13
**next** 147:19 177:2
177:10,12 178:23
179:7
**nine** 199:22 200:5
**nobody** 21:12
23:11 24:5,22
25:16 26:24 28:6
75:12,13 77:18
197:21 198:17,24
199:2
**none** 21:6,8 24:16
24:17 105:10
188:5
**Norfolk** 205:3
**normal** 67:15 74:12
94:12 135:21
159:8,11
**normally** 74:14
**Notarial** 205:13
**notary** 1:17 205:5
205:18,20

**note** 112:10 132:6
**notes** 72:11 73:10
73:23 107:12,13
205:8
**nothing** 157:18
173:16 189:1
191:20
**notice** 3:8 6:20 7:7
10:20 21:1 43:9
103:2 184:1
**notified** 90:8
201:24
**notwithstanding**
73:23
**number** 4:3 6:20
8:9,13,15,16,17
9:5,16,21 11:24
12:4,18 13:3,5,14
13:18,24 14:10,20
14:23 21:1 30:11
30:11 39:2 40:12
40:14 64:23 65:11
65:13 106:17
110:9 120:1,18,22
131:17 132:7
133:13 137:17,19
137:23 138:20
139:21 140:8
141:15,17,18,19
144:1 147:18,20
148:7 149:11,14
149:19 150:7
151:8 152:6,8,18
154:19,21 155:9
156:19 157:9,20
158:6 166:14,19
166:21 168:5
180:4 181:11
182:8,8,21 183:1
183:3,7,17 185:21
186:2,8,21,21
188:12 197:16,17
200:2 203:7
**numbered** 133:8
138:4 139:11
**numbering** 133:16
**numbers** 14:4 97:3
**numerous** 11:16
131:7

_____

**O**

**O** 4:1
**oath** 5:8
**object** 17:20 43:21
43:22 56:2 68:9
72:15 73:13 74:18

82:6 88:12 89:22
89:24 102:22
104:24 141:22
145:4,5 149:1
150:17 151:17
165:11 167:15
179:1,18 181:1
183:11 186:24
194:19 195:2
197:23 198:5
201:16 203:17
**objected** 8:13 9:20
10:1 38:7 39:14
41:5,20 138:24
183:7 199:10
**objecting** 41:3
173:23
**objection** 7:19 9:7
9:9,11 11:12,16
16:17,18,20 17:7
19:12 20:16 21:15
22:8,14,15 23:1
23:15,22 25:1
26:18 27:7 28:8
28:16 32:12 33:14
34:7 35:19,20
36:16 38:3,20,21
39:6 48:17 49:17
50:7,8,22 52:4,19
52:21 53:4,6 54:1
54:24 55:7,15,24
57:4,19 58:1,9,19
59:1,11,21 60:11
60:24 61:3,10,11
61:13,22 62:9
63:3,17,18,21
65:17 66:14,16
68:8,11,20 69:5,7
70:3,4 71:3,4
72:23 74:3 75:16
75:23 76:11,22,24
78:7 79:1,16 81:1
81:2,16 82:10,21
83:18 84:11 85:4
85:7,23 86:2,16
91:1 92:15 96:7
97:7,23 98:21
99:18,19,22
100:20,22 101:23
102:7 104:1,3
105:3,13 107:1,22
108:1,15 110:16
110:17 111:19,20
112:22 113:18,20
114:6,7,21 117:1
119:16 122:1,23

123:17 125:1,13
126:6,23 128:1,7
128:20 129:11
130:3 131:9
134:20 135:13
137:7 139:24
140:15 141:4
143:19 144:8
145:16 146:17
149:6 150:14
152:11 153:14
154:1 156:7 159:1
159:20 161:13
162:8 164:19,21
167:17,18 168:11
169:15,17 171:4
171:17 172:21
173:10 174:21,23
175:7,22 176:11
177:5,6 179:3
180:19 185:13
187:22 188:9
189:23 192:1,18
200:14 202:22
**objections** 10:5
12:1 41:8 42:23
44:11 47:9 56:10
64:12,13 72:21
199:15,20
**objects** 11:5
**obligation** 201:17
203:13
**obligations** 29:8
150:8 178:6
200:17 203:20
**obviously** 65:6
128:15
**occasion** 98:19
**occasions** 189:9
**occur** 100:3
**occurred** 95:10
**occurs** 99:1,5,7
**off** 105:23 119:19
120:19 121:20
129:18 132:1,8
133:15 174:15
181:16
**office** 11:18 189:16
**officer** 128:5 129:7
**officers** 128:12
**Offices** 1:18
**often** 79:8 121:6
**Oh** 67:7 83:4
**Ohio** 115:10
**okay** 5:15,20,21 6:3
6:13,16 7:6,16,22

8:18 9:10 10:15
11:2,9,10,19
12:15 13:1,11,12
13:24 14:17,22,24
16:2,8 20:2,7,23
21:9 22:21 23:9
25:21 26:12 27:13
27:17,24 29:5,11
30:5,7,9,20 31:3,8
31:21 32:4,8 33:9
34:12 35:2,24
36:9,12 37:20
40:12 42:4 44:7
46:18,22 47:13,19
47:22 48:5,11
49:3,6,12 50:15
51:7,14 52:10,10
52:15 54:6,9,16
54:19 55:12 57:1
57:14,17 58:6,17
59:6 60:21 61:19
62:14 63:11 64:23
65:5,24 66:6,10
67:3,11,15,18,24
68:17 69:2,21
70:13,17,23 71:10
71:14,23 72:4
73:21 74:12 75:2
76:20 77:4,10,21
78:2,11,20,23
79:7,13,24 80:5
80:21 81:23 84:5
84:24 87:24 88:19
89:11 91:5,9,15
92:3 93:5,15
95:14 96:3 98:9
98:17 99:4 100:9
101:10,14,19
102:4,19 103:9,11
104:17 105:9
106:8,14,17 108:9
109:9,15 110:2,9
111:7,14 112:17
113:8,11 114:2,18
115:16 116:2,16
116:22 119:2,14
120:11,18 121:7
123:7 125:24
127:9,17,23 128:5
128:16 129:21
130:12,18,21,23
131:16,18 132:10
132:22 133:12
134:1,5,10,12
135:4,10 136:2,5
136:9,16,20,24

137:16 139:10,13
139:20 140:22
141:15 143:2,10
143:15 145:12
146:1,4,14 147:3
147:14,17,21
148:6,14,22
149:22 151:1
152:17,23 153:10
153:21 154:13
155:22 156:3,19
157:3,20 158:20
161:20 163:7,15
163:20 164:2,14
165:8 166:19,22
167:9 169:2,10
170:23 172:14
173:23 175:18
176:20 178:21
179:12 180:12,13
181:15,20 182:21
183:15 184:12
185:2,8 187:19
188:5,12,22 189:3
189:12,15,21
191:22 193:22
195:1,15,19,22
196:4,13,24 197:7
198:23 200:5
203:6 204:1
**OLSON** 2:3
**Omaha** 2:4 4:17
6:7 12:10 15:8
16:5,15 17:12
19:23 20:4,6,14
24:16 28:14 29:22
34:4 35:12 43:4
43:23 89:13 90:12
90:16 92:4,13
93:1,4,16,18
106:8,12,13
121:21 122:21
123:4,15,21 124:1
124:3,9,12,14,16
127:14,14,16
130:9 145:14
155:15 156:5,15
156:22,22 157:22
157:23 158:7
160:3,7,13,21
161:7,8,24 162:2
162:5,13 163:9,11
163:14,19,22
164:12 166:8,19
166:21 167:13

173:17 174:13,15
175:11 176:9
177:9,14,19,23
178:3,24 179:10
179:14 180:1,5,16
181:3,6 182:12,12
189:2 197:19
198:15,18 199:1,3
200:1,12 202:6
203:2,5
**once** 84:5 85:19
116:13 164:16
**one** 2:13 14:5 18:4
18:12 23:19 37:20
54:7 59:3 74:22
82:3 83:15 91:5
93:23 95:13
102:18 103:7,10
103:12 105:22
106:13 110:3
115:8 116:3,11,22
119:2,11,14 133:8
135:1 145:8,13,23
147:2 162:1,4
168:6,15 169:4,8
170:8 173:8 176:3
202:3
**ones** 14:15 80:23
**only** 14:15,18 30:23
90:6 121:7,19,20
122:19 156:14
189:9 194:4
**open** 59:17 65:20
103:23 104:13
111:16 112:8,19
113:16 114:4,11
114:18 115:8,19
115:22 116:7,11
116:16
**opened** 115:1,4,9
115:11,20 116:1
116:10
**opening** 103:21
104:22 105:18
112:7 113:12,14
**operate** 157:22
182:11 199:24
**operated** 122:20
**operates** 139:18
**operating** 65:20
119:13 123:3
134:3,5,8,15
135:11,24 155:14
156:21
**operations** 131:11
**opinion** 77:19

**opportunities** 37:9
50:16 111:8 147:1
165:2 168:19
**opportunity** 13:13
59:24 89:3 96:18
123:13 163:19
164:9,13 166:23
168:9,21
**oral** 203:2
**order** 170:17
**other** 14:18 44:18
54:16 59:16 79:13
94:3 95:1,7 96:16
96:23 98:10
103:20 110:6
111:14 132:16
137:4,12 141:11
150:10 153:8
156:20,24 157:5,8
157:19 158:20
160:15,22 161:10
162:4 164:11
169:23 176:2
178:1,2,21 189:2
194:9,10,14,16
195:11,11,19
196:1 197:7,8,13
201:1
**others** 48:2 68:23
93:8,9 111:5
153:5 169:23
172:3 176:7 186:1
**otherwise** 15:4
41:19 155:10
**ourselves** 102:9
**out** 6:13 19:19
20:10,24 21:9,17
22:22 28:3,12
29:4,19 30:14
35:10 42:9,13,18
62:18 68:21 78:13
84:17 163:2
164:12 169:6
170:12 171:22
172:1 173:13
175:12 182:15
193:19 196:17
198:12 202:2
**outcome** 205:11
**outside** 30:1 56:2
**over** 10:8 44:4
153:3 180:21
186:1
**overbroad** 9:21
40:7
**overhead** 141:9

**overview** 69:15
162:13 177:18
**own** 15:16 27:17
50:11 55:5,16,20
57:17 58:2 63:13
64:5 89:18 90:3,5
104:6 105:5
164:17 166:18,24
176:6 186:14
192:11 197:8
**owned** 152:23
**ownership** 55:21
56:13,18,22 57:15
140:2
**owns** 55:13

_____
**P**
_____
**P** 2:1,1 4:1
**package** 78:19
**page** 3:7 14:24
64:24 65:10,14,21
67:3,10 68:6 69:2
69:3,18,19,22
71:23 75:2 121:21
133:2,5,8 134:1
136:9,13,24
141:15,17,18
146:4,10 148:4
150:5 152:5 186:6
186:8,10
**pages** 1:1 6:24 7:2
7:6,13 14:1 70:10
106:18 132:8,12
132:17 133:4,13
138:3 139:10,12
146:11
**Painter** 93:9 127:19
127:20,21 128:16
197:11 200:10
202:15
**paper** 156:4
**Paragraph** 30:11
**parameters** 191:12
**parent** 57:15 148:8
148:9,21
**parents** 15:6
155:13
**part** 24:17 41:13
69:3 82:9 85:1
104:21 151:8
154:14 155:23
177:17
**participating** 19:22
**particular** 10:9
12:9 17:5 41:16
71:16 86:8 88:9

100:11 164:16
**parties** 205:11
**partner** 134:3,6,16
135:11
**partnered** 147:10
**partners** 135:24
**Partnership** 1:6,6
4:18 139:21 150:7
152:8,24 153:8
**party** 95:3
**pass** 164:16 166:23
167:12
**passed** 164:13
180:2
**Patallion** 43:3
**path** 112:3
**Patton** 111:11
116:1
**pending** 4:20 5:4
11:14 177:9
**Pensacola** 146:6
**people** 17:15 18:9
19:3 21:18,24
27:14 30:16,17
31:1,2 47:15,22
51:11 54:16 89:5
92:23 108:12
134:7,23 176:8
177:1 202:13,15
**percent** 140:10
**performance** 108:4
110:7
**period** 104:21
144:1
**periods** 92:1
174:19 178:3
**permissible** 11:8
**permission** 126:3
126:19
**permit** 10:12 11:6
23:18 36:18 39:6
41:7 91:3 115:2
117:10,13 120:9
139:2 184:18
**permitted** 199:13
**permitting** 47:7
56:7
**person** 8:3,6 9:1
29:4 87:14 93:12
93:13,14 162:24
172:15 176:2,15
183:22 197:17
198:11,15 199:19
201:6
**personal** 15:16
107:13

personally 19:10
  27:14 157:14
person's 30:7
phone 39:19 40:4
  195:23 197:3,6
phrased 90:2
pick 43:6 131:16
  154:18,20
pictures 3:10 54:3
  121:4 129:5
  134:14 140:11
  161:21
piece 156:4
pieces 11:17
pipeline 13:22
  64:17 65:10,24
  70:24 71:15 74:16
  74:22 89:16 111:8
  112:11 114:9
  121:20 167:24
place 2:8,13 67:20
  67:22 68:1,3 94:5
  94:8,12 170:10
  189:15
Plaintiffs 1:8,16 2:5
  4:19
plan 112:19 123:8
  123:10
planning 112:8,14
  114:15 117:2,4,5
  118:7,11
plans 117:9 199:24
playing 43:5
Plaza 2:3
please 4:14 5:11,13
  6:23 8:21 13:17
  17:23 18:23 19:14
  23:24 25:9 29:14
  31:5,10 32:20
  34:17 36:22 49:22
  52:11 63:23 64:12
  64:14 69:18 72:21
  77:21 80:8 82:16
  82:24 83:4 91:15
  95:17 99:6 105:23
  108:18 120:20
  122:11 125:5
  133:14 138:4
  142:11 147:4
  148:10 149:12,19
  154:21 166:1,15
  175:5
point 52:1 53:15
  56:12,24 62:22
  81:11 91:5 103:17
  173:21,22

Pointe 15:8 148:23
  149:4
population 170:2
Port 146:7
portfolio 37:23
  89:1
portion 8:17 55:13
  55:16,20
posed 19:13
position 198:14
  203:23
possession 65:6
  143:17 144:6
  183:2
possibly 52:23
potential 16:5
  17:11 18:18 20:3
  21:5 34:4 35:12
  62:19 66:11,18
  71:6 96:21 98:4
  103:18 105:10
  156:5 166:23
  167:10 168:7
  169:8,11 170:18
  171:15 174:18
  179:13
potentially 19:22
  23:12 24:8 95:1
  100:1 104:19
  117:7 155:21
  180:14 183:8
potentials 66:5
Potter 137:13
power 153:12,23
  164:15
practice 74:12
  127:4 159:9,11
preferences 153:3
  186:1
preparation 5:23
  195:6 202:19
prepare 194:13
prepared 9:15
  78:18 143:16
  151:13
prepares 80:5
preparing 192:6
presence 190:2,16
  192:10
present 2:17 12:8
  89:19 93:8
presentations
  72:13 73:24
presented 89:11
  92:3
presently 122:20

Preserve 64:11,13
President 129:6
press 121:17
presumably 26:15
  50:2 65:14 69:2
  178:22
previous 182:17
previously 157:6
  171:6
print 21:20
printed 129:18
  132:1
prior 7:10,13 21:16
  25:2 48:3 49:2
  86:17 105:14
  123:1 145:14
  156:8 173:11
  179:15 180:16,20
  192:19 200:15
prioritized 92:1
private 37:17
  135:22
privilege 7:21
  190:7
privileged 190:9
  195:3
probably 73:10
  172:15 195:21
problem 39:15
  82:20
procedure 29:9
  41:14 42:23 53:2
  85:15 86:24 198:3
  200:18 201:19
procedures 39:7
  43:1 182:19
proceed 46:10
  95:24 106:6
  133:23 182:5
  191:17
proceedings 46:6
  95:20 106:2
  119:23 133:19
  182:1
process 14:12 20:6
  24:18 45:10 52:2
  52:17 62:22 63:6
  64:19 84:6,9,12
  85:2,19 86:5,14
  88:1,6,21 96:3
  100:6 104:19
  105:19 114:12,13
  116:9,14 118:7
  124:19 125:16
  158:15 162:12
  169:8 195:21

processes 117:4,5
produce 12:21 15:2
  21:2 28:6 39:20
  40:10,11,15,20
  43:12 155:9
  156:19 157:20
  181:11 182:9,21
  188:12 203:13
produced 14:9,11
  14:19 21:6,8,21
  24:17 28:19 29:5
  38:8,12 40:18
  42:7 103:1 151:24
  154:15 156:11
  157:19 177:11,13
  177:23 178:22
  179:11 180:9
  183:10 184:2,13
  186:22 188:6
  189:2 194:6 199:5
  200:5,20 203:22
producing 8:14
  39:1 138:18
proforma 97:1
progress 135:8
project 12:9 15:8
  16:15 17:12 18:19
  20:4,13 34:4
  36:13 37:4 39:10
  41:17 90:20
  148:23 151:15
  177:23
projections 97:3,21
  112:14 113:13
  114:15
projects 10:9 35:16
proper 42:22 77:15
  87:9
properly 11:7 44:1
propose 63:7
proposed 92:13
  100:13 124:4
proprietary 9:23
  12:14 40:6 117:3
  119:7
protected 7:21
  190:7
protocol 25:22,24
  26:3,7 27:3 49:13
protocols 39:8
provided 142:7,19
  143:4 152:9
  155:22 156:4
provides 48:14
providing 150:11
proviso 203:9

prudent 63:1
public 1:17 205:5
  205:18
publishing 48:22
  136:7
purged 25:22
purposes 6:17
  141:8 166:6
  186:19
pursuant 12:18
pursue 90:4,5,7
  91:18 168:9
pursued 39:16
pursuing 163:19
  175:13
push 101:10 181:15
pushed 101:6
put 52:23 62:4
  80:19,20,24 81:12
  86:13 88:8 91:24
  104:7 161:2
  178:23 187:12
  200:8
puts 80:14,15
  178:15,18
putting 105:4
P.C 2:3
p.m 204:5

**Q**

quarterly 79:10,14
  109:17,24 155:23
  159:10 176:21,22
  177:2,10,12
  178:10,13,23
  179:7,14
question 5:11,15
  7:20 8:20,23
  17:22,24 18:2,5,7
  18:14,23 19:1,13
  20:9,24 23:18
  24:1 25:8,10,12
  28:18,21,22 29:14
  29:16 32:16,19,22
  35:4,21,23 36:23
  37:1 38:4 44:14
  44:24 45:8,21
  46:13,16 49:21
  50:11 53:9 59:12
  61:24 62:10 63:23
  64:1 70:8 73:14
  73:16 74:6 75:21
  77:3 82:12,16,23
  82:24 83:7,20
  87:10 91:4 94:19
  105:16 108:18,23

109:12 110:21
112:2 115:3
117:12,16,22
118:1,5,12,20
119:5 120:8,10
125:5,7,24 126:18
133:10 140:17
142:11,13 145:6,7
149:2 154:7
159:21 161:17
162:21,23 166:10
166:13 168:14
170:23 171:6,12
172:21,23 175:2
176:15 179:2,19
181:1 183:12
184:19 187:1
190:13 191:12
192:3 194:2 195:9
197:24 198:4
201:9,12,20
**questioning** 80:11
84:14
**questions** 5:2 10:13
11:4 13:10 36:19
39:11,12 41:1,10
41:18 42:17 43:16
46:2 47:8 56:8
73:5 80:8 85:16
87:10 109:2
113:23 117:2
120:6 138:1,3
147:20 178:19
191:23 192:15
193:10 199:14
200:2
**question-by-ques...**
139:4
**quickly** 8:19 87:13
**Quite** 58:21
**quote** 135:24

——— **R** ———
**R** 2:1 4:1 205:1
**rambley** 59:13
**rather** 102:18
**Rave** 1:10 3:10
4:21 15:4,16 16:4
16:14 17:12,12
18:18 19:21 20:3
20:13 21:4 22:3
22:18 23:12,12
24:7,8 27:15
28:13 29:21 30:22
31:2,16,19 34:3
35:16 36:1,6,10

36:13,14 37:4,5
37:20 38:1 39:12
45:4 46:15,20
47:3,20 48:4,8,23
49:2,14 50:1,15
51:8,11,24 53:11
53:16 54:3,21
55:13,17,21 57:2
57:12,13,15 58:7
59:8 60:16,21
61:8 62:5,5,5,18
64:16 66:7,8,12
67:21 78:8,16
79:8 86:4 88:5,23
89:1,12,17 90:12
91:11 92:13
100:13 101:18,19
102:15 103:2,6,12
103:23 113:6
118:16 119:2
120:14 121:3
122:15 124:8,18
124:23 125:9
126:3,15,19,20
127:12,19,22
128:5,12,24 129:5
130:1 132:24
134:12,13,24
136:10,14,15,21
136:22 137:1,3,11
138:21 139:17,18
140:5,11,12,19,24
141:20 142:6,18
143:7,9,9,11,17
144:24 145:12
148:21 151:5
152:17 153:11
155:11 157:21
163:10,21 164:7
165:1 166:22
167:1 172:19
174:18 176:8
177:1 178:15,18
178:18,22 179:13
181:9 182:10,23
184:15 185:10
186:3 188:13
189:4 190:21
197:13 199:23
200:3,11 201:3
202:16
**Rave's** 59:17
158:22 189:6
199:23
**reached** 34:14,22
35:9,13 81:11

**reaches** 88:6
**read** 8:20,23 15:9
17:22 18:7,14,22
19:1 23:21,24
24:1 25:9,12
29:13,16 32:19,22
34:16,19 37:1
44:14,20,24 63:22
64:1 82:16,24
83:7 108:17
111:12 125:7
142:13 146:7
148:8 152:20
153:6
**reading** 129:7
140:8
**ready** 46:10 82:1
83:12 95:24 106:6
112:13 133:23
182:5
**real** 110:9 167:23
**really** 19:17 20:9
30:1 45:20 59:23
62:2 73:17 87:17
97:16 104:8
113:12 121:5
133:8 161:16
186:13 191:20
193:7 201:8
**realm** 147:5
**reason** 121:7,19
129:16,19 132:2
145:21
**reasonable** 33:5
**recall** 7:1 33:22
46:16 51:22 58:20
65:4 67:13 68:2
68:13 72:6 74:1,7
74:8 75:6 76:3,3
81:7 83:22 91:22
94:6,9 95:2,6,9
98:23 101:1
103:15 107:5
109:13 113:9
115:14 124:15,20
137:10,15 146:23
162:1 163:5,12,16
163:20 175:9,14
192:21 193:16,18
194:5,10 196:2,15
197:5 202:24
**recalls** 160:18
**receive** 142:22
**received** 6:19 14:13
21:21
**receiving** 7:1 65:4

113:10 124:15
**recent** 38:19 132:11
**recess** 5:19 43:17
43:20 46:10,12
95:16,23 105:22
106:6 120:20
133:23 181:13,18
182:5
**recollection** 72:4,17
75:14,20,24 76:8
76:13 77:5,22
93:2,7,11,15,17
93:22 94:3,16,21
94:23 107:14
149:20 158:8,10
159:15 160:3,8,12
160:22 161:3,11
161:20,23 164:11
166:17 179:23
180:3 181:5 196:7
196:11
**record** 4:13 8:12
9:19 13:17 47:6
87:3 91:8 105:23
119:19 132:7
133:15 138:11
179:12 203:18
**records** 70:14
203:13
**Recross** 3:2
**RED** 1:7 2:18 4:18
127:13 129:24
145:2,9,13,23
150:5 151:6 162:2
177:1 198:1
**Redirect** 3:2
**refer** 143:8 146:9
156:21 182:17
185:23
**referred** 14:3 149:3
**referring** 115:24
133:1 143:21
157:21 166:7
182:10 186:7
**refresh** 72:4 94:16
166:16
**regard** 49:12
**regarding** 15:7
16:4,15 19:21
21:5 23:12 24:7
24:16 28:14 29:21
34:4 40:16 92:13
138:19 155:14
156:5 164:12
185:9 188:20
189:2 197:18

199:5,23 200:4,21
203:5
**regards** 202:19
**related** 180:5
**relates** 153:4
**relating** 9:16 10:13
139:6 157:21
177:22 181:12
182:10,22 190:17
**relationship** 30:21
37:22 61:19 86:20
184:14 185:2
187:10,20,24
**relative** 30:10
156:15 197:8
205:10
**releases** 121:17
**relevant** 11:13,22
12:8 27:22 114:23
117:6 138:12
139:7 151:2
**relied** 41:6
**remember** 124:10
124:11 130:14
159:17 160:6
196:5,19 197:2
**remodeling** 102:14
**render** 8:4
**rephrase** 5:13
**report** 110:12
129:20 135:4
142:23 167:12
**reported** 94:21
165:9
**reporter** 1:16 3:16
13:2 17:21,24
23:21 44:20
133:13 138:8
146:11 205:24
**REPORTING** 1:23
**reports** 114:9 156:2
156:20
**represent** 4:17
**representative** 8:8
9:3 16:14 174:17
184:2 196:1
200:11 202:16
**representatives**
20:12,13 34:3
127:13,18 129:24
**representing** 189:4
**REPRODUCTI...**
205:23
**request** 9:22 12:22
27:23 30:10,15
70:21 155:19

157:13 190:2
202:14
**requested** 15:21
170:22 190:15
**requesting** 196:8
**requests** 8:16
**require** 96:10
126:19 127:2
148:12
**required** 131:13
141:10 148:17,20
**requirement**
173:17
**requirements**
141:12 173:14
**research** 26:4
172:16
**respect** 10:11
154:23 174:2
199:8,9
**respond** 15:22
157:13,15 183:11
202:4
**responded** 10:18
187:16
**responding** 12:5
133:10
**response** 10:3
14:10,19 28:19
29:9 38:8,13 39:1
42:24 127:1 183:3
**responsible** 131:22
132:14
**responsive** 14:16
15:15 32:1 170:21
177:15 183:17
184:6 186:21
**restate** 35:22 36:22
49:22 88:15 104:5
125:4 166:9
**result** 70:19
**results** 107:18
108:9 110:4
**retail** 103:8,21
**retained** 3:16
**return** 153:4
**reveal** 189:24
**revealing** 192:4
**revenue** 97:3,21
98:5
**review** 6:23 16:6,23
21:18 23:5 78:19
84:1,12 101:5,15
104:10 108:3
110:10 123:14
126:15 132:12

136:6 150:22
151:18 153:16
154:8 156:16
165:1 185:16
186:14 188:21
**reviewed** 14:14
15:16,18 27:21,22
70:1,21 78:1
101:17 123:24
124:2 125:20
144:13,19,20
155:19 157:14
179:9 180:4 189:1
194:6
**reviews** 1:10 4:22
15:4 16:4,14
17:12 18:19 22:3
53:11 54:21 88:23
90:12 113:6
132:24 136:10,14
136:21,23 137:1
138:21 140:5,19
140:24 141:20
142:6,18 148:21
152:18 153:11
155:11 157:21
182:10,23 185:11
188:13 200:3
**rider** 194:11
**right** 10:8 32:18
44:4 46:3 48:5,11
54:19 55:12 64:24
65:8 67:20 72:20
74:15 89:5 140:16
145:12 165:23
183:22 190:22
195:5 198:23
203:8
**rights** 153:2 185:24
**right-hand** 132:9
**rise** 64:18
**Rock** 115:8,9
**rocket** 108:20
**role** 168:2
**room** 195:17
**Rouge** 69:16
111:10 115:12,13
115:18 122:4
147:22,23 148:2,5
**routine** 22:12,16
25:23 67:15
**routinely** 22:1
**Roy** 136:13
**rule** 62:19
**rules** 29:8 83:1,2,3
87:20,21 198:2

200:18 201:18
203:21
**run** 181:18

_____

**S**

**s** 2:1,11 3:6 4:1
182:23
**sales** 109:9,9
**sale-leaseback**
61:15 146:5,14,21
147:7
**Sale-leasebacks**
147:2
**same** 9:7 15:22
16:20 23:3 27:7
52:21 53:6 55:7
61:13 63:21 66:16
68:11 76:24 82:10
83:18 86:2 99:22
103:23 105:3
108:1 113:20
114:7 116:15
117:22,24 119:16
119:16 122:5
126:6 135:10,11
155:17 156:23
157:24 167:17
170:8 171:17
175:7 182:9,14,19
187:22 188:1,9
192:1,2 193:14
200:2 202:22
205:23
**saw** 98:23 123:20
**saying** 23:4 38:15
66:8 82:18 87:5
91:6 99:16,23
104:18 162:4
173:7,12 177:18
**says** 7:9 14:5,6
40:15 65:10,21
67:9 69:17 71:15
107:18 108:9
110:10 111:8,9,13
111:15 112:7,18
113:11,14 129:8
132:23 136:17
139:14 140:10,22
146:13 147:19,22
152:21
**scenario** 103:10
**schematics** 161:22
163:3
**science** 108:20
**scope** 30:1 56:3
61:1 91:2 114:22

119:8 144:9 145:6
149:7 151:12
171:5,18 172:22
**Scott** 137:13
**Seal** 205:13
**search** 10:2,10
15:12 27:17 32:9
33:2,6 182:9,14
**seating** 101:20
102:1
**second** 12:7 13:22
14:5 20:9 47:3
69:22 115:24
130:14 150:5
181:13
**secretarial** 198:21
**secretaries** 157:1
**see** 9:11 11:1 14:24
41:5 44:15 54:19
65:11,13 67:1,2
69:16,20 71:17,18
75:3,4 94:10,12
94:13 96:5,15
98:11,19 100:15
108:10 114:24
140:18 155:3
165:24 172:17
191:4 193:2
**seeing** 149:20
161:21,23 163:5
**seek** 50:2
**seen** 7:10,13 150:1
150:16,20 151:19
**send** 42:4
**senior** 126:18
127:11,18,21
128:11,14,15,17
129:1,3,24 166:22
**sense** 52:13 191:17
191:18 193:5
**sensitive** 105:11
117:7 118:10
**sent** 19:10,21,24
20:24 21:9,17
28:3 30:14 43:9
174:7 177:21
182:15
**separate** 54:21 55:8
163:13
**separately** 138:4
**September** 13:21
13:23 66:11 67:1
68:5 69:21,22
70:1 80:22 83:21
158:8,22 159:18
160:4,23 161:4

163:7,13,23 165:8
176:22 178:11
179:8,15 180:15
201:3 205:20
**series** 84:13
**served** 44:1 138:13
**server** 26:9
**services** 143:5
**set** 30:10 56:22
68:5 170:12,16,24
171:13,22 172:1
184:14 187:10
193:19 200:17
201:17 205:7,13
**sets** 68:21
**set-aside** 3:13
149:23
**several** 23:18 116:9
130:4
**shareholder** 139:21
140:4
**sheet** 111:14
**she'll** 87:16 138:8
**Shields** 2:7 5:18,19
6:23 7:19 8:11 9:7
9:19 11:3,15,24
16:17,20,22 17:7
18:3 19:12 20:16
21:15 22:8,14
23:1,15 24:13
25:1,7 26:18 27:7
28:8,16 29:2,6
32:12 33:14 34:7
35:19 36:16 38:3
38:12,18,24 39:23
40:2,9 41:2,22
42:5,11,20 43:19
44:10,17 45:6,22
47:6 48:17 49:17
50:7,22 52:4,21
53:6,8 54:1,24
55:7,15,24 56:6
57:4,19 58:1,9,19
59:1,11,21 60:11
60:15,24 61:11,13
61:22 62:9 63:18
63:21 64:13 65:17
66:16 68:8,11,20
69:5 70:3 71:4
73:7 74:3 76:11
76:24 77:2,13
78:7 79:1,16 81:2
81:16 82:10 84:11
85:7 86:2,16 87:9
87:19 89:24 91:1
92:15 96:7 97:7

97:14 98:21 99:19
99:22 100:20
101:23 102:7
104:3 105:3,13
107:1 108:1,15
110:17,21 111:19
113:20 114:6,21
115:2 117:1,16,24
118:3,19 119:4,16
120:4 122:1,23
125:3,13 126:6,23
129:11 130:3
131:9 132:6 133:1
133:5 134:20
135:13 137:7
138:10,15,23
139:2,24 140:15
141:4,22 143:15
144:8 145:5,16
146:17 149:3,6
150:14 151:11
152:11 153:14
154:1,4,23 156:7
157:5 159:1,20
160:15 161:13
162:8 164:19
166:5 167:17
168:11 169:15
171:4,9,17 172:21
173:2,10,21 174:2
174:21 175:7,22
176:11 177:6,12
177:20 178:5
179:3 180:19,24
183:5,19 184:4,18
185:13 186:6,24
187:6,22 188:9
189:23 190:6,12
191:1,11 192:1,18
193:12,14,24
195:2,8 197:23
199:8 200:14
201:4,15 202:22
203:17
**Shopping** 15:8
**shops** 103:22
**short** 46:9,12 106:5
119:22 133:18,22
182:4
**show** 83:5 194:16
**showing** 108:12
**shown** 6:6 163:3
**side** 132:9
**sign** 59:18 60:3
62:6
**signed** 101:18

125:18
**significant** 105:17
**signify** 134:6
**signing** 59:2,7
**simple** 45:20 62:3
71:11 113:12
148:11
**simpler** 118:13
**simply** 108:22
109:5 114:14
115:17 186:19
**since** 159:14 178:13
178:21
**single** 16:12 34:3
104:14 156:4
163:9,21
**sit** 42:8 51:22 57:7
58:21 61:7 65:3
71:21 72:2 77:6
79:19 88:21 89:7
91:22 93:17,22
98:22 101:16
106:15 123:9,19
124:3 126:7,10,15
137:10 158:22
163:16 164:10
170:11,20 172:5
175:9 189:5 194:5
**site** 3:10,11 35:12
51:3 52:14,22
53:16,18 55:22
56:23 60:8 61:8
62:5 63:1,7,12
64:4 77:24 78:15
78:18 81:11 84:17
86:7,8,13 88:7,9
88:24 89:13 90:7
90:20 91:17,23
92:13 93:19 99:15
99:24 100:11
104:9 106:9,12
120:19 121:3,6,14
122:4,5,6,8
123:14 124:9
125:17,19 126:17
129:5,17,20 130:9
131:6,20,21 132:3
132:12,13,17
145:13 148:2,4,5
156:5 160:3,7,13
160:22 161:8,24
162:5,14 163:11
163:14,22 164:16
165:4 166:23
167:5,6,10,12
168:7 170:18

171:15 197:18
199:3
**sites** 35:17 49:15
52:12 53:12,13
57:1,8 58:24 59:8
60:21 61:14,20
62:19,23 64:17
65:15 66:12,18
69:16,24 71:14
88:5,24 89:15
90:5 91:21,24
96:10 101:3,14,20
102:15,20,23
103:18 105:10
122:10 131:7,13
162:11 167:2
**site-by-site** 52:7
56:14,18 147:9
**sitting** 106:18
**situation** 60:1
96:20 98:23
103:16 104:9
116:13 169:20
173:22
**situations** 103:12
**size** 51:21 96:19
**skill** 205:9
**Smith** 4:16 12:18
**some** 5:2,2,3 12:19
12:21 13:10 26:15
31:18 42:17 51:17
51:19 52:13 53:15
54:9 55:13 60:16
62:22 71:24 78:13
84:16,18 87:1
96:10,24 97:2,20
98:9 99:15 100:11
102:19 103:18,22
103:22 104:18
109:2 120:6 136:2
139:2 150:21
151:7 158:14
170:9 174:14
191:17,17,19
193:5 199:13
**somebody** 21:2
22:4 26:13 43:12
45:16 70:18,19
80:18 176:16
178:15
**someone** 127:5
**something** 89:18
100:12,18 103:14
142:7,18 181:15
**sometimes** 27:16
81:19

**sophisticated** 87:14
**sorry** 56:19 67:7
95:9 113:5 149:3
**source** 61:16
147:13
**South** 2:4
**space** 26:8,10
**speak** 22:4 134:17
**speaking** 72:20
82:21
**specialized** 136:3
**specific** 33:12,17
35:5,16 39:7
46:22 47:19 50:16
50:17 51:16 73:23
77:5,22 80:4
91:23 93:10 96:10
104:9 107:14
126:8 131:6
153:18 158:10
159:15 160:3,7,11
161:3,10 172:10
187:14 191:21
202:14
**specifically** 72:6,12
75:6 80:14 95:2,6
103:15 106:18
107:5 109:14
127:19 133:11
138:21 148:1
150:2 160:13
193:17 202:11,19
203:1
**specifics** 26:4,21
27:9 32:6 83:20
87:1
**speculate** 26:19
27:1 32:14 72:19
73:3,18 75:10
92:18 113:2
**speculating** 79:4
112:24 113:22
176:13,16
**speculation** 32:13
50:9,23 52:20
56:1 59:22 60:12
63:4,20 65:18
68:10 69:6,8 70:5
73:14 74:19 76:1
76:23 79:2,17
81:4,17 82:8 85:5
85:24 86:18 88:14
89:23 91:2 92:16
97:8 100:21 104:2
105:1 107:2
110:19 112:23

125:2 128:2,8,21
129:12 144:9
149:7 152:12
159:2 162:16
164:22 165:18
168:12 169:16
175:23 176:12
179:4 185:14
**spell** 31:5,10
**spend** 91:19
**spin** 105:5
**spoken** 189:8
**ss** 205:3
**St** 146:7
**stadium** 102:1
**stadium-type**
101:20
**staff** 157:12 198:21
**staffed** 48:4
**stage** 102:17 121:10
**stages** 66:19
**stamped** 150:5
**stamps** 14:4
**stand** 78:23
**standard** 158:13
**standards** 167:5
**start** 124:24 125:11
**started** 4:23 141:2
**starter** 163:15
**starts** 65:11
**state** 1:19 2:8 4:13
8:12 25:10
**stated** 125:15
140:17 182:20
195:12
**statement** 22:6 50:5
59:9 85:21 88:10
105:15 107:7
109:10,19 111:17
121:23 185:4
186:4,14 198:17
**statements** 141:20
142:6,17 143:16
152:21 185:22
**States** 1:3 4:20 6:7
**Status** 110:10
**stenographic** 205:8
**step** 37:14
**Stephenson** 93:8
94:10,13,17,22,23
94:24 127:20
128:24 129:2,6
137:12 163:8,24
164:8 167:11,21
168:8,14 174:14
176:24 197:10,12

200:10 202:15
steps 15:14 32:4
33:12,17 155:17
156:23 157:24
Steven 2:18
Stewart 1:19 2:7
still 127:23 143:10
153:12 177:9
202:7
stock 57:17 58:3
stockholder 140:11
stop 72:24 73:5
storage 27:4
store 26:16
stores 103:22
story 180:9
strategy 102:17
159:23
stray 36:19
Street 1:19 2:4,8,13
102:13
structure 52:23
140:2
structures 56:13,18
56:22
STRYKER 2:3
studies 156:20
style 193:6
sub 41:13
subject 9:8 10:7
38:6 41:23 199:12
subjects 41:19
submitted 92:7,9
92:12
subpoena 10:18
11:8 12:5 14:12
14:13 16:1 21:10
21:17 27:23 28:20
29:10 38:6,20
41:3 42:24 43:9
44:1 47:10 56:3
61:1 70:21 91:3
114:22 119:8
138:12 144:10
145:6 149:8
151:12,16,23
171:5,18 172:22
173:19 177:15,20
178:6 184:6
194:11 203:21
subpoena's 40:7
subsequent 7:2
14:13 84:16 181:4
181:5 202:3
subsequently 51:2
125:20

subsidiaries 15:7
57:2 155:13
subsidiary 57:8
140:12 148:15
substantial 78:19
substantive 18:5
suggests 200:16
201:16
suitable 88:7
Suite 2:13
summarize 188:23
SUPERVISION
205:24
support 140:24
141:9 157:12
supportive 161:24
supposed 154:15
sure 43:14 91:7
132:15 138:5,17
154:24 159:14
166:2 174:12
178:18
surprise 44:13
suspect 30:6
sworn 4:7 205:7
Syracuse 111:11
121:9,11,22
122:21 123:4,8,12
system 25:22 30:2

**T**

T 3:6 205:1,1
take 5:18 6:13,20
6:21 7:7 10:21
11:10 13:9 15:14
19:9 26:12 27:3
41:22 43:10,17
45:17,22 49:23
52:12 55:12,21
59:6 64:23 67:20
67:22 70:17 80:7
82:1 83:12 92:22
93:12 95:12,15
97:2 102:19
105:21 109:4
110:12 111:1
112:8 113:15
120:20 137:23
151:1 156:23
157:24 158:12
178:10 181:13,18
183:1 185:8
189:15 203:11
taken 46:5 94:4,7
95:19 106:1
119:22 133:18

181:24 205:8
takes 84:13,20
taking 6:8 42:23
144:4
talk 20:8 59:6
68:22 100:9 131:5
151:14 169:2
188:23 191:22
192:24 196:6
197:11
talked 8:2 78:21
107:15 126:16
130:13 155:5
190:11 191:15
202:13,15
talking 30:16 44:21
109:15 143:9
162:15 194:23
talks 69:14 146:4
Tape 119:18
tapes 119:20
team 15:22 17:16
18:9 19:3 22:4,17
47:19 48:10 49:2
51:2,7,8,24 53:11
53:16 62:18 78:16
86:4 88:23 89:12
89:17 90:4 93:3
95:2 98:15 99:8
101:2 123:11
124:23 125:10
126:3 127:22
128:15,17 129:1,3
134:8 135:4,20
143:14 157:11
160:6,12 164:15
164:24 167:1
197:13 200:8
201:24
technical 126:9
147:5,16
technically 127:2
128:13
tecum 7:7 10:20
43:10
telephone 27:16
195:20
telephonic 79:11
83:24
tell 5:20 20:23 43:3
66:2 82:15 87:16
94:1 101:16
131:24 138:11
150:2 154:13
159:3 180:7
181:20 191:8,15

telling 19:8 21:13
22:23 23:10 24:5
73:21 81:7 85:14
163:2 167:11
188:18
ten 6:5 33:10 53:13
149:24 199:22
200:6
tenant 103:16
tenants 103:13
Tennessee 116:2
term 97:11,11
101:11 109:12
134:7 187:24
terminology 91:6
187:13
terms 53:10 96:21
98:15,18 99:9
100:10,13,15
101:2,7,12 104:8
124:13,15 130:9
148:11 187:14
191:20
testified 4:8 72:16
75:24 129:12
145:18 157:6
160:16 177:17
198:7
testify 8:8,14 9:3,15
21:2 38:16,23
39:3 43:12 154:15
187:3 199:11
testifying 141:23
177:7
testimony 5:7 8:4
8:16 14:8 16:3,10
19:20 21:16 22:22
24:21 25:2,14
66:15 73:24 76:7
85:8 86:17 90:11
90:18 92:6 99:21
105:14 107:24
108:16 111:21
123:1,7,24 124:2
127:17 129:21
135:14 153:21
155:16 156:3,8
158:3 164:6,14
165:19 170:14,15
173:11 174:16,24
179:12,20 180:20
192:19 197:20
200:15 205:7,7
Texas 1:10 119:11
119:13 146:6
Thank 18:21 36:5

91:16 120:11
132:10 141:18
204:2
Thanks 80:12
166:3
theater 10:9 13:22
16:5,15 19:23
20:4 23:13 24:8
34:4 35:16 37:8
39:10 41:16 45:16
49:24 50:4,16,20
59:8,17 62:5 63:1
65:10,24 66:12
70:24 71:15 74:16
74:22 89:16 90:13
90:20 92:4 101:19
107:18 108:5,9
110:14 112:9,20
113:16 114:18
115:4,19,22 116:7
116:16 117:15,21
118:4,8,16,20
120:14 121:8,10
121:12,15 127:14
132:24 134:16
139:6,13 145:1,13
155:15 157:22
169:13 182:12
199:24
theaters 45:10 66:1
66:3 101:21 102:5
106:23 108:11
109:10 110:5,8
111:15 115:1
121:20 122:16,19
146:6 147:11
156:21
their 8:7 9:3 21:18
21:19 30:18 31:3
32:6 33:4 55:5
63:13 64:5 81:24
83:11 89:2,18
90:5,14 117:4,8
118:6 121:5
156:24 157:12
164:17 165:5
166:24 178:23
they'd 42:6
thing 107:19 162:1
169:9 174:6
things 22:17 96:17
96:23 97:4 98:10
110:6,14 111:3
163:5
think 11:13 27:1
28:22 43:15,18

46:12 50:3 61:8
62:15 75:10 76:9
77:19 82:11,19,20
85:13 86:6,7
87:15 88:6 90:1
105:4 113:22
116:4 117:6 118:2
121:2 139:10,14
161:16 168:13
172:2 173:1,18
176:14 180:22
187:14 191:1
192:9 193:15
195:4,21 203:7,12
**thinking** 51:15
**third** 12:11 14:23
30:24 133:5
**third-party** 61:16
147:8
**Thomas** 129:6
**thorough** 16:24
**though** 172:11
**thought** 95:15
113:5
**three** 7:2 14:1
30:17,20 31:1
72:7,8 74:9 89:8
126:14 195:11
**Three-page** 3:9
**through** 25:3 40:23
45:10,17 65:15,19
66:1 80:23 85:1
86:13 89:17 100:5
114:12 116:6
144:2 154:16
155:2,4,18 158:18
158:19 181:18
199:6
**throughout** 67:23
**Thursday** 1:20
**ticket** 109:9
**tickets** 108:13
**tie** 111:23
**time** 5:19 8:11
23:19 53:12 54:17
66:4,21 84:21
91:20 92:1 98:24
103:18,23 104:21
105:9,10,17,17,20
107:12 109:21
130:16 131:3,22
131:22 143:3
144:22 150:21
152:2 162:12
163:18 164:4
168:18 171:21

174:14,19 175:10
178:3 179:24
186:12 195:20
196:7,16
**timeline** 126:17
**times** 23:18 25:4
72:12 73:24 101:1
101:6 104:12,18
109:21 130:4,6
156:18 160:5,10
201:23
**timetables** 69:14
100:1 111:7,9
112:18
**timing** 95:8
**title** 129:9 135:11
135:17 136:16
**today** 5:8,17 6:17
7:14 8:4 9:16
10:24 12:20 28:6
43:13 51:23 57:7
58:21 61:7 65:3
71:21 72:2 77:6
79:19 88:21 89:7
90:15 91:19,22
93:17,22 96:16
98:22 100:24
101:16 106:15
107:4 111:4 122:2
123:9,19 124:3
126:7,10 137:10
141:7 149:21
154:15 160:10
163:16 164:10
169:6,19 170:11
170:20,22 172:1,5
175:9 185:16
188:6 189:5
191:17 192:16
193:10 194:5
201:22 202:20
**together** 70:10
80:15,19,24 81:12
81:24 83:10 88:8
111:24 112:1
168:17 178:15,19
200:8
**told** 28:4 39:5,18
39:20 40:6,8,9
42:2,5 45:11 67:5
93:16,18 109:13
113:9 126:17
141:1 151:19
160:9,13,23 161:1
161:2 163:22
164:5,8 176:5,20

177:1 191:9
197:12,12 200:22
**Tom** 92:24 93:7
94:13,21,23,24
128:24 129:2
137:12 163:8,14
167:21 168:14
**top** 65:12,13,21
67:9 112:10
136:17 146:11
**topic** 8:13,15,16,16
8:17 9:21 10:1,3,5
12:2 38:9,13 39:2
39:3,6,13,15 41:5
41:6,8,10,13,19
47:9 81:19 138:15
138:23 183:6,11
187:3 199:14
**topics** 11:8 40:10
56:10 68:22 74:23
80:20 111:5
**total** 140:23
**totally** 136:7 151:3
**town** 110:14
**Traditional** 132:23
**train** 95:15
**transaction** 125:17
146:22
**transactions** 61:15
146:5
**transcript** 3:16
**transcription** 205:8
205:22
**translate** 98:5
**transmissions**
28:13 29:20
**travel** 106:8
**traveled** 6:16
**trips** 84:17
**true** 70:14 192:16
205:7
**try** 28:4 32:5 74:14
103:14
**trying** 8:1 19:19
20:10 22:21 29:3
35:10 86:23 87:12
87:24 151:6 161:2
162:20,22 163:2
166:16 186:19
193:2
**turn** 14:23
**turning** 141:15
**twenty** 144:2
**two** 7:3,13 10:17
13:18 14:3,8,11
14:15 30:23 41:24

47:2 70:9 111:23
137:4,12 156:10
156:14,17 159:16
174:19 187:11
189:6,9 197:3
**two-prong** 179:22
**type** 81:12 97:20
188:23
**types** 80:14 111:2
167:2
**typical** 68:17 70:23
86:6 96:8 107:19
110:3 111:2
126:17 135:22
**typically** 27:16
68:22 71:6 74:16
79:10 94:10 96:5
96:15,20 98:2,13
98:14 99:1,4,7,12
100:3 105:16,19
108:3,4,5 109:24
114:8 178:19

**U**

**Uh-huh** 109:18
**ultimately** 63:12
64:5 116:15
163:18 164:12
167:3 175:11
**unbuilt** 118:4
**unclear** 5:12
**uncomfortable**
133:9
**under** 5:8 29:8 46:2
110:9 117:18
118:16,20,24
134:17 150:8
152:14 155:9
157:9 173:19
178:6 198:2
203:20,21 205:23
**underling** 176:3
**understand** 5:5,7
5:11,22 9:11 10:5
10:15,21 11:4,19
14:17 16:9 21:9
23:10,22,23 24:4
27:24 28:2 37:13
47:14 49:21 51:19
54:20 60:6 72:9
77:23 81:10 82:17
82:20 85:13 86:11
87:4 88:1 91:14
97:17 99:14
100:10 104:17
109:16 112:16

113:11,12 118:12
121:16 122:18
130:22 131:24
139:1 158:7 160:2
163:4 164:4 170:6
173:22 176:5
184:12 186:18
187:23 195:4
196:9 197:20
200:19 202:11
204:1
**understanding**
26:6,7 27:2 28:11
151:8 176:23
**understands** 167:1
168:18 184:20
**understood** 5:15
**undertaken** 10:10
**unduly** 12:5
**unfair** 116:3
**unique** 52:13,14,22
99:15,24 100:1,12
**United** 1:3 4:20 6:7
**Units** 152:19,19,20
152:23 153:3
**unless** 125:18 127:5
158:14 205:23
**unquote** 135:24
**unreasonable** 12:3
**unreasonably** 12:4
**until** 85:1 99:10
164:7,12 186:14
**unusual** 34:2,9 35:7
100:17 162:6
**update** 106:22
107:18
**updates** 108:24
**updating** 131:23
**use** 22:1 27:14,16
97:11 134:7
135:19
**used** 131:11 135:21
148:1
**uses** 26:16 39:9
112:11
**using** 187:13

**V**

**vague** 17:7 19:12
28:16 35:4 49:17
52:4 88:14 89:24
93:2,7,11,17 94:2
97:23 100:23
114:6 122:1
125:13 126:23
134:20 137:7

141:6 146:17
154:1 164:19
**variety** 47:17 93:21
115:18 177:21
**various** 66:19
67:22 101:1,6
109:10 110:5
122:10 146:24
**vastly** 9:21
**Ventures** 3:11 6:2
7:8 8:4,7,12 9:2
9:20,24 10:7,17
11:5 12:6 15:6
16:4,12,13 17:11
18:17 19:22 20:12
21:2,4,24 23:11
24:6 25:21 27:4
28:13,18 29:2,7
29:21 30:21 31:18
35:16 36:10,12
37:3,15,16,21
38:1 39:8 41:15
45:3 46:15 47:2
47:14,18,20 48:13
49:14 51:12 52:2
52:16 53:23 54:17
54:18 55:9,13
57:14 58:6 62:4,6
63:15 64:8 65:7
66:7 70:15 78:4
80:18 81:14 82:2
83:13 86:12 88:7
89:9,20 90:14,19
90:21 103:1
106:12,13 117:4
125:20 126:15
127:6 131:19,21
134:4,23 135:6
136:18 138:13,22
139:20 140:22
142:8,20 143:7,17
144:6 148:18,23
150:7,11 151:6
152:7,24 153:8,12
153:22 155:12
158:21 163:1
170:15,24 171:13
172:18 175:19
176:7 182:22
183:2,6 184:9,15
185:10 186:3
188:15 197:18,21
198:14,24 199:3
199:23 200:4
201:2,6 203:19
**verbal** 33:24

**verges** 38:4
**versus** 107:18
108:10
**very** 44:11 53:10
87:13 99:11 104:7
104:8 117:7 118:9
122:17 135:22
141:6 147:15,16
153:18 167:2
168:17 169:7
170:7 187:14
191:16
**vetoed** 91:23
**VIDEO** 1:14
**VIDEOGRAPH...**
119:18
**view** 51:3 171:22
196:14
**Village** 15:8
**virtue** 72:10
**visit** 5:19 197:19,21
198:8
**VOLUME** 1:1
**voluminous** 12:12
183:9
**voting** 58:7,14
153:1 185:24
**vs** 1:9

_____
**W**
_____

**W** 129:6
**wait** 99:10
**waiving** 10:4 39:5
41:8 47:8 56:9
199:14
**want** 23:20 24:11
42:18,20 43:17
45:9,17 53:17
63:7 73:17 77:1,4
85:16 87:2 89:19
90:6 91:7 96:2
101:11 111:23
127:18 131:16
138:7 144:22
146:9 154:18
155:3 157:7
166:16 174:12
177:8 183:15
186:13 190:4,8,10
193:24 200:24
**wanted** 151:13
181:15 193:4
**wants** 26:24 45:16
75:12,13 77:18
**wasn't** 122:3
145:18

**water** 44:5
**way** 44:18 69:10
90:2 99:12 105:6
114:11 132:18
135:20 140:16
187:16
**Wayne** 139:7,14,19
140:11 145:1,9
146:1,3 149:5
151:5,14
**ways** 146:24
**web** 3:10,11 120:19
121:3,6,14 129:5
129:17,20 131:20
131:21 132:3,12
132:13,17
**weekly** 135:7
**well** 10:19 15:17
21:20 23:20 26:24
30:19 32:15 38:10
38:14 39:16 42:2
42:13 43:2 49:23
54:10 62:2,14
66:2,24 69:14
75:12 86:23 87:6
90:19 92:22 99:14
103:17 107:11
112:6 116:6
122:15 126:13
129:16 133:3,8
138:14 140:8
143:24 144:24
145:21 150:4
151:21 154:13
155:2 159:8
166:13 169:2
170:13 171:7
173:6,24 176:20
177:8,16 183:24
185:21 187:4
190:4,19 191:4,18
192:14 196:21
200:19 201:8
**went** 14:14 106:12
106:13 155:4,18
157:11 198:12,15
198:16,18,24
199:3 201:23
**were** 3:16 8:18
12:19 14:11,15,16
14:19 15:24 17:4
20:5,10 24:16,17
24:22 25:15 39:1
39:20,24 42:5,6
45:12 66:20 69:24
70:18 72:5 80:22

82:1 83:12 90:16
92:3 93:16 103:16
113:5 124:13
127:16 129:23
130:8 143:3 153:9
154:14 156:4
157:19 158:21
160:21,23 161:7,8
163:2,19,22 164:5
164:8 178:10
190:1 192:10,15
193:7,10 194:6
**weren't** 43:1
175:13
**WEST** 1:7
**we'll** 20:8 44:15,15
83:5 133:12 139:3
145:6
**we're** 6:8 37:17
43:5 56:7 62:15
87:20 104:21
107:15 162:5
163:8 173:22
176:21
**we've** 10:1,10 25:3
28:1 38:17 40:24
41:20 56:12,23
107:12,12,15
126:16 138:24
155:5 156:10
168:17 171:20
177:23 178:5
180:21 199:9
203:22
**WHEREOF**
205:13
**while** 133:15
195:17
**wished** 41:22
**witness** 1:15 3:2 4:6
7:1 9:8 10:24 11:6
16:21,23 20:19
21:17 22:9,16
23:4 24:11,14
25:9,18 26:19,20
27:8 28:17,24
29:24 32:13 33:4
33:16 34:8 35:21
36:22 37:8 38:16
40:15,20 41:1
43:8 45:7,13
50:10,24 52:6,22
53:7,10 54:2 55:8
55:16 56:5,11
57:6,20 58:2,12
58:20 59:2,12,23

60:14,16 61:4,14
61:23 62:10 63:5
63:22 64:15 65:19
66:17 68:12,21
69:10 70:7 71:5
73:3,15,17 74:5
74:21 76:2,13
77:1,4,14 78:8
79:3,19 80:13
81:6,18 82:9,11
82:17 83:19 84:12
85:9 86:3,19
87:11 88:15 90:1
91:5,10 92:17
95:17 96:8 97:16
98:1,22 99:23
100:24 101:24
102:8 104:5 105:4
105:15 107:4
108:2 111:22
112:24 113:19,21
114:8 115:4
117:14 118:5,22
119:5 122:2 123:2
123:19 125:4,15
126:7 127:1
129:12 130:5
131:10 132:11
133:4,9 134:22
135:15 137:9
138:18 140:1,16
141:5 142:22
143:20 144:12
145:8,17 149:9
150:21 152:13
153:16 154:3,6
155:4 157:10
159:3,21,22
161:16 162:10
164:24 166:9
167:21 168:13
169:19 171:5,20
172:23 173:12
175:1,8 176:13
177:16 179:21
181:3 184:21
185:15 186:10
187:23 189:24
190:20 192:8,20
193:15 194:1,4
195:10 198:7
200:20 201:22
202:24 203:22
205:6,13
**witness's** 21:16
25:2 81:4 86:17

105:14 108:16
111:21 123:1
135:14 156:8
165:19 173:11
179:19 180:20
192:19 200:15
203:10
**word** 76:14 112:11
177:19
**words** 50:12 59:16
88:16,20 90:3
103:20 104:6
150:10 153:8
161:2 176:2
**work** 22:5 48:10
92:23 105:6 135:6
**worked** 33:10
168:17
**working** 29:11
64:17 66:4 171:20
**works** 26:13 31:18
47:20 88:16,21
99:12 198:19
**wouldn't** 92:18
162:5
**writing** 71:16,18
**writings** 75:3
**written** 1 70:16,24
171:13 172:6
184:13 187:9,17
188:23
**wrong** 76:14
**wrote** 41:3
**W.P** 146:5 147:10
147:19,22,24
148:1 153:1

**X**
**X** 3:1,6
**X-number** 45:19

**Y**
**Yeah** 79:3 80:10
81:6 157:7 160:17
181:14 196:15
**year** 46:22 47:1
109:22 112:6,7,8
112:20 113:12,14
113:15 114:3
143:20 144:2
174:4
**years** 6:5 33:10
72:7,8 74:9
143:24 144:4,14
149:24
**yesterday** 132:1,4
189:14

**York** 6:15 121:9,11
121:22

**$**
**$10** 131:4
**$50** 49:12 130:13
140:23 152:9,13
152:14

**0**
**0003** 150:5
**001** 3:9 14:5,18
67:3 68:6 69:19
106:21
**002** 3:9 14:6,18
64:24 69:2 71:17
75:2 112:7 121:21
**02109** 1:24 2:9

**1**
**1** 1:2 3:8 4:3 6:20
7:6 8:9 9:5 12:18
14:10,20,23 21:1
30:11,11 40:17
65:15,19 106:19
119:19 138:20
154:19,21 182:8
197:16 199:6
**1:07** 204:5
**10** 66:11 67:1 152:5
186:8,10 200:2
**10th** 13:23 69:22
**100** 140:10
**11** 80:22 139:12
163:7,23 179:15
180:15
**11th** 13:21 68:5
69:21 70:1 158:9
158:22 159:18
160:4,24 161:4
165:8
**12** 136:24
**120** 3:10
**1200** 2:13
**13** 3:9 136:13
**131** 3:11
**137** 3:12
**14th** 205:13
**149** 3:13
**15** 205:20
**168th** 1:5 4:18
**17** 136:9
**17th** 2:4
**18** 66:1 89:17
**1999** 47:3 48:24
49:4,5,7,8 130:13
130:17,24 141:2

**2**
**2** 3:9 7:6 13:3,5,14
13:18,24 64:24
68:6 106:17,19
121:21 141:16,17
141:18 147:18
148:4,4,7 152:24
155:10 158:6
166:14,19,21
176:22 180:4
**20** 134:1
**2000** 48:3
**2001** 144:3 152:22
**2002** 13:21,23 47:4
66:11 67:1 68:5
69:22,23 70:1
80:22 83:21
130:14,17 131:2
144:5 158:9,22
160:4,24 163:7,13
163:23 178:11
179:8,15 180:15
197:18
**2003** 111:7,9,15,16
112:18,20 144:5
176:24 179:16
180:16
**2004** 144:5 162:13
177:17
**2005** 1:20 129:18
132:1 205:13
**2006** 205:20
**205** 1:1
**22nd** 176:24
**23rd** 176:24
**248-5000** 2:9
**27th** 39:21 42:3
144:3,5
**29th** 129:18 132:1

**3**
**3** 3:10 7:6 110:9
120:1,18 121:2
129:5 133:2
156:19 157:9
**30** 1:20
**30(b)(6)** 7:16 103:2
183:24
**31** 179:16 180:16
**322-3925** 1:24
**341-6000** 2:5
**3500** 2:13
**374-3208** 2:14

**4**
**4** 1:23 3:4,11

120:22 131:17
157:20 181:11
182:8
**402** 2:5
**409** 2:4
**45** 189:20 195:15
195:18

**5**
**5** 3:12 8:13,15,17
9:16,21 38:13,17
39:2,4,13,15
40:19 41:6,8,9,19
47:9 56:10 137:17
137:19,23 139:21
140:9 141:19
144:1 147:20
150:7 152:6,8,13
152:18 153:8
173:21,22 182:21
183:3,17 185:21
186:6,9,10,21
199:9,9 203:7
**50** 130:24
**500** 2:3
**53** 1:19 2:8

**6**
**6** 1:2 3:8,13 65:15
65:19 149:12,14
149:19 151:8
188:12
**617** 1:24 2:9
**64** 105-2100 2:14
**68** 102-2663 2:4

**7**
**7** 40:17 65:11,13
66:1 89:16 197:17
199:6
**723-9432** 1:24

**8**
**8** 8:16,17 40:12,14
41:6,9 47:9 56:10
**800** 1:24
**816** 2:14

**9**
**9** 146:4,10,10
**9:15** 1:21

071905SR.txt


08:58:37                IN THE UNITED STATES DISTRICT COURT

08:58:37                   FOR THE DISTRICT OF NEBRASKA

08:58:37

08:58:37    168th AND DODGE, L.P., ET AL.,)
08:58:37                                 )
08:58:37                    Plaintiffs,  )
08:58:37                                 )
08:58:37          vs.                    )    No. 8:03CV171
08:58:37                                 )
08:58:37    RAVE REVIEWS CINEMAS, LLC.,  )
08:58:37                                 )
08:58:37                    Defendant.   )
08:58:37    _____)
08:58:37

08:58:37

08:58:37            VIDEOTAPED DEPOSITION OF SCOTT REHORN
08:58:37
08:58:37

08:58:37

08:58:37                      Phoenix, Arizona
08:58:37                       July 19, 2005
08:58:37                        9:02 a.m.
08:58:37
08:58:37
08:58:37
08:58:37
08:58:37
08:58:37
08:58:37
08:58:37    (Copy)
08:58:37
08:58:37    PREPARED FOR:              REPORTED BY:
08:58:37                              Lori L. Yeager, RPR, CRR
08:58:37    MS. LYNN S. McCREARY       Certified Court Reporter
08:58:37    Attorney at Law            CCR No. 50408
08:58:37




                AZ LITIGATION SUPPORT, LLC    (480) 481-0649
[]
                                                                    2

08:58:37   1                    I N D E X

08:58:37   2   EXAMINATION:                              PAGE:

EXHIBIT 11

071905SR.txt
16:49:25 17      A.      Not to my knowledge that I memorialized it
16:49:29 18  anywhere.
16:49:30 19      Q.      Okay.  What's your recollection of that
16:49:34 20  conversation?
16:49:35 21      A.      My recollection of the conversation was Bob
16:49:37 22  and Tom called and said that we have bad news, that our
16:49:48 23  deal was turned down by Boston Ventures and by Elizabeth
16:49:54 24  whatever her name is, Smith, and Tom was apologetic and
16:50:01 25  said that -- I said this was supposed to be a formality,
                        AZ LITIGATION SUPPORT, LLC    (480) 481-0649
⬜
                                                                    290

16:50:07  1  and he said it was supposed to be a formality.  And he
16:50:11  2  then explained to me that they were presented a deal or
16:50:21  3  did a deal, I don't know if it went to committee on that
16:50:25  4  date or not, with Continental Properties in North
16:50:28  5  Cincinnati, and because Continental had to -- because
16:50:36  6  Continental was in competition with three other -- two
16:50:40  7  other developers, they basically bought Rave Theaters and
16:50:47  8  said we're going to give them a free deal, or I'm not
16:50:52  9  exactly sure what the deal was, but Bob called Elizabeth
16:51:01 10  a bean counter and said that she didn't understand the
16:51:04 11  real estate transaction, she was just looking at the
16:51:07 12  numbers, and her comment was:
16:51:09 13              Why would I approve a deal like this when
16:51:11 14  there's other deals out there, such as this deal in North
16:51:18 15  Cincinnati.
16:51:19 16              And they said:
16:51:21 17              You can thank your friend Mr. Zigler, because
16:51:24 18  they know I know him.  As a matter of fact, I was the one
16:51:26 19  that introduced them to each other.  And so when I did
16:51:29 20  get off the phone, I called Mr. Zigler and thanked him
                                Page 253