UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| 168th and DODGE, L.P. (f/k/a BROWN INVESTMENT PARTNERSHIP, LTD.) and RED DEVELOPMENT OF WEST DODGE, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 05-MC-10293-RGS |
| vs. | ) ) | |
| RAVE REVIEWS CINEMAS, LLC, | ) ) | |
| Defendant. | ) ) | |

**AFFIDAVIT OF KATHLEEN B. SHIELDS IN SUPPORT OF
THIRD PARTY BOSTON VENTURES MANAGEMENT INC.'S
OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

I, Kathleen Burdette Shields, state under penalties of perjury that the following facts are true:

1.      I am a partner with the law firm of Choate, Hall & Stewart LLP, and am counsel of record for Third Party Boston Ventures Management Inc. ("Boston Ventures") in the above-captioned case. I submit this Affidavit in support of Boston Ventures' Opposition to Plaintiffs' Motion to Compel.

2.      Exhibit A to this Affidavit contains true and correct copies of selected excerpts from the deposition transcript of Boston Ventures' corporate designee, Elizabeth Granville-Smith, which was taken on June 30, 2005.

3.      On behalf of Boston Ventures, I sent a letter to Red's counsel on June 10, 2005 objecting to the second subpoena served on Boston Ventures by Red. After my June 10 letter,

1

counsel for Red did not contact me until the evening of June 28, two days before the scheduled

June 30 deposition of Boston Ventures' corporate representative. During our telephone

conversation on June 28, we discussed Boston Ventures' objections to Red's second subpoena.

Red's counsel stated that he was most interested in documents concerning the Board approval

process for new theaters that Rave wanted to build, and documents describing any procedure that

Boston Ventures may follow when deciding to approve or disapprove an individual theater that

Rave wanted to build. I informed Red's counsel that Boston Ventures continued to object to the

current scope of Topic 5 of Red's subpoena, but that if Red agreed to narrow the scope of Topic

5 to the documents he just described, I would consult with my client and may agree to a

compromise in which Boston Ventures would search for such documents. Red's counsel

responded that he needed to consult with his client and would let me know if he would so limit

Topic 5.

      4.      During our telephone call on the evening of June 28, Red's counsel also suggested

that he may want to postpone the scheduled June 30 deposition so that the parties' dispute over

Topic 5 could be resolved before the expense of the deposition was incurred. I agreed with that

approach and agreed to consult with my client to find other convenient dates for the deposition.

      5.      On June 29, I left two telephone messages for Red's counsel so that we could

continue our discussion about whether he would agree to compromise concerning the scope of

Topic 5 and whether he wanted to reschedule the June 30 deposition. My telephone calls were

not returned.

      6.      At about 4 p.m. on June 29, I received a faxed letter from Red's counsel. The

letter indicated that Red's counsel intended to proceed with the June 30 deposition. The letter

did not address our discussion concerning a compromise on Topic 5.  Red's counsel ultimately

refused to limit the scope of Topic 5.


Signed under the pains and penalties of perjury this 26th day of August, 2005.


/s/ Kathleen Burdette Shields
Kathleen Burdette Shields

3

EXHIBIT A

1                                      VOLUME:    I
                                       PAGES:    205
2                              EXHIBITS:  1 - 6

3

              IN THE UNITED STATES DISTRICT COURT
4                 FOR THE DISTRICT OF NEBRASKA

5

    168th and DODGE, L.P., a Nebraska      )
6   Limited Partnership f/k/a BROWN        )
    INVESTMENT PARTNERSHIP, LTD., and      )
7   RED DEVELOPMENT OF WEST DODGE, LLC     )
    a Missouri Limited Liability Company,  )
8                                          )
                              Plaintiffs,  )
9                                          )
    vs.                                    )
10                                         )
    RAVE REVIEWS CINEMAS, LLC, a Texas     )
11  Limited Liability Corporation,         )
                                           )
12                            Defendant.   )

13

14              **VIDEO DEPOSITION OF ELIZABETH**

15  **GRANVILLE-SMITH,** a witness called on behalf of the

16  Plaintiffs before Dawn Mack-Boaden, Court Reporter

17  and Notary Public in and for the Commonwealth of

18  Massachusetts, held at the Law Offices of Choate,

19  Hall & Stewart, 53 State Street, Boston,

20  Massachusetts, on Thursday, June 30, 2005,

21  commencing at 9:15 a.m.

22

23                  EYAL COURT REPORTING, INC.
                    4 FANEUIL HALL MARKETPLACE
24                BOSTON, MASSACHUSETTS  02109
               (617)  723-9432        (800)  322-3925

1      A.    Yes.

2      Q.    First of all, it asks you to produce all

3   correspondence, whether in electronic format or

4   otherwise, between Rave Reviews Cinemas, L.L.C.,

5   including its agents and employees, and Boston

6   Ventures Management, Inc., including its parents,

7   subsidiaries, agents and employees, regarding the

8   Village Pointe Shopping Center project in Omaha,

9   Nebraska.  Did I read that correctly?

10      A.    Yes.

11      Q.    Now, did you actually engage in this

12   search?

13      A.    Yes, I did.

14      Q.    What steps did you take to -- to look for

15   responsive documents?

16      A.    I reviewed all of my own personal Rave

17   files, as well as all my electronic files.  I then

18   reviewed all of the central files that we keep

19   within the firm, where we keep all of our deal

20   memoranda, et. cetera.

21          I then requested that every member of my

22   team do the same and asked for them to respond back

23   to me with the affirmative that either they had

24   found documents or they had not.  They were also

1    each given a copy of this subpoena.

2         Q.    Okay.  Now, Ms. Granville-Smith, is it

3    your testimony that there is no e-mails between

4    Boston Ventures and Rave Reviews Cinemas regarding a

5    potential theater engagement in Omaha, Nebraska?

6         A.    Based upon my review of our files, I did

7    not find any e-mail correspondence.

8         Q.    So -- okay.  Again, I'm following up so I

9    can understand you.

10        So it's your testimony for the judge and

11   the ladies and gentlemen of the jury that Boston

12   Ventures doesn't have a single e-mail communication

13   between any employee, agent of Boston Ventures and

14   any representative of the Rave Reviews Cinemas

15   regarding a theater project in Omaha, Nebraska?

16

17                  MS. SHIELDS:  Objection.

18                  MS. MCCREARY:  Objection; asked and

19             answered.  It's argumentative.

20                  MS. SHIELDS:  Same objection.

21                  THE WITNESS:  Shall I answer?

22                  MS. SHIELDS:  If you can.

23                  THE WITNESS:  Based upon my review of

24             our files, which I believe was thorough, I

EYAL COURT REPORTING, BOSTON, MA (800) 322-3925

1          found no e-mail correspondence.

2

3    BY MR. COYLE:

4          Q.    Now, were you actually -- did you have any

5    involvement in this particular engagement?

6

7                MS. SHIELDS:  Objection as vague.

8

9    BY MR. COYLE:

10         Q.    Did you have any involvement in -- in

11   Boston Ventures looking at a potential investment in

12   a Rave -- Rave Reviews Cinema project in Omaha,

13   Nebraska?  Did you have any involvement in that?

14         A.    I had no direct involvement.

15         Q.    What does that mean?  I mean, did people

16   on your team have involvement in that?

17         A.    No direct involvement.

18         Q.    I guess I -- I don't know what that means.

19

20                MS. MCCREARY:  I'm going to object.

21                I'm going to ask the court reporter if you

22                can read back his foundational question,

23                please.

24                COURT REPORTER:  The last question?

1           MS. MCCREARY:  His foundational

2      question.

3           MS. SHIELDS:  The not what does that

4      mean.  The one where there's actually a

5      substantive question.

6

7           (The question was read back as

8      follows:

9           "I mean, did people on your team

10     have involvement in that?")

11

12          MS. MCCREARY:  The one before that.

13

14          (The question was read back as

15     follows:

16          "Did you have any involvement in

17     Boston Ventures looking at a

18     potential investment in a Rave

19     Reviews Cinema project in Nebraska?")

20

21          MS. MCCREARY:  Thank you.

22          MR. COYLE:  Can you read my last

23     question back, please?

24

```
 1                        (The question was read back as

 2              follows:

 3                        "I mean, did people on your team

 4              have involvement in that?")

 5

 6   BY MR. COYLE:

 7       Q.    Now, you've answered -- let me follow up.

 8              You're telling me no direct involvement.

 9   I take it that direct involvement means that you

10   never personally sent an e-mail?

11

12                   MS. SHIELDS:  Objection; vague.  If

13              you can answer the question as posed,

14              please do.

15

16   BY MR. COYLE:

17       Q.    I mean, really, this is not meant to be

18   that hard.

19              I'm just trying to find out if there's --

20   is it your testimony, Ms. Granville-Smith, that you

21   never sent an e-mail to anybody at Rave regarding

22   Boston Ventures potentially participating in the

23   development of a theater complex in Omaha, Nebraska?

24       A.    I don't know whether or not I sent an
```

1    e-mail to them about that or not.

2        Q.    Okay.  Did -- did you ever have any

3    discussions with anybody at Rave about a potential

4    investment in a theater project in Omaha, Nebraska?

5        A.    I had knowledge that they were looking at

6    Omaha.  I had no direct involvement in the process.

7        Q.    Okay.  Now, let's go back to when you say

8    direct involvement -- and we'll talk about that in a

9    second, but my question is really a lot more narrow.

10        What I'm trying to find out is, is were

11    there ever any e-mail communications with

12    representatives of Boston Ventures and

13    representatives of Rave involving this project in

14    Omaha, Nebraska?

15

16            MS. SHIELDS:  Objection; asked and

17        answered.

18            MS. MCCREARY:  And foundation.

19            THE WITNESS:  I don't know if there

20        are any e-mails.

21

22    BY MR. COYLE:

23        Q.    Okay.  And let me tell you why I'm asking

24    you the question is, is that we sent out this

1    notice, Exhibit Number 1, and we asked Boston

2    Ventures to produce somebody who could testify about

3    these matters, and we asked you to bring with you

4    all e-mails between Boston Ventures and Rave

5    regarding this potential engagement in Omaha,

6    Nebraska, and none have been produced.  Can we agree

7    on that?

8        A.    None have been produced.

9        Q.    Okay.  Now, I understand that you sent out

10   a copy of the subpoena to all of your colleagues and

11   asked them, you know, to look; and, apparently,

12   nobody gave you any e-mails.  Is that what you're

13   telling us?

14

15            MS. SHIELDS:  Objection.  It misstates

16            the witness's prior testimony.

17            THE WITNESS:  I sent out the subpoena.

18            I asked people to review their e-mail

19            correspondence, all their electronic files,

20            as well as our print files.  And what I

21            received back is what I produced.

22

23   BY MR. COYLE:

24       Q.    Do you -- do people at Boston Ventures

1    routinely use e-mail?

2         A.    Yes.

3         Q.    And, certainly, Rave Reviews Cinema is

4    somebody that members of your team, so to speak,

5    work with on a daily basis; is that a fair

6    statement?

7

8                   MS. SHIELDS:  Objection.

9                   THE WITNESS:  Not on a daily basis.

10

11   BY MR. COYLE:

12        Q.    How about on a routine basis?

13

14                  MS. SHIELDS:  Objection.

15                  MS. MCCREARY:  Objection.

16                  THE WITNESS:  On a routine basis, we

17            discuss things with the management team of

18            Rave.

19

20   BY MR. COYLE:

21        Q.    Okay.  I mean, I'm just trying to figure

22   out what your testimony is on this.

23                  Are you telling us that there are no

24   e-mails?

 1  BY MR. COYLE:

 2      Q.    Okay.  Let me follow up on that.  What do

 3  you mean by company matter?

 4      A.    That's a vague question.  You'll have to

 5  be more specific.

 6      Q.    I'm just following up on your -- you said

 7  to me -- I asked you if it was unusual; you said no

 8  because this was a company matter; it had not

 9  reached the level of the board of managers.

10          And I'm just trying to figure out what you

11  meant by company matter.  What does that mean?

12      A.    The potential site in Omaha had not yet

13  reached a level of development in which it was

14  discussed in detail at the board of managers level.

15      Q.    Did the board of managers at Boston

16  Ventures discuss specific Rave projects for theater

17  sites?

18

19              MS. SHIELDS:  Objection.

20              MS. MCCREARY:  Objection.

21              THE WITNESS:  Your question is

22          incorrect.  You have to restate the

23          question.

24              MR. COYLE:  Okay.

1          A.    We have had business conversations with

2     members of the Rave management team prior to that.

3          Q.    Okay.  But your first equity commitment

4     was in 1999?

5          A.    In or around 1999.

6          Q.    Okay.  Was there a certain amount of money

7     that was committed in 1999?

8          A.    In or around 1999, we committed a first

9     installment, yes.

10         Q.    And how much was that?

11         A.    Fifty million dollars.

12         Q.    Okay.  Now, in regard to that $50 million

13    commitment, was there a protocol that was generally

14    followed by Boston Ventures and Rave about

15    individual sites?

16

17              MS. SHIELDS:  Objection; vague and

18         ambiguous.

19

20    BY MR. COYLE:

21         Q.    Do you understand my question?

22         A.    Could you restate it, please.

23         Q.    Well, I take it that you're not going to

24    build a theater in every, you know, city in America

1   BY MR. COYLE:

2       Q.    Just give me a general procedure.

3

4               MS. MCCREARY:  Objection; asked and

5           answered.  It's badgering.

6               MS. SHIELDS:  Same objection.

7               THE WITNESS:  Shall I answer?

8               MS. SHIELDS:  If you can answer the

9           question.

10              THE WITNESS:  In very general terms,

11          the management team at Rave reviews many

12          sites.  At any time, we could have five to

13          ten sites in different levels of analysis

14          and diligence.

15              At some point during the analysis of a

16          site, the Rave management team makes a

17          determination that they want to go forward

18          with the site; and they will bring an

19          approval book to the board of managers.

20

21  BY MR. COYLE:

22      Q.    And that board of managers would be the

23  board of managers at Boston Ventures?

24

EYAL COURT REPORTING, BOSTON, MA (800) 322-3925

1          conference calls, we approve and review

2          board approval books.

3

4  BY MR. COYLE:

5      Q.    Okay.  And once the board approval book is

6  approved, then the process can move forward to the

7  execution of a lease?

8      A.    It's a little more complicated than that.

9      Q.    But, generally, that would be the process?

10

11          MS. SHIELDS:  Objection.

12          THE WITNESS:  The process is we review

13          board books.  It takes a series of

14          conference calls, questioning, and analysis

15          by the Board.

16          In some cases, there are subsequent

17          diligence trips out to look at the site.

18          In some cases, we modify.

19          And then it moves in to lease

20          negotiations, which then takes a

21          considerable amount of time.

22

23  BY MR. COYLE:

24      Q.    Okay.  But you'll never get to the lease

1    general -- the process here; and I understand that

2    there might be a difference here and a difference

3    there.

4            But, generally, this due diligence on

5    these different sites is done by Rave; and then,

6    eventually, it reaches a process where they think if

7    it's a site that's suitable for Boston Ventures to

8    consider, they put together this approval book, and

9    then you look at that particular site.  Is that,

10   generally, a fair statement?

11

12           MS. MCCREARY:  Object to the form.  It

13        assumes facts not in evidence; calls for

14        speculation; vague.

15           THE WITNESS:  I would like to restate,

16        in my words, how it works.

17

18   BY MR. COYLE:

19    Q.    Okay.  Go ahead.

20    A.    Not agreeing to your words, necessarily.

21   As I sit here today, the approval process works as

22   such:

23           The management team of Rave reviews many

24   sites.  When they find a site that they believe

1    merits being in the Rave portfolio and they have

2    completed the majority of their analysis and

3    diligence on the opportunity, they bring it to the

4    attention of the board of managers.

5        Q.    All right.  How many people are on the

6    board of managers?

7        A.    As I sit here today, I believe it's five.

8        Q.    And three of those board of managers would

9    be from Boston Ventures?

10       A.    Yes.

11       Q.    Okay.  Was a approval book presented by

12   the Rave management team to the board of managers

13   for the site in Omaha, Nebraska?

14       A.    No, it was not.

15       Q.    Now, are -- can there be sites on the

16   theater pipeline -- and looking at this list of 7

17   through 18 -- where the Rave management team could,

18   on their own, decide that it's not something they

19   want to present to the board of managers of Boston

20   Ventures?

21

22            MS. MCCREARY:  Object to the form.

23            Calls for speculation and lacks foundation.

24            MS. SHIELDS:  Object; vague.

1            THE WITNESS:  I think it's complicated

2        the way you phrased it.  I'll answer it in

3        my own words.

4            The management team decides to pursue

5        or not pursue sites based upon their own

6        analysis.  Only when they decide they want

7        to pursue a site and bring it to the board

8        of managers are we notified.

9

10    BY MR. COYLE:

11    Q.    And -- and it's your testimony that the

12    Rave Reviews Cinemas never brought the Omaha,

13    Nebraska theater complex to the board of managers

14    for Boston Ventures for their approval?

15    A.    As I said earlier today, I knew about

16    Omaha; that they were looking at it.  It was never

17    brought for approval to the board of managers.

18    Q.    Was it -- so is it your testimony that

19    Boston Ventures -- well, let me back up.

20            Has a --- has a theater project site been

21    brought to the board of managers of Boston Ventures

22    where they've -- they've made a decision not to

23    invest?

24

1              MS. SHIELDS:  Objection; calls for

2         speculation.  It's beyond the scope of the

3         subpoena.  I'll permit Ms. Granville-Smith

4         to answer the question.

5              THE WITNESS:  Okay.  One point:  You

6         keep saying -- your terminology is

7         incorrect, and I want to make sure it's

8         clear for the record.

9              MR. COYLE:  Okay.

10             THE WITNESS:  Board of managers of

11        Rave.

12

13   BY MR. COYLE:

14        Q.    I understand.

15        A.    Okay.  But please be clear.

16        Q.    Thank you.  So has there ever been a -- a

17   site that's been brought to the board of managers

18   that they decided not to pursue?

19        A.    As I said earlier today, we spend a lot of

20   time on the approval books and make modifications

21   about sites.

22             I can not recall, as I sit here today, a

23   specific site that was vetoed.  But, certainly, many

24   sites have been modified or put on the back burner

1    for periods of time as we prioritized the needs of

2    the company.

3         Q.    Okay.  Were you ever presented with an

4    approval book on the Omaha theater?

5         A.    No, I was not.

6         Q.    Is it your testimony that no such approval

7    book was ever submitted to the board of managers?

8         A.    To the best of my knowledge, I do not

9    believe any approval book was ever submitted to the

10   board of managers.

11        Q.    Do you -- do you know why no approval book

12   was ever submitted to the board of managers

13   regarding the proposed Rave site in Omaha, Nebraska?

14

15             MS. SHIELDS:  Objection; calls for

16         speculation.

17             THE WITNESS:  I would have to

18         speculate.  It wouldn't be within my

19         knowledge base.

20

21   BY MR. COYLE:

22        Q.    Well, I mean, it's on your list.  I take

23   it you work with these people every day.

24             Did you ever say to Tom, Hey, what

```
 1        A.     Yes, I am.

 2        Q.     I want to go back to this approval book --

 3   this approval process.  Okay.

 4               Now, is there information that you -- that

 5   is -- you typically see in an approval book?

 6

 7               MS. SHIELDS:  Objection.

 8               THE WITNESS:  Yes, there is typical

 9          information in an approval book.

10               Some sites may require specific

11          additional information.

12

13   BY MR. COYLE:

14        Q.     What kind of -- what kind of information

15   would you typically see in an approval book?

16        A.     As I said earlier today, among other

17   things, there would be a description of the

18   opportunity; description of the market, including

19   demographics, size; a description of the competitive

20   situation; and, typically, a description of the

21   potential lease terms.

22               The approval book might include maps,

23   among other things.

24        Q.     What do you call the -- is there some kind
```

1    of proforma financial?  What do you call that?

2          I mean, I take it that there's some

3    numbers -- analysis of projections of revenue and

4    things of that nature.  What do you call those?  Is

5    that an FY?

6

7              MS. SHIELDS:  Objection; calls for

8          speculation.

9

10   BY MR. COYLE:

11      Q.    What is the term?  Is there a term you use

12   for that or --

13

14             MS. SHIELDS:  Assumes facts not in

15         evidence.

16             THE WITNESS:  I really don't

17         understand what you're asking me.

18

19   BY MR. COYLE:

20      Q.    Is there -- is there some type of -- of

21   projections of revenue?

22

23             MS. MCCREARY:  Objection as vague;

24         assumes facts not in evidence.

1            THE WITNESS:  In our approval books,

2        there would typically be an assessment of

3        the level of attendance expected to be

4        generated by the potential cinema, which

5        would then translate into a revenue

6        expectation.

7

8  BY MR. COYLE:

9      Q.    Okay.  Now, let's go back to some of the

10  other things you described for me.

11          A lease:  Would you see a lease in your --

12  in your approval book?

13      A.    The approval books typically have, but not

14  all of them, but they would typically include the

15  economic terms that the management team believed

16  they could get from the developer.

17      Q.    Okay.  And would you -- and those are --

18  the economic terms you'd get from the developer,

19  would you, on occasion, see, then, an actual lease?

20

21          MS. SHIELDS:  Objection.

22          THE WITNESS:  As I sit here today, I

23        don't recall a situation where I saw a

24        lease at the time of the approval.  It

1             typically occurs much later.

2

3     BY MR. COYLE:

4        Q.     Okay.  And what do you mean it typically

5     occurs much later -- the lease?  Could you describe

6     that for me, please; explain.

7        A.     What typically occurs is the management

8     team determines what they believe the economics to

9     be of the lease and the terms of that lease; but we

10    wait until we have approval by the Board before

11    launching into very detailed lease negotiations.

12             That's the way it typically works.  But,

13    again, each deal is different.

14       Q.     Well, when you say each -- I understand

15    every -- every site has some unique factors

16    associated with it; is that what you're saying?

17

18             MS. MCCREARY:  Objection.

19             MS. SHIELDS:  Objection.

20             MS. MCCREARY:  Misstates her

21         testimony.

22             MS. SHIELDS:  Same objection.

23             THE WITNESS:  What I'm saying is that

24         each site has unique elements to it;

1        potentially unique timetables.

2            And what I said earlier is that

3        typically the lease negotiations occur

4        after we have an approved deal that has

5        gone through the board of managers approval

6        process.

7

8    BY MR. COYLE:

9        Q.    Okay.  Now, when you talk about economic

10   terms from the developer -- and, again, I understand

11   that each particular site might have some --

12   something unique about it -- will -- will the board

13   of Rave ever look at the proposed terms from a

14   developer and say, Hey, we need -- you know, we

15   don't like these terms, see if you can go back and

16   get this, this, and this.

17            Would that be unusual for you to have

18   something like that?

19

20            MS. SHIELDS:  Objection; calls for

21        speculation, and compound.

22            MS. MCCREARY:  Objection as to

23        definition of board.  It's vague.

24            THE WITNESS:  As I said earlier today,

1         I can recall various times going back and

2         asking the management team to modify terms

3         about sites.

4              And then when they get more in to the

5         lease negotiations, I review those leases

6         and have pushed back on various times on

7         economic terms.

8

9    BY MR. COYLE:

10        Q.    Okay.  And when you say push back, that --

11   that's a term where you'll want to negotiate further

12   -- the terms?

13        A.    Yes; or just say no.

14        Q.    Okay.  So will -- there will be sites

15   where you'll actually review the lease?

16        A.    As I sit here today, I can tell you that I

17   have reviewed the majority, if not all, of the

18   leases that Rave has signed.

19        Q.    Okay.  Now, are all of the Rave theater

20   ~~sites -- these are -- these are stadium-type seating~~

21   theaters; is that correct?

22

23             MS. SHIELDS:  Objection.

24             THE WITNESS:  Yes; all of the cinemas

1          have stadium seating in them.

2

3   BY MR. COYLE:

4       Q.     Okay.  And these are all brand new

5   theaters?

6

7                   MS. SHIELDS:  Objection.

8                   THE WITNESS:  We built all the -- all

9          the cinemas for ourselves, yes.

10

11  BY MR. COYLE:

12      Q.     I mean, you're not -- you're not buying,

13  you know, Ajax Cinema on Fourth Street and

14  remodeling it.

15              These are -- these are sites that Rave is

16  building from the ground up.

17      A.     At this stage, our strategy has not been

18  one of acquisition, but rather of new build.

19      Q.     Okay.  Now, I take it that -- are some of

20  your sites, then, in new developments?

21

22                  MS. MCCREARY:  I'm going to object to

23          the characterization of your sites.

24                  She's here on behalf of Boston

1          Ventures.  She's not produced in accordance

2          with a 30(b)(6) notice for Rave.

3

4   BY MR. COYLE:

5          Q.     You can answer.

6          A.     At Rave, the company builds in many

7   different locations.  One of the locations happens

8   to be within leisure and retail development.

9          Q.     Okay.

10         A.     That's one scenario, yes.

11         Q.     Okay.  And have you had -- have you had

12  situations where Rave is going in as one of the --

13  the initial tenants of a new development?

14         A.     That is certainly something we try to

15  avoid; but I can't recall specifically if, in any

16  situation, we were the first tenant.

17         Q.     Well, I guess my point is, is that are

18  some of these potential sites driven -- have time

19  constraints on them?

20              In other words, there's going to be a

21  grand opening of a -- of a new retail development

22  of, you know, of maybe some stores and some shops

23  and -- that Rave would open with at the same time?

24

1          MS. MCCREARY:  Objection; lacks

2      foundation, calls for speculation.

3          MS. SHIELDS:  Objection; compound and

4      ambiguous.

5          THE WITNESS:  I'm going to restate the

6      answer in my own words.

7          It's very difficult to put these

8      general terms against what is really a very

9      specific situation with each site.

10         If you review leases that the company

11     has, in certain of those leases there are

12     times associated upon which the developer

13     would like us to be open at; but,

14     certainly, not in every single case.

15

16  BY MR. COYLE:

17     Q.    Okay.  And I understand.  And what I'm

18  saying is, is that some times in your approval

19  process, that could potentially be a factor; that,

20  you know, we need to make a decision on this within

21  this time period if we're going to be part of this,

22  you know, grand opening.

23

24          MS. MCCREARY:  Object to the form;

1  leading, calls for speculation, and assumes

2  facts not in evidence.

3         MS. SHIELDS:  Same objection.

4         THE WITNESS:  I think you're putting

5  your own spin on this.  It just doesn't

6  work that way.

7

8  BY MR. COYLE:

9    Q.    Okay.  So there's never a time -- as far

10  as these potential sites, none of them are time

11  sensitive?

12

13         MS. SHIELDS:  Objection; misstates the

14         witness's prior testimony.

15         THE WITNESS:  My statement to this

16         question is that there typically is

17         significant time -- lead time -- ahead of

18         an opening such that the board approval

19         process typically is not constrained by

20         time factors.

21         MR. COYLE:  Let's -- can we take a

22         recess for just one minute.

23         Let's go off the record, please.

24

1    management at Rave?

2

3            MS. SHIELDS:  Objection; asked and

4        answered several times.

5            THE WITNESS:  I do believe I have

6        already answered this a couple of times.

7            But I had no knowledge -- I don't know

8        if they were in discussions on the lease

9        terms to the Omaha site.

10

11   BY MR. COYLE:

12   Q.    Okay.  Now, earlier in the deposition you

13   talked about a 1999 commitment of $50 million and

14   then a second commitment in 2002.  Do you remember

15   that?

16   A.    What I said at that time is that it was in

17   and around 1999 and in and around 2002.

18   Q.    Okay.

19   A.    Those are the approximate dates.

20   Q.    That's fine.

21   A.    Okay.

22   Q.    I understand.

23   A.    Okay.

24   Q.    And in 1999, it was 50 million?

1    A.    Yes.

2    Q.    And what was the commitment in 2002?

3    A.    In and around that time, we committed an

4 additional $10 million.

5    Q.    And when you talk about this commitment,

6 that is not for any specific site, but for

7 investments in numerous sites.

8

9         MS. SHIELDS:  Objection.

10        THE WITNESS:  The commitment in the

11        equity is used to fund the operations of

12        the company, including capital expenditures

13        required to build new cinema sites.

14

15 BY MR. COYLE:

16    Q.    Okay.  I want you to pick up Exhibit

17 Number 4.

18    A.    Okay.

19    Q.    Are you familiar with the Boston Ventures

20 web site?

21    A.    I've been on the Boston Ventures web site

22 from time to time.  I'm not responsible for its

23 content or the updating of it.

24    Q.    I understand.  I will tell you that this

1    granted to W.P. Carey, have all of the voting

2    rights, including the ability to elect the Board of

3    Managers and certain preferences over B and C Units

4    as it relates to return of invested capital, among

5    others.

6            Did I read that correctly?

7        A.    No, you didn't, actually.  It's Boston

8    Ventures Limited Partnership 5.  But all other words

9    were correct.

10       Q.    Okay.  And as far as the ability to elect

11   the Board of Managers of Rave Reviews Cinemas,

12   Boston Ventures still has that power?

13

14           MS. SHIELDS:  Objection; calls for a

15           legal conclusion.

16           THE WITNESS:  I would have to review

17           our current LLC agreement to give you a

18           very specific and certain answer to that.

19

20   BY MR. COYLE:

21       Q.    Okay.  Is it your testimony,

22   Ms. Granville-Smith, that Boston Ventures does not

23   have that power?

24

EYAL COURT REPORTING, BOSTON, MA (800) 322-3925